Page 1

Hearing in the Matter of:

J████ A█████████

Thursday, December 20, 2007

9:16 a.m.

Job No.:  120843

Volume 1 of 1

Transcribed by:  Bonnie Panek

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 2

1                      C O N T E N T S

2    OPENING STATEMENTS:                              PAGE
          By Mr. Bogin                                 15
3         By Ms. George                                16

4    EXAMINATION OF MS. OWENS:
          By Mr. Bogin                                 20
5         By Ms. George                                51
          By Mr. Bogin                                 69
6
     EXAMINATION OF DR. DOYLE:
7         By Mr. Bogin                                 75
          By Ms. George                                97
8         By Mr. Bogin                                103

9    EXAMINATION OF MS. HUMES:
          By Mr. Bogin                                113
10        By Ms. George                               114

11   EXAMINATION OF MS. STEVENSON:
          By Mr. Bogin                                116
12        By Ms. George                               117

13   EXAMINATION OF MS. MATTHEWS:
          By Ms. George                               120
14        By Mr. Bogin                                130
          By Ms. George                               140
15
     EXAMINATION OF MS. JOHNSON:
16        By Ms. George                               145
          By Mr. Bogin                                174
17        By Ms. George                               193

18   EXAMINATION OF MR. ANDERSON:
          By Mr. Bogin                                201
19        By Ms. George                               209

20   EXAMINATION OF MS. STEELE:
          By Mr. Bogin                                211
21        By Ms. George                               219
          By Mr. Bogin                                221

22

Case 1:08-cv-00580-RJL   Document 8   Filed 07/03/2008   Page 3 of 45
HEARING IN RE: J██████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 3

1               P R O C E E D I N G S

2           (The hearing began at 9:16 a.m. as follows:)

3           HEARING OFFICER:  Okay.  Good morning.  This

4   is the matter of J████ A█████ born ██████████, 2003.

5   Today is Thursday, December 20th, 2007.  We are in

6   Hearing Room 5A and it is approximately 9:15.  This

7   hearing concerns the special education services being

8   provided by the District of Columbia Public Schools and

9   is authorized by the IDEA of 2004.

10          This hearing is being recorded and a copy of

11  the recording and/or transcript can be obtained by

12  making a written request to the Student Hearing Office.

13  This hearing is confidential and will remain private

14  unless the parent petitioners express that they wish

15  this to be made a public hearing.  My name is Will

16  Purcell.  I am the hearing officer.  I'll now ask those

17  in attendance to identify themselves for the record.

18          MS. GEORGE:  Good morning.  Laura George,

19  attorney for D.C. Public Schools.

20          HEARING OFFICER:  Good morning.

21          MR. BOGIN:  Matthew Bogin representing ██████

22  and his parents.

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 4

1          HEARING OFFICER:  Good morning.

2          MS. OWENS:  Stephanie Owens, educational

3   advocate.

4          HEARING OFFICER:  Good morning.

5          MS. STEELE:  Alicen Steele, J█████ mom.

6          HEARING OFFICER:  Good morning.

7          MR. ANDERSON:  Carl Anderson, J█████

8   father.

9          HEARING OFFICER:  Good morning, sir.

10         MS. STEVENSON:  Erin Stevenson, occupational

11  therapist.

12         HEARING OFFICER:  Good morning.

13         MS. MASSEY:  Kristin Massey, occupational

14  therapist.

15         HEARING OFFICER:  Good morning.  Counsel,

16  does the parent wish to waive a formal reading of the

17  parental rights?

18         MR. BOGIN:  Yes.

19         HEARING OFFICER:  Are there any preliminary

20  matters?

21         MR. BOGIN:  Well, as I told you off the

22  record the special master's -- I'm not sure whether it

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1  will be relevant, but the special master scheduled a

2  hearing for me at 2:30 so I need to leave here by 2:00

3  at the latest.

4        HEARING OFFICER:  Okay.  Do you have an

5  approximate time for your case in chief?

6        MR. BOGIN:  I would suspect about two and a

7  half hours.

8        HEARING OFFICER:  Ms. George.

9        MS. GEORGE:  Given that the whole day was

10  scheduled I alerted my witnesses that I'd probably be

11  calling them after lunch.  If I do have to call them

12  earlier than that there might be a problem, but I'll

13  call them and ask if they're available before lunch if

14  that has to happen.  I mean, it was scheduled for all

15  day so I was just trying to give them a head's up.

16        MR. BOGIN:  I understand that.  The special

17  master scheduled the hearing yesterday, so there was

18  not much I could do.

19        HEARING OFFICER:  Would it make sense to try

20  to navigate with your witnesses now or you want to

21  break in about a couple of hours and put everyone on

22  notice?

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1          MS. GEORGE:  Either way.  If you prefer me

2     to try to call them now I can.

3          HEARING OFFICER:  When do you think they'll

4     be available?

5          MS. GEORGE:  I alerted them that they should

6     be available after lunch.

7          HEARING OFFICER:  Oh, after lunch.  Okay.

8     How much time would you need?

9          MS. GEORGE:  To call them?

10         HEARING OFFICER:  Yes.

11         MS. GEORGE:  Five minutes.

12         HEARING OFFICER:  Okay.  Let's go off record

13    five minutes.

14         MS. GEORGE:  Okay.

15         HEARING OFFICER:  And let her put her

16    witnesses on notice.

17         MS. GEORGE:  Okay.

18         (There was a brief recess in the

19    proceedings.)

20         HEARING OFFICER:  We're back on record in

21    the matter of J████ A███████ born July 29th, 2003.  Do

22    we have any other preliminary matters?

HEARING IN RE: J███████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1          MS. GEORGE:  Oh, I'd like to invoke the rule

2     against witnesses, please.

3          MR. BOGIN:  Okay.

4          HEARING OFFICER:  Okay.  All those witnesses

5     with the exception of the parent petitioners will be

6     asked to wait in the petitioner room and then we'll

7     call you out when we're ready for your testimony.

8          MR. BOGIN:  We're going to keep our first

9     witness.

10         MS. GEORGE:  Sure.

11         HEARING OFFICER:  That's fine.

12         MR. BOGIN:  You stay.

13         HEARING OFFICER:  I have before me a 5-day

14    disclosure dated December 13th, 2007.  It attaches 33

15    documents and lists 10 witnesses.  Ms. George, are

16    there any objections to petitioner's five-day

17    disclosure?

18         MS. GEORGE:  No objections.

19         HEARING OFFICER:  Okay.  Do we have a

20    five-day disclosure from DCPS?

21         MS. GEORGE:  Yes, we do.

22         HEARING OFFICER:  Thank you.  I have a 5-day

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 8

1    disclosure dated December 14th, 2007.  It lists eight

2    witnesses and attaches nineteen documents.  Counsel,

3    are there any objections to --

4              MR. BOGIN:  I have one with six witnesses

5    that says amended.

6              MS. GEORGE:  It was --

7              HEARING OFFICER:  That's what I have.

8              MS. GEORGE:  I have this -- another amended

9    page was sent to you on the same day, and I've got a

10   fax confirmation here that the one page was changed and

11   was sent.  I can show that to you.  In fact, it's in

12   the back of that there.  It's the second to the last

13   page.  That lists eight witnesses.

14             MR. BOGIN:  Well, all I know is that what's

15   shown on the back page is what I have, which is six

16   witnesses and the cover letter is dated December 14th,

17   so I'm kind of curious.  That was faxed on December

18   13th.  I don't have a problem with what I have.

19             HEARING OFFICER:  Do you want to identify --

20             MS. GEORGE:  It probably isn't going to

21   matter, but I have the date as December 13th on both of

22   the sheets.

HEARING IN RE: J██████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1          HEARING OFFICER:  Let him see -- I guess

2     what he's saying, on the fax cover sheet itself it only

3     lists six witnesses, so if you have anything that

4     actually lists eight --

5          MS. GEORGE:  It's on a page before that I

6     think --

7          HEARING OFFICER:  Oh.

8          MS. GEORGE:  -- is it not?

9          HEARING OFFICER:  Correct.

10         MS. GEORGE:  Yeah.

11         MR. BOGIN:  No, but that's not -- there's a

12    -- this letter is dated December 14th.

13         HEARING OFFICER:  Okay.

14         MR. BOGIN:  This letter is dated December

15    13th.  It's not the same document.  I don't know

16    whether it makes any difference, but it's not the same

17    document.

18         HEARING OFFICER:  Do you want to see what --

19         MS. GEORGE:  Yeah.  Well, I've got the same

20    thing here.

21         HEARING OFFICER:  Okay.

22         MS. GEORGE:  Well, in any event this was

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 10

1   sent to your office and it has all eight witnesses

2   listed, and that was the only change.

3              HEARING OFFICER:  Okay.  So then -- let's

4   see here.  The two additional witnesses are a Marion

5   McDowell (phonetic) and Monica Harris?

6              MS. GEORGE:  Yes, but I'm probably not

7   calling them anyway.

8              MR. BOGIN:  I don't have a -- I just want to

9   know what --

10             HEARING OFFICER:  Okay.

11             MR. BOGIN:  I'm not objecting.

12             MS. GEORGE:  I apologize.  I know.

13             MR. BOGIN:  I'm just trying to figure out

14  what's what.

15             HEARING OFFICER:  Okay.  We'll admit DCPS's

16  five-day disclosure and petitioner counsel's five-day

17  disclosure.

18             MS. GEORGE:  Thank you.

19             HEARING OFFICER:  Any other preliminary

20  matters?

21             MR. BOGIN:  Yes, I have one.  DCPS -- well,

22  let me say it differently.  The record does not

Case 1:08-cv-00580-RJL    Document 8    Filed 07/03/2008    Page 11 of 45
HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 11

1    disclose that DCPS ever filed a response to the due

2    process hearing pursuant to 1415C2B(i)(ii), and in

3    accord with Massey versus the District of Columbia.

4             HEARING OFFICER:  Okay.

5             MS. GEORGE:  I have a response to that.

6             HEARING OFFICER:  Sure, Ms. George.

7             MS. GEORGE:  A case dated October 31st,

8    2007, Evelyn Sykes versus District of Columbia, the

9    court ruled that under the IDEA it does not specify

10   default as a penalty for failure to serve an

11   appropriate response (inaudible).

12            MR. BOGIN:  I didn't ask for a remedy yet.

13            MS. GEORGE:  Okay.

14            MR. BOGIN:  I just wanted to establish that

15   there is no response.

16            HEARING OFFICER:  Okay.

17            MR. BOGIN:  And I think that's conceded,

18   correct?

19            MS. GEORGE:  It's conceded.

20            MR. BOGIN:  And so we would ask that DCPS,

21   because we have no opportunity to know what DCPS is

22   controverting in our complaint, be barred from putting

HEARING IN RE: J▆▆▆▆ A▆▆▆▆▆
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 12

1   on any evidence because we're unable to prepare.

2              HEARING OFFICER:  Ms. George.

3              MS. GEORGE:  Isn't barring us from putting

4   on evidence just the same as a default?

5              MR. BOGIN:  No.

6              MS. GEORGE:  I mean, substantively it's the

7   same.  You're saying that we don't get to defend

8   ourselves.

9              MR. BOGIN:  No, I didn't -- I don't think it

10  is.  DCPS still has the opportunity to contest our

11  case.  It just doesn't have the opportunity to put on

12  its case in chief.  We may not meet our burden.  It's

13  not automatic.  The default is automatic.  We're still

14  prepared to put on evidence.

15             HEARING OFFICER:  Are you prepared to assert

16  any affirmative defenses today, Ms. George?

17             MS. GEORGE:  We are prepared to assert that

18  we did not deny FAPE.

19             HEARING OFFICER:  Okay.  Are you planning to

20  disprove petitioner's case or are you planning to put

21  on evidence and testimony to prove any one of your

22  affirmative defenses?

HEARING IN RE: J██████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 13

1          MS. GEORGE:  We are planning to put on

2    evidence and testimony to demonstrate that we offered

3    an appropriate placement to the student.

4          MR. BOGIN:  It seems to me that that's -- I

5    mean, we set out issues and facts, none of which was

6    controverted.  We're prepared to put -- to prove that

7    if we need to, but we have no opportunity to know what

8    their case is because they never controverted any of

9    our facts.

10         HEARING OFFICER:  Right.

11         MR. BOGIN:  And that's an affirmative

12   defense.

13         HEARING OFFICER:  Ms. George, is it your

14   contention that Anne Beers is the appropriate

15   placement?

16         MS. GEORGE:  Yes.

17         HEARING OFFICER:  Okay.  And so it appears

18   that DCPS has not come forward with any new

19   information.  It appears that DCPS is going to stand

20   behind their prior notice of placement.

21         MR. BOGIN:  Well, as long as their case is

22   -- let's -- so that we're clear I think that we need to

HEARING IN RE: J█████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 14

1    -- that DCPS needs to identify what notice it's going

2    to rely on so that we know what's outside the bounds of

3    the notice.

4            MS. GEORGE:  Is the question what notice

5    we're going to be relying on, what notice --

6            MR. BOGIN:  We don't -- we -- they --

7            HEARING OFFICER:  Was there a prior notice

8    of placement issued to --

9            MS. GEORGE:  Yes.

10           HEARING OFFICER:  -- Anne Beers?

11           MS. GEORGE:  Yes, there was, and I believe

12   it's even in petitioner's own disclosure.

13           MR. BOGIN:  Uh-huh.

14           MS. GEORGE:  Yes, it is.  And you can see

15   that it was --

16           MR. BOGIN:  I understand.  I want it

17   identified, and I think DCPS is limited to putting on

18   evidence that stays within the bounds of the document,

19   and the reason is that Anne Beers has a smaller --

20           HEARING OFFICER:  Okay.

21           MR. BOGIN:  It's DCPS 4.

22           HEARING OFFICER:  In the interests of time I

HEARING IN RE: J██████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 15

1    know you want to get into your case.

2            MR. BOGIN:  Yeah.

3            HEARING OFFICER:  I'm not particularly sure

4    where the objections lie, so during the presentation --

5            MR. BOGIN:  Okay.

6            HEARING OFFICER:  -- of DCPS's case it won't

7    be globally limited, but during the presentation you

8    can raise objections if you feel that DCPS is raising

9    an affirmative defense or something that was outside of

10   your knowledge based on the prior written notices that

11   you have.

12           MR. BOGIN:  Okay.

13           HEARING OFFICER:  Any other preliminary

14   matters?

15           MS. GEORGE:  No.

16           HEARING OFFICER:  Okay.  Opening statements.

17           MR. BOGIN:  Well, yeah, in the interests of

18   time we're going to be sure -- I mean, our complaint is

19   in the record.  I presume you had an opportunity to

20   review it.  We --

21           HEARING OFFICER:  Very briefly, yes, sir.

22           MR. BOGIN:  Well, briefly we --

HEARING IN RE: J███ A██████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1      HEARING OFFICER:  I'll spend more time with

2  it after the case of course.

3      MR. BOGIN:  Yeah, that the placement at Anne

4  Beers is not appropriate and the program we're

5  proposing, which includes placement at Jenny Walter

6  Hall Center, speech language and DIR therapy as well as

7  transportation is appropriate.

8      HEARING OFFICER:  Okay.  Ms. George.

9      MS. GEORGE:  I'm just going to get into a

10  few more of the facts, but it won't be too lengthy.

11  The student was identified as eligible for special

12  education in December of 2006 and it's DCPS No. 11.

13  The first IEP that was developed for him was 12-12-06,

14  and DCPS 15 is the initial notice of placement for him

15  at West.

16      HEARING OFFICER:  Okay.

17      MS. GEORGE:  The child attended West.  It's

18  West Elementary School.  Now, for some reason even

19  though the IEP that was developed in 12-06 was current,

20  the teacher at West did an annual review and didn't

21  make any substantive changes to the IEP, didn't change

22  the hours of services to the IEP, but held an MDT

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 17

1    meeting.

2              After the school year was over the parents

3    were unsatisfied with the education that the student

4    received at West and in June of '07, and this is JA,

5    J████ A████████ No. 14, another MDT meeting was held

6    with various members from the care center and the

7    parents were there too, and DCPS admitted that the

8    teacher at West was in error, and I'm quoting from the

9    document, was in error in not documenting the child's

10   progress with evaluation procedures stated on the IEP.

11             So it was also determined that an IEP needed

12   to be revised, but the advocate requested progress

13   reports from the teacher prior to the next meeting and

14   the teacher whose name is -- the teacher at West, her

15   name is Ms. Meshak (phonetic), Evangelina Meshak, she

16   submitted a goal page update and she submitted a

17   progress report, and those are DCPS No. 12 and No. 13.

18             HEARING OFFICER:  Okay.

19             MS. GEORGE:  And then the MDT team

20   reconvened in August -- on August 15th, '07, and this

21   is DCPS No. 3 and 4, and MDT notes at which time the

22   team conceded that the class at West wasn't

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 18

1    appropriate, that the student should be out of the

2    general education setting and that the child needed a

3    smaller class.

4              It was also stated at this time J██████ IEP

5    is current.  They're talking about the 12-12-06 IEP.

6    It still didn't need to be updated, and based on the

7    progress notes from 6-07, which were identified as DCPS

8    12 and 13, it was determined that the IEP was still

9    appropriate, and it states the information presented

10   shares that J█████ has not made progress.

11             So a placement was identified for him at

12   Anne Beers and it stated in DCPS 4 in the prior notice

13   that this will meet his level of need and it has a

14   smaller class size, and we'll have some testimony today

15   about what Anne Beers can provide to the student, and

16   that it is an appropriate placement for him.

17             HEARING OFFICER:  The MDT --

18             MS. GEORGE:  Thank you.

19             HEARING OFFICER:  Thank you.  The MDT's

20   determination of progress is in 4, DCPS 4?

21             MS. GEORGE:  That's No. 3, the MDT notes.

22   It's at the end of the first paragraph, the last

HEARING IN RE: J██████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 19

1   sentence.  The information --

2               HEARING OFFICER:  Okay.  I see it.

3               MS. GEORGE:  -- presented shares that J████

4   has not made progress.

5               HEARING OFFICER:  And the -- let's see.  We

6   have a draft IEP and then we have an IEP that followed

7   that up to say that those documents, the MDT team

8   determined that the December IEP was still appropriate.

9               MS. GEORGE:  Uh-huh.  The draft IEP was in

10  April of '07.  I'm not sure what that is, but I suspect

11  that it's when the teacher at West convened an MDT

12  meeting and no one is really sure why.

13              HEARING OFFICER:  Okay.  Okay.  Counsel, do

14  you want to call your first witness?

15              MR. BOGIN:  Sure.  We'd call Ms. Owens.

16              HEARING OFFICER:  Ms. Owens, would you raise

17  your right hand for me, please?

18                      STEPHANIE OWENS,

19  having first been duly sworn, was examined and

20  testified as follows:

21              HEARING OFFICER:  Okay.  Counsel, you may

22  proceed.

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 20

1                    DIRECT EXAMINATION

2           BY MR. BOGIN:

3      Q    Give us your name, please.

4      A    Stephanie Owens.

5           MR. BOGIN:  And Ms. Owens' resume is our

6  exhibit, JA 26.

7           HEARING OFFICER:  Thank you.

8           MR. BOGIN:  Okay.  So we'd proffer her as an

9  expert in special education.

10          HEARING OFFICER:  Any objection, Ms. George?

11          MS. GEORGE:  I'd like to ask a couple of

12  questions.

13          HEARING OFFICER:  Of course.

14                  VOIR DIRE EXAMINATION

15          BY MS. GEORGE:

16     Q    Okay.  It says that you have certification

17  in special education; is that correct?

18     A    Yes, it is.

19     Q    Did you have a copy of that?  It's not part

20  of the disclosure.

21     A    I don't have that with me, but --

22          MR. BOGIN:  Objection.  She's testifying

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 21

1    under oath that it's current.

2             BY MS. GEORGE:

3        Q    Okay.  And you have a master's degree in

4    special education?

5        A    I do.

6        Q    Are you pursuing a Ph.D.?

7        A    I'm not.

8        Q    And you don't have one, right?

9        A    I do not.

10       Q    Do you teach currently?

11       A    I do not.

12       Q    When was the last time you taught?

13       A    Well, I work -- I do teach actually.

14       Q    Okay.

15       A    Not in a formal classroom setting.  I work

16   individually with students --

17       Q    Uh-huh.

18       A    -- in a school setting and privately.

19       Q    You teach in a school setting and privately.

20   Is that what you said?

21       A    I work individually with students in a

22   school setting and privately.

Page 22

1          Q      Oh, you work individually in the school

2    setting and privately.  Okay.  Did you ever teach in a

3    classroom?

4          A      Yes, I did.

5          Q      When was the last time you did that?

6          A      Three years ago.

7          Q      And where was that?

8          A      (Inaudible) Elementary School, D.C. Public

9    Schools.

10         Q      I'm --

11                MS. GEORGE:  I'm going to object to her

12   being offered as a witness -- I mean, as an expert on

13   the basis that she does not have the Ph.D. degree that

14   we usually see in experts and that her experience in

15   teaching was -- in a classroom was over -- was three

16   years ago.

17                HEARING OFFICER:  Okay.  Ms. Owens, have you

18   participated as an expert witness in a previous due

19   process hearing?

20                THE WITNESS:  I have.

21                HEARING OFFICER:  Okay.  Counsel, would you

22   like to --

HEARING IN RE: J██████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 23

1                    DIRECT EXAMINATION (CONTINUED)

2                    BY MR. BOGIN:

3        Q      Well, let me -- in the District of Columbia

4    Public School hearings?

5        A      Oh, have I?

6        Q      Have you testified as an expert in other

7    DCPS hearings?

8        A      Yes, I have, yes.

9        Q      And how recently?

10       A      Or I have been put in.  I don't think that

11   we ever got to the table and it didn't go all the way

12   through, but I have been represented as an expert

13   witness in two other cases.

14              MS. GEORGE:  Have you been qualified as an

15   expert by a hearing officer in a due process hearing?

16              THE WITNESS:  I've been to two of these and

17   testified, yes.

18              MS. GEORGE:  Have you been qualified as an

19   expert?

20              THE WITNESS:  I don't recollect exactly what

21   the verbiage was on the other hearings, but I've done

22   this exact same capacity in two other DCPS hearings.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 24

1        MS. GEORGE:  I didn't hear an affirmative

2   answer that she's been qualified as an expert.

3        HEARING OFFICER:  Counsel, would you like to

4   be heard?

5        MR. BOGIN:  I don't know what a Ph.D. has to

6   do with an expert, and her resume I think speaks for

7   itself, plus she's been qualified as an expert in

8   similar hearings so I'm not quite sure what DCPS's

9   objection is.

10        HEARING OFFICER:  Ms. George.

11        MS. GEORGE:  I didn't hear her state that

12   she was qualified as an expert in prior hearings.  She

13   stated that she testified and she doesn't remember the

14   verbiage.  I don't know if you can offer testimony.

15        HEARING OFFICER:  I think you should just

16   proffer that she's participated as an expert witness.

17   Is that your proffer?

18        MR. BOGIN:  Yes.

19        HEARING OFFICER:  Okay.  Okay.  Ms. Owens

20   will be named an expert witness in special education.

21        MS. GEORGE:  Thank you.

22        BY MR. BOGIN:

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 25

1    Q    Are you familiar with J████ A████████?

2    A    Yes.

3    Q    And tell us how you're familiar with Jesse.

4    A    I was contacted by J████s parents late

5    March, early April just prior to the meeting that Ms.

6    Meshak had held because they were told at this meeting

7    that West Elementary School is not the appropriate

8    placement for him.  Out of concern for that they had

9    contacted me to do an observation to help them

10    determine Jesse's current status and then help them

11    with the next steps.

12    Q    Okay.  And so what did you do to get

13    familiar with J████?

14    A    I did two observations of J████ at West

15    Elementary School.

16    Q    Okay.

17    A    And met with the parents and had met with

18    J████.

19    Q    And have you had an opportunity to review

20    the record -- the documents --

21    A    Absolutely.

22    Q    -- that form the record?

HEARING IN RE: J████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 26

1      A     Yes.

2      Q     Okay.

3      A     And I spoke with his teachers as well.

4      Q     Okay.  Both at West?

5      A     Yes.

6      Q     Okay.  And DCPS in its opening said that

7  J████ didn't make any progress at West.  Do you agree

8  or disagree with that statement?

9      A     I agree.

10     Q     And can you give us some insight into why in

11 your opinion J█████ didn't make any progress at West?

12     A     Yes.  In reading some of the prior reports

13 of classroom observations, specifically one done by Ms.

14 Edgehill, a DCPS employee, it stated that he knows

15 letters, numbers and the things that he was doing prior

16 to me meeting J█████, and then looking at his -- just

17 one example, looking at his current report card stating

18 that he can't do any of that which to me would mean a

19 regression.

20          Also I observed a young man who was not

21 participating in the lesson.  Approximately 70 percent

22 of the time he was not engaged.  He had his hands

HEARING IN RE: J▮▮▮▮ A▮▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 27

1    covering his ears due to his sensory issues.  Those are

2    just a few examples.  He was definitely overloaded

3    sensorally in the classroom, and that's just one

4    example of the fact that he regressed if he was able to

5    do something and in DCPS's report he can no longer do

6    that.

7         Q    Let me direct your attention to what's in

8    the record as JA 13.  You can take a look at this here.

9         A    Uh-huh.

10        Q    And I ask if you recognize that?

11        A    I do.

12        Q    And tell us what it is.

13        A    It is a school observation report that I

14    wrote on -- for observations done on May 4th and May

15    11th.

16        Q    At -- of --

17        A    West Elementary School.

18        Q    Okay.  And does that document lay out in

19    greater detail why you think that J▮▮▮ regressed at

20    West?

21        A    Yes.

22        Q    Okay.  Is there a difference between making

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 28

1    no progress and regressing?

2        A    Yes.

3        Q    And tell us what the difference is.

4        A    Making no progress is staying currently

5    where he has been without gaining any skills.

6    Regression is at one time having the skills and then no

7    longer demonstrating those skills.

8        Q    Okay.  Just give me one second.  Sorry.

9    When someone is programming for a child and trying to

10   determine progress is it important to chart that

11   progress contemporaneously?

12       A    Absolutely.

13       Q    And let me show you what's in the record as

14   DCPS 12 and ask if you've seen that document before?

15       A    Yes, I have.

16       Q    And do you know what it purports to be?

17       A    A progress update.

18       Q    And do you know when it was done?

19       A    June 11th, 2007.

20       Q    Okay.  And does it purport to be a progress

21   update of J██████ time at West?

22       A    Yes.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 29

1      Q      Okay.  You said earlier that it's important

2  to chart progress contemporaneously?

3      A      Uh-huh.

4      Q      Is this an example of contemporaneous

5  charting of progress?

6      A      In my professional opinion, no.

7      Q      Why?

8      A      It doesn't have any data or anything to back

9  up that.  It's just basically a listing of

10  approximately his IEP goals stating he can or cannot do

11  them.  There's no evidence backing that.  When I

12  requested this I requested evidence backing the

13  progress that J█████ had made through the year based on

14  his IEP goals.

15      Q      Okay.  When you say you requested this what

16  do you mean by that?

17      A      Before this meeting on June 11th I had

18  requested progress notes so that we could, in fact, get

19  to the table to draft an appropriate IEP for J█████ or

20  revise an appropriate IEP.  Without current progress

21  with teacher's information and data it's almost

22  impossible to draft or revise an IEP.

HEARING IN RE: J██████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 30

1    Q    Okay.  And is -- or are you able to tell

2    whether this document is actually key to his -- to

3    specific goals and objectives in his IEP or is it just

4    kind of a global document?

5    A    I think some of those goals are stated on

6    his IEP as -- I mean, I can check that.  I don't have

7    it memorized.

8    Q    Okay.  Why don't you do that, and while

9    you're doing that were you ever provided with any data

10   as to how that -- how those -- how the document was

11   compiled?

12   A    I was not, and I did receive that at the

13   meeting instead of ahead of time as I had requested so

14   that we could be prepared at that meeting, so no.

15   Q    Okay.  And while you're still looking --

16       HEARING OFFICER:  For the record, I want her

17   to identify which IEP she's going to cross-reference.

18       MR. BOGIN:  Okay.

19       THE WITNESS:  That does include a few of the

20   IEP goals, but not all of them.

21       BY MR. BOGIN:

22   Q    Okay.  And that's the IEP that's in the

Page 31

1   record?

2        A    Sure, the 12th, December 12th.

3        Q    Which would be among other things --

4        A    It's the only IEP that's been drafted.

5        Q    That is true.  Okay.  Now, did you have --

6   so you said that you were at the June 11th meeting,

7   correct?

8        A    Uh-huh, yes.

9        Q    And tell us about that meeting, please.

10       A    The meeting was held at the care center.

11  J██████ father, Carl Anderson, and I attended.  There

12  were no teachers, none of J██████ current teachers,

13  just two employees of the care center were present.

14  They were unable to comment on his progress, on J████

15  at all, and gave us this sheet.

16       Q    And was Ms. -- it was -- the sheet was

17  prepared by Ms. Meshak, correct?

18       A    I believe so.

19       Q    And was she at the meeting?

20       A    She was not.

21       Q    All right.  Okay.  Was there then a

22  subsequent meeting?

HEARING IN RE: J██████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 32

1    A    There was, on I believe it was August 15th.

2    Q    Okay.  And were you present?

3    A    I was.

4    Q    Okay.  And can you tell us about that

5    meeting?

6    A    Sure.  Again, I had requested the progress

7    and the purpose was to review his progress and there

8    was nothing new, again just that sheet that we had just

9    referred to, the progress sheet from the teacher and no

10   new data.

11   Q    Okay.  And what was the result of that

12   meeting?

13   A    Again, we were unable to revise an IEP

14   without progress of data and we ended the meeting.

15   Q    Okay.

16   A    At the end of the meeting they did provide

17   us -- I asked for the meeting notes and then they did

18   provide us with a prior notice.  However, that wasn't

19   discussed in the meeting.  They had specifically in the

20   meeting stated that they couldn't provide us with a

21   placement without a proper revised IEP, so -- but then

22   this ended up making it into the packet.

HEARING IN RE: J██████ ████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 33

1       Q       And when you say this you're talking about

2       --

3       A       I'm sorry, the prior notice.

4       Q       -- DCPS 4?

5       A       Yes.

6       Q       Okay.  Let me see if I can get you to break

7   down your testimony --

8       A       Uh-huh.

9       Q       -- what you just said.

10      A       Sure.

11      Q       You had a meeting at the care center on

12  August 15th, 2007, correct?

13      A       Uh-huh, uh-huh.

14      Q       You have to say yes.

15      A       Yes.

16      Q       And at that meeting you were present with

17  Mr. Anderson and some people from the care center,

18  correct?

19      A       Yes.

20      Q       And there was a discussion -- was that Ms.

21  Harris and Ms. McDowell and Ms. Johnson?

22      A       Yes.

HEARING IN RE: J▮▮▮▮▮▮ A▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 34

1      Q      Okay.  And at that meeting was there

2  discussion about whether or not J▮▮▮▮ IEP could be

3  revised?

4      A      Yes.

5      Q      Okay.  And was there also discussion about a

6  placement for J▮▮▮ for the upcoming school year?

7      A      They didn't -- they were not able to discuss

8  a placement with us because they said that the IEP

9  needed to be revised, but then they did give us a prior

10 notice.

11     Q      Okay.

12     A      So they did say he --

13     Q      Let me --

14     A      Sure.

15     Q      Okay.  When you say they you're talking

16 about the DCPS employees, correct?

17     A      Yes.

18     Q      Okay.  And they -- you were told by DCPS

19 that the IEP needed to be revised?

20     A      Yes.

21     Q      And you were told by DCPS that the IEP

22 couldn't be revised because there was no data?

HEARING IN RE: J████ ██████N
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 35

1      A      Yes.

2             MS. GEORGE:  Objection.  Leading question.

3             MR. BOGIN:  I'm just restating.

4             BY MR. BOGIN:

5      Q      Were you told by DCPS that the IEP could not

6  be revised because there was no data?

7      A      Was I told by DCPS that it could not be

8  revised because there was no data.  I specifically said

9  it's impossible to revise an IEP without data.  They

10 agreed.

11     Q      Okay.

12     A      And they admitted that there was no data

13 collection throughout the year.

14     Q      Okay.  And then was there discussion about a

15 placement for J████?

16     A      Not a specific school placement, but there

17 was discussion about another -- a least restrictive

18 environment closest to his home.

19     Q      Okay.  And was there discussion about

20 whether there could be a placement without a revised

21 IEP?

22     A      No, they did not offer us a placement.

HEARING IN RE: J███████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 36

1       Q       Okay.  And then let me direct your attention

2   to DCPS 4.

3       A       Uh-huh.

4       Q       When was that given to you?

5       A       On the same meeting included with the copy

6   of meeting notes that I had requested.

7       Q       Okay.  And had there been any discussion

8   about Anne Beers at the meeting?

9       A       No, a specific school, no.

10      Q       Okay.  Had the parents been asked whether or

11  not they thought that Anne Beers was an appropriate

12  placement at the meeting?

13      A       Had they been --

14      Q       Well, had Anne Beers been described to the

15  parents?

16      A       No.

17      Q       Okay.  And therefore the parents couldn't

18  have given an opinion about whether Anne Beers was

19  appropriate because they weren't told about it?

20      A       Right, and so we also did an observation of

21  it.

22      Q       I understand that, but on August 15th --

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 37

1      A      No.

2      Q      -- was there any description of Anne Beers?

3      A      No.

4      Q      Okay.  Now, let me direct your attention to

5  DCPS 11, which is I believe as you said in your

6  testimony earlier the only IEP, correct?

7      A      Yes.

8      Q      And have there -- were there any revisions

9  made to this document in either April, June or August?

10     A      No.

11     Q      Okay.  And when was this IEP developed?

12     A      December 12th, 2006.

13     Q      Okay.  And just for the record what's today?

14     A      December 20th, 2007.

15     Q      Okay.  And is that more or less than a year

16  after the IEP was developed?

17     A      It's more than a year.

18     Q      Okay.  Okay.  Now, let's switch gears.  Let

19  me direct your attention to JA 22 which I'll show you

20  and ask if you are familiar with that document?

21     A      Yes, I am.

22     Q      And tell us what it is.

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 38

1      A      It's a school observation report that I did

2      on October 22nd and October 30th.

3      Q      Okay.

4      A      And that was of Anne Beers and the Jenny

5      Walter Hall Center.

6      Q      Okay.  Let's focus on October 22nd first.

7      A      Sure.

8      Q      Did you observe Anne Beers on that day?

9      A      I did.

10      Q      And can you summarize for us your

11      observation?

12      A      Sure.  The classroom was made up of

13      approximately nine children with a teacher, a head

14      teacher, an aide and a dedicated aide.  The classroom

15      had students that were all characterized as

16      developmentally delayed.  There was in my opinion lack

17      of transition and structure routine, structural

18      routines that are necessary for J█████.

19              There was a high level of noise in the

20      classroom and I did not witness any scheduling, the

21      picture schedules that are necessary.  I did not

22      witness any transitional routines that were necessary

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 39

1    and there -- that's my description.  It was --

2        Q    Okay.

3             HEARING OFFICER:  Counsel, can I get

4    clarification for the record?

5             MR. BOGIN:  Yes.

6             HEARING OFFICER:  I thought the witness

7    testified that there was a teacher, an aide and a

8    dedicated aide.

9             MR. BOGIN:  Yeah, I was just going to --

10   that's my number one point.

11            BY MR. BOGIN:

12       Q    Okay.  When you say a dedicated aide what do

13   you mean?

14       A    Dedicated to another student in the

15   classroom.

16       Q    Solely to that student?

17       A    Solely to that student.

18       Q    Okay.  So just to clarify for the hearing

19   officer, there's one child with his or her own aide?

20       A    Uh-huh.

21       Q    And then there's eight other children with a

22   teacher and an aide, right?

HEARING IN RE: J▮▮▮▮ A▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 40

1       A      Yes.

2              MR. BOGIN:  Okay.  Is that --

3              HEARING OFFICER:  Thank you.

4              BY MR. BOGIN:

5       Q      And how would you -- from your observation

6    how would you characterize the functioning level of the

7    children in the classroom?

8       A      Academic functioning very low, behavioral

9    functioning very low as well.

10      Q      Okay.  And when you say very -- in

11   comparison to Jesse were they functioning -- where were

12   they functioning academically?

13      A      Sure.  I think -- they were functioning

14   below J▮▮▮▮▮ academic functioning.

15      Q      Okay.  Where were they functioning

16   behaviorally?

17      A      Below J▮▮▮▮▮ behavior functioning.

18      Q      Okay.  Is it important for J▮▮▮ to be with

19   children who are functioning at or above his level?

20      A      Yes.

21      Q      And why?

22      A      So that he can be provided with appropriate

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 41

1    models for appropriate behaviors and cognitively as

2    well.

3        Q       And is J█████ the kind of child who would

4    model himself after appropriate models?

5        A       I believe so, yes.

6        Q       Okay.  Did you have an opportunity to talk

7    to the teacher?

8        A       Yes, we did.

9        Q       And can you summarize for us those

10   conversations?

11       A       Sure.  When I -- when we met with the

12   teacher she was unaware we were coming even though we

13   had scheduled the previous week.  She initially gave us

14   her background, educational background, and then we had

15   -- I had specifically asked her to describe the

16   functioning of the classroom and the students, as well

17   as any specialists that join the classroom during the

18   day.

19               She labeled all the students as

20   developmentally delayed and specifically stated that

21   her understanding of D.C. is when anyone under five,

22   unless they have a physical disability, are labeled as

HEARING IN RE: J███████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 42

1    developmentally delayed.  When I asked her to explain

2    further the individual needs of the classroom she was

3    pretty vague and unable to give me specific detailed

4    backgrounds of the students' functioning.

5          I then went on to ask her how she charts

6    progress because that's very important, and she had

7    asked Ms. Steele how she would like her to chart the

8    progress.  Then she -- with further prompting and more

9    questions she did explain the IEP, IEP report card and

10   the D.C public report card at length, and did add that

11   she does take some pictures and saves work samples, and

12   that's basically her description of the class because

13   the class did enter so we had to cut our interview with

14   her short.

15        Q    In your opinion is that an adequate way to

16   chart progress?

17        A    No.

18        Q    Why?

19        A    Because I think that -- it was unclear how

20   she, in fact, did chart the progress according to the

21   IEP.  She just mentioned there was a report card and an

22   IEP report card, but it was unclear how she keeps her

Page 43

1    data and that's important.  Pictures are lovely.

2    However, I think it's most important to collect data

3    related to J▓▓▓▓▓ needs.

4         Q    Okay.  So were you able to form an opinion

5    as to whether the program at Anne Beers is appropriate

6    to meet J▓▓▓▓▓ needs?

7         A    I was.  I don't think it's appropriate.

8         Q    And tell us why.

9         A    Because I think that it has a high level --

10   it's not very structured.  There was no transitional

11   cues, there was no integrated therapy services in the

12   classroom.  When I did ask about those she said there

13   were part-time people that go to Anne Beers.

14             There was a high level of behavioral needs

15   in the classroom, a very low level of language in the

16   classroom, and I don't feel like it would be an

17   appropriate placement for J▓▓▓ as it wouldn't provide

18   appropriate models or be at the same cognitive and

19   behavioral level as J▓▓▓.

20        Q    Okay.  Now, can you tell us what J▓▓▓ needs

21   in a program?

22        A    Sure.  I think J▓▓▓ needs a small student

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 44

1    to teacher ratio.  I think he needs a classroom that is

2    very -- provides a lot of models for language,

3    especially pragmatic language.  I feel that J████ needs

4    a classroom with high structure, especially pictorial

5    cues, scheduling.  He needs previewing, he needs

6    modeling.

7           He needs transitional warnings.  He needs

8    good models in the classroom, the students in the

9    classroom so he can learn from his peers as well as his

10   teachers.  He definitely needs a placement that is low

11   noise level due to his sensory needs, and definitely a

12   team approach that is integrated throughout his day

13   that also meets regularly to educate the parents as

14   well as the staff members all meet together.

15        Q    Now -- excuse me.  You said that he needed a

16   low noise level because of his sensory needs?

17        A    Uh-huh.

18        Q    Can you tell us about his sensory needs,

19   please?

20        A    Sure.  When I observed J████ at West he

21   spent, as I stated in my report, a majority of the time

22   with his hands covering his ears due to the high level

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 45

1    of noise.  When I went to Anne Beers I -- although the

2    class size was much smaller I did experience and

3    witness a similar level of noise in the classroom and

4    of disorganization that I think was not far from the

5    current -- from the previous classroom at West with a

6    much higher ratio of students.

7         Q    Okay.  And what is it about J█████ in

8    particular that the noise affects?

9         A    Well, he just isn't able to discriminate and

10   regulate his, you know, sensory system, so when the

11   noise overloads him he retreats and is unable to

12   participate because that is dominating his senses at

13   the time.

14        Q    Okay.  Now, you talked about him needing a

15   team approach.  What did you mean by that?

16        A    The service providers that work with him,

17   his occupational therapists, his speech and language

18   therapist, his social skills training, and his teachers

19   as well as his parents need to all be communicating

20   together the effective ways to educate J█████ so it can

21   be a most effective plan.  Having the providers are

22   important, but unless there's communication together

1    the plan is not effective in my opinion, as effective

2    in my opinion.

3        Q    Okay.  Now, let's go back to JA 22.

4        A    Sure.

5        Q    And your other observation was on October

6    30th?

7        A    Uh-huh.

8        Q    And where was that observation?

9        A    At the Jenny Walter Center.

10        Q    Okay.  And did you see J█████ there?

11        A    I did.

12        Q    Okay.  Can you tell us what you observed

13    there?

14        A    Sure.  I observed J█████ during a -- an

15    unstructured playtime on the playground, and I observed

16    J█████ playing with two other students, smiling,

17    laughing, interacting with them, having some reciprocal

18    language conversation, and as well as approaching his

19    teachers and having dialogue with them as well, so --

20        Q    Can you compare and contrast between Beers

21    and Jenny Walter Hall for us?

22        A    I did not observe J█████ at Anne Beers, but I

HEARING IN RE: J███████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 47

1    can compare between --

2        Q    Well, between the programs, right.

3        A    The programs.  Well, the programs were three

4    students to two teachers.  The teachers had -- were

5    modeling appropriate language for J████, were using

6    very concise language with J█████ and were generally

7    interacting with him and encouraging him to interact

8    with the other students, although I did observe a

9    student who didn't need that much encouragement.  He

10   felt very comfortable interacting with those students.

11       Q    Okay.  And have you had an opportunity to

12   discuss J█████ with the staff at Jenny Walter Hall?

13       A    I did.  I did.  They -- the staff works with

14   J█████ obviously in a very small student to teacher

15   ratio.  They provide integrated services.  They work a

16   lot on the social pragmatics of language with J█████ and

17   the social skills, which is another area, large area

18   for J██████ that he needs to work on.

19            Also, they have a sensory system set up for

20   him where they have -- give him sensory breaks, have a

21   sensory diet set up for him in the classroom, which

22   means providing the sensory tools he needs in order to

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 48

1    feel comfortable in the classroom whether that be a

2    break or weighted belts or lap belts or things that are

3    necessary for him to feel grounded in the space.

4              They work with other providers that come to

5    work with J▓▓▓▓, they work with the parents

6    consistently.  They have constant communication and

7    team meetings together, and they have seen J▓▓▓▓ in the

8    short time that he's been there progress.

9         Q    Okay.  So were you able to form an opinion

10   about the appropriateness of Jenny Walter Hall for

11   J▓▓▓▓?

12        A    Yes.

13        Q    And what's that opinion?

14        A    I feel that Jenny Walter Hall is an

15   appropriate placement for J▓▓▓▓.

16        Q    And let me direct your attention back to

17   DCPS 11.  You said that the IEP needed to be revised?

18        A    Well, they had stated that.

19        Q    Okay.  DCPS had told you that the IEP --

20        A    Told the parents that it was an

21   inappropriate placement, so from that we gathered that

22   due to the inappropriate placement an IEP needed to be

HEARING IN RE: J████ A████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 49

1    revised, and they did come to the table with that but

2    didn't revise it.

3         Q    Okay.  So is the IEP that we have in the

4    record as DCPS 11 appropriate to meet J█████ needs?

5         A    No.

6         Q    And why?

7         A    The IEP -- well, first of all, it's expired.

8    Second of all, there is no social emotional component

9    to the IEP at all, and there's also no behavioral

10   component to the IEP, and from my observations I feel

11   that J█████ needs a behavioral system to help him

12   navigate his day.

13        Q    Why?

14        A    To help model appropriate behaviors for

15   J█████, to help him independently navigate situations

16   that are stressful for J█████ appropriately instead of,

17   you know, acting on impulses due to sensory overload.

18             MR. BOGIN:  Okay.  I have no further --

19   excuse me.  I have no further questions.

20             HEARING OFFICER:  Ms. George.

21             MS. GEORGE:  Yes.  Just one moment.  Just

22   one moment, please.

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 50

1        HEARING OFFICER:  Okay.  Let me just ask, JA

2   14, what is this?

3        MR. BOGIN:  JA 14 you said?

4        HEARING OFFICER:  Yes, sir.

5        MR. BOGIN:  I think that's -- it's the same

6   IEP as -- it's the only IEP, which is that it goes

7   along with the entire document.  We put the entire

8   document in.  The important part for us is the last

9   page of the MDT notes of June 12th where it says that

10  the progress wasn't documented monthly, but we didn't

11  want to -- we didn't want to just put in an excerpt

12  from the document.

13       HEARING OFFICER:  Okay.

14       MR. BOGIN:  And --

15       HEARING OFFICER:  It's identified in the

16  five day as a June 12th IEP.

17       MR. BOGIN:  Well, I understand, but there's

18  a date on it that says June 12th.

19       HEARING OFFICER:  Right.

20       MR. BOGIN:  That's why it was identified

21  that way.

22       HEARING OFFICER:  Okay.  Thank you.

HEARING IN RE: ▬▬▬ A▬▬▬▬▬
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 51

1          MS. GEORGE:  Okay.  Ms. Owens?

2          THE WITNESS:  Yes.

3          MS. GEORGE:  Maybe this will clarify some of

4    your questions now.

5                     CROSS-EXAMINATION

6          BY MS. GEORGE:

7          Q     The IEP, the initial IEP was developed in

8    December '07; is that correct?

9          A     December '06.

10         Q     '06.  Thank you.  And that IEP has not been

11   changed in any way, correct?

12         A     No.

13         Q     All right.  Now, you stated that you can't

14   revise an IEP without data?

15         A     Not -- it's very difficult to change an IEP

16   without any previous progress or current progress.

17         Q     Right.  And the IEP wasn't changed, right?

18         A     It was not changed.

19         Q     So based on what you're saying that was the

20   right thing to do?

21         A     Right.  The purpose of the meeting, they

22   told us as stated in the MDT notes, is to review his

HEARING IN RE: J████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 52

1    progress at West and to revise an IEP, so when I got to

2    that meeting without progress it was not possible to

3    carry out that purpose.

4         Q    When you're pointing like this --

5         A    Sorry.

6         Q    -- are you pointing at the June 12th, '07

7    MDT notes --

8         A    Yes.

9         Q    -- where it says the purpose of the meeting

10   is to review J██████ progress and revise the IEP for a

11   determination of appropriate placement?

12        A    Yes.

13        Q    Okay.  So do you see further down where it

14   says Zaundra (phonetic) Johnson stated that the

15   placement could not be predetermined until IEP is

16   revised because J█████ should be placed in a least

17   restrictive environment that is closer to the child's

18   home?

19        A    Yes, I do see that.

20        Q    But the IEP wasn't revised after this date?

21        A    No, it couldn't be revised.

22        Q    Okay.  What did happen was that a different

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 53

1   placement was offered, right, based on the existing

2   IEP?

3        A      They did not offer us a placement at this

4   meeting.

5        Q      Okay.  Not at that meeting?

6        A      Right.

7        Q      All right.  Now, let me point to the 8-15-07

8   MDT notes.  This is DCPS No. 3.  You stated that Anne

9   Beers wasn't discussed at this meeting and wasn't

10  offered at this meeting?

11            MR. BOGIN:  Objection.  She said it wasn't

12  discussed.  She didn't say it wasn't offered.

13            THE WITNESS:  Right.

14            BY MS. GEORGE:

15       Q      You stated that the prior notice was not

16  provided at this meeting?

17       A      I did say it was provided.  It was provided

18  with the stack of copied pages from the meeting notes.

19  It wasn't -- they made a copy of the notes they were

20  writing at the table.

21       Q      Uh-huh.

22       A      And then did include that prior notice with

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 54

1    that at the end.

2        Q     When was that given to you?

3        A     As we were about to leave.

4        Q     So the prior notice was given to you at the

5    meeting?

6        A     It was given, yes.  It was not discussed.

7        Q     Okay.  I'm looking --

8            HEARING OFFICER:  Okay.  Counsel, can you

9    just give me a second?

10            MS. GEORGE:  Uh-huh.

11            HEARING OFFICER:  From now on on the

12    objections just state the basis of the objection and --

13            MR. BOGIN:  But she wasn't restating --

14    yeah, I understand.

15            HEARING OFFICER:  And if you feel the record

16    is unclear you can address it on redirect.

17            BY MS. GEORGE:

18        Q     I'm looking at the 8-15-07 MDT meeting

19    notes, and that's DCPS No. 3, and here it says the

20    purpose of the meeting, the first sentence -- are you

21    looking at the same thing?

22        A     Yes.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 55

1       Q      Okay.  -- is to review J████ progress and

2    determine if any changes are needed to the IEP.  So

3    that's different than what they stated in June, which

4    is they indicated that they were going to be making

5    changes and that changes were needed to be made, but

6    here they're saying we have to determine if changes

7    need to be made?

8              MR. BOGIN:  Objection.  What's the

9    relevance?  I mean, it only --

10             HEARING OFFICER:  This is relevance?

11             MR. BOGIN:  Yes.

12             HEARING OFFICER:  Overruled.

13             MR. BOGIN:  Well, it doesn't help their

14   case.

15             HEARING OFFICER:  No.  Okay.  Thank you.

16             THE WITNESS:  I'm sorry.  Could you state

17   your question again?

18             BY MS. GEORGE:

19      Q      I'm just pointing out what it says and I'll

20   get to the question.

21      A      It does say that changes need to be made,

22   determine if changes need to be made.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 56

1        Q      All right.  So it looks like there's a

2   question of whether changes need to be made?

3        A      It says review J███████ progress and

4   determine if any changes are needed on the IEP.

5        Q      Okay.  Do you know whether any changes were

6   made to the IEP on this date?

7        A      There were no changes made on that date.

8        Q      Okay.  So then it would be logical to

9   conclude that --

10              MR. BOGIN:  Objection.  She's calling for a

11  conclusion outside of her --

12              HEARING OFFICER:  Sustained.

13              BY MS. GEORGE:

14       Q      Well, you were at the meeting, right?

15       A      I was at the meeting.

16       Q      And was it stated at the beginning of the

17  meeting that it was going to be determined whether

18  changes needed to be made?  I mean, does this note

19  correctly reflect what was discussed at the meeting?

20       A      The meeting was on 8-15.  I'm reading what

21  they wrote here, and so I assume they had actually said

22  that out loud, but I'm --

Page 57

1      Q      Okay.

2      A      I cannot recall exactly.

3      Q      Okay.  In any event, you can testify that --

4   and you did already that no changes were made to the

5   IEP at this point?

6      A      No, no changes were made to the IEP.

7      Q      Okay.  So then it was determined that no

8   changes should be made?

9      A      No, it was determined that no changes could

10  be made because there was no data to make changes or

11  revise.

12     Q      Okay.  And that was the correct

13  determination to come to in your opinion?

14     A      You can't change an IEP without knowing

15  where the child is educationally.

16     Q      So then they did the right thing in not

17  updating it?

18             MR. BOGIN:  Objection.  What does the right

19  thing mean, substantively or procedurally?

20             MS. GEORGE:  What would you --

21             HEARING OFFICER:  Basis of the objection?

22             MS. GEORGE:  What would you have suggested?

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 58

1           HEARING OFFICER:  Are you striking that?

2           MS. GEORGE:  No, I -- well, no.

3           HEARING OFFICER:  Okay.  Basis of the

4     objection?

5           MR. BOGIN:  What does the right thing mean?

6     The right thing procedurally is what the witness

7     testified.  I think the implication from the question

8     is whether it was the right thing substantively, and

9     that's not what the witness testified to.

10          HEARING OFFICER:  Right.  You're trying to

11    clarify the record.  The basis of the objection I'll

12    entertain.  If you need to clarify the record you can

13    do that --

14          MR. BOGIN:  The question is unclear.

15          HEARING OFFICER:  Okay.  Restate your

16    question, please.

17          BY MS. GEORGE:

18     Q     In your professional opinion what should

19    have been done at this point with respect to the IEP?

20     A     Data should have been collected and an IEP

21    should have been revised.

22     Q     Data should have been collected as of

HEARING IN RE: J████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 59

1    8-15-07?

2        A    No, it should have been collected from

3    December until June when he was --

4        Q    Given that the data hadn't been collected

5    what, in your professional opinion, should have been

6    done at this point, 8-15-07?

7        A    Well, from my observations I do know that it

8    should have been revised, but it was not possible to be

9    revised in my professional opinion.

10        Q    Well, we can't go back in time, but you

11    stated that the data needed to be collected

12    contemporaneously?

13        A    Yes.

14        Q    And it wasn't, and we also know that based

15    on the statute that the child always has to have an IEP

16    in place, so given that an IEP has to be in place and

17    given that the data hadn't been collected

18    contemporaneously what should have been done as of this

19    date, 8-15-07?

20            MR. BOGIN:  Objection.  It's, A, a compound

21    question, and B, the statute says that the child has to

22    have not just an IEP in place but an appropriate IEP in

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 60

1    place.

2              HEARING OFFICER:  You're speaking to the

3    objection.

4              MR. BOGIN:  Hm?

5              HEARING OFFICER:  I'm asking you not to

6    speak to the objection.  I need the basis of the

7    objection.

8              MR. BOGIN:  It's an incorrect statement of

9    the law and it's a compound question.

10             HEARING OFFICER:  The objection is

11   overruled.

12             MS. GEORGE:  I'm just trying --

13             HEARING OFFICER:  I think the first half of

14   the question she was restating an earlier answer, and

15   then she was doing a question to follow up on that

16   earlier answer.

17             MR. BOGIN:  Okay.

18             HEARING OFFICER:  The objection is

19   overruled.

20             BY MS. GEORGE:

21      Q    You were present at the June meeting, right?

22      A    Yes.

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 61

1        Q        Where Zaundra Johnson stated that the

2   teacher at West was in error in not documenting the

3   child's progress, correct?

4        A        Yes.

5        Q        Okay.  What would you have done -- well, you

6   were at the meeting.  What were you suggesting be done

7   at that point?

8        A        We did not know -- I mean, there was no

9   documentation on paper for us at that meeting, which is

10  what I requested.

11       Q        Uh-huh.

12       A        And I believe that that's -- not what I

13  believe.  That is what I was requesting.  I can't

14  imagine -- well, they did not collect any data which is

15  not procedurally appropriate, and there was also -- I

16  requested at that meeting progress notes for the next

17  meeting and a teacher present at the meeting to at

18  least speak to his progress, but neither of those were

19  present at the 8-15 meeting, so we were unable to do

20  anything from there.  After two requests of progress

21  notes and teachers present there was nothing that could

22  be done at that time.

HEARING IN RE: J██████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 62

1     Q     So I'm just trying to get a hold on what you

2   think should have been done at that point.  Nothing,

3   scrap the IEPs and start again with no data?

4     A     The teacher should have been present and

5   maybe --

6             MR. BOGIN:  Objection on relevance.  It's

7   not her job --

8             THE WITNESS:  Right.

9             MR. BOGIN:  -- to make up for DCPS's

10  admitted failure.

11            HEARING OFFICER:  The basis of your

12  objection is relevance?

13            MR. BOGIN:  Relevance.

14            HEARING OFFICER:  Overruled.

15            BY MS. GEORGE:

16     Q     Okay.  Now, you stated that you had asked

17  for a progress report; is that right?

18     A     Yes.

19     Q     And you said that you received the goal page

20  update, is that correct, which is DCPS No. 12?  I can

21  show this to you.  Is this what you received?

22     A     Yes.

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 63

1      Q      Okay.  Did you receive anything else?

2      A      That was received at -- I requested it ahead

3  of time so that I could review it.  It was received at

4  the table at that meeting.

5      Q      Did you receive a progress report which is

6  DCPS No. 13?

7      A      Those were present at the table, presented

8  at the table --

9      Q      Okay.

10     A      -- at that meeting.

11     Q      So what does the progress report have, what

12  does that have on it?  I mean, is that different than

13  the --

14     A      Which one are you referring to?

15     Q      -- goal page update?

16     A      And the report card.

17     Q      Yes.  It's -- the top of it says progress

18  report --

19     A      Right.  Okay.  I'm sorry.

20     Q      -- 3 year old, school year 06/07.

21     A      Right.  One is --

22     Q      What's on this page?

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 64

1       A       On this?

2       Q       Yes, the page you're looking at, the

3   progress report, DCPS No. 13.

4       A       Motor development, language and cognitive.

5       Q       Under each of those main sections which you

6   correctly identified --

7       A       Social (inaudible).

8       Q       Right.  -- aren't there examples of things?

9       A       There are.

10      Q       Under motor development, for example, it

11  says jumps, walks stairs alternating feet, runs, throws

12  catches.  Under language it says follows directions,

13  tells first name, uses words, things like that?

14      A       Yes.

15      Q       Are those examples of -- can that be

16  considered data regarding his progress?

17      A       There's no measurable data here.  It's

18  stating if he does or does not do it.  There's no data

19  backing up how often he does it, how -- in what

20  situations he does it, which is the whole basis of an

21  IEP, having measurable data.

22      Q       When we're talking about a four year old

HEARING IN RE: J██████ A██████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 65

1    what kind -- aside from something like this what would

2    you expect to see?

3         A    Specific goals towards J██████ disabilities

4    and deficits.

5         Q    This isn't a goals page.  This is a progress

6    report which is what you asked for.

7         A    I asked for a progress report on J██████

8    specific areas of need.

9         Q    And these are not his areas of need?  It

10   doesn't encompass his areas of needs?

11        A    They are, but it's a generic area of need

12   for any student that is in that classroom, not geared

13   towards J██████ specifically.

14        Q    So in your opinion this wasn't sufficient to

15   revise the IEP?

16        A    No.

17        Q    And back to the questions I was asking

18   before, the IEP wasn't revised?  You weren't present at

19   the 12-06 IEP meeting, correct?

20        A    No.

21        Q    The parents were present at that, right --

22   oh, well, never mind.  It doesn't matter.  Okay.  Back

HEARING IN RE: J██████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 66

1    to the 8-15-07 MDT notes, you stated that Anne Beers

2    wasn't discussed.  I'm looking at the first paragraph

3    just after -- about midway down it says the father was

4    given the option to place J████ in a smaller class, but

5    it would not be an inclusion class but an out of

6    general education class with fewer children.

7              DCPS answered parents' questions about

8    service delivery models offered by DCPS and options for

9    J█████.  At this time J████████ IEP is current and based

10   on the progress notes of 6-11-07 it appears to be

11   appropriate.  The information presented here is that

12   J█████ has not made progress.  Further down it actually

13   mentions Anne Beers where it says -- and I'm just going

14   to be reading the whole thing here.

15             This is the second paragraph starting midway

16   down and there are some letters that are cut off sort

17   of on mine but I can fill in.  DCPS is in disagreement

18   with the parent and believes that the IEP is

19   appropriate.  That documentation provided by the

20   teacher indicates that little progress was made, and

21   additionally the parent reports that J█████ demonstrated

22   some regression.

HEARING IN RE: J███ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 67

1          The team recommends that J████ be placed in

2    a self-contained program with a smaller teacher/student

3    ratio at Anne Beers.  The next page, J██████ placement

4    will be changed from West to Anne Beers.  So you stated

5    that this wasn't discussed at the meeting.  Are you

6    asserting that these notes do not correctly reflect

7    what was discussed at the meeting?

8          A    No.  Looking back at here they discussed --

9    they were very specific about saying that they -- a

10   least restrictive environment or smaller class size.

11   Anne Beers was not a focus of that meeting.  When we

12   got the prior notice placement we made the decision to

13   go observe Anne Beers, so I will state that it was

14   never not mentioned ever.

15         Q    But let me get this straight.  You will --

16         A    It was because I did testify --

17         Q    -- state that it was never not mentioned?

18         A    That's poorly worded, but --

19         Q    I'm sorry.

20         A    We did get the prior notice and it was -- it

21   was there on the page.

22         Q    Uh-huh.

Page 68

1       A       I did not write these notes and these notes

2    were written by the DCPS staff, but it was -- I will

3    state that they did say smaller class size and

4    inclusion class out of general education with fewer

5    students.  I was not in control of these meeting notes

6    so I got all of this at the end of the meeting.

7       Q       Uh-huh.  I'm just asking.

8       A       And we were -- I did state that in the prior

9    notice Anne Beers was on that sheet.

10      Q       But you're stating that Anne Beers wasn't

11   described at the meeting.  It seems like it was based

12   on these notes, so are you saying that these notes are

13   inaccurate?

14      A       No.  I mean, I'm stating that my impression

15   of that meeting and what I -- we spent the majority of

16   the time on on that meeting was inability to draft a

17   new IEP.  They stated that he needs a new placement and

18   the parents, you know, asked questions specific to

19   that.

20              Anne Beers -- maybe I should say that it was

21   stated on the IEP notes or on the prior notice notes.

22   Yes.  I'm sorry that I don't recall exactly the wordage

HEARING IN RE: J▮▮▮▮ A▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 69

1    of the whole meeting.  Does that --

2         Q    Okay.  Sure, sure.

3         A    I'm not denying that they had said Anne

4    Beers.

5         Q    Right.  Okay.  Okay.

6              MS. GEORGE:  I don't have any other

7    questions.  Thank you.

8              HEARING OFFICER:  Redirect?

9              MR. BOGIN:  Just briefly.

10                    REDIRECT EXAMINATION

11             BY MR. BOGIN:

12        Q    Going back to DCPS 3 and 4 and the August

13   15th meeting, was there a team -- was there a consensus

14   of the team including the DCPS individuals, you and the

15   parents, that Anne Beers was an appropriate placement

16   for J▮▮▮▮?

17        A    No.

18        Q    Was there a vote taken as to whether J▮▮▮

19   should be placed at Anne Beers?

20        A    No.

21        Q    How did J▮▮▮ get -- if you recall, if you

22   know how was the placement made for J▮▮▮ to go to Anne

HEARING IN RE: J███████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 70

1    Beers?

2        A     It was written on a prior notice.

3              MR. BOGIN:  I don't have anything further.

4              HEARING OFFICER:  Ms. Owens, do you

5    routinely participate in MDT meetings?

6              THE WITNESS:  When asked by the parents I

7    do.

8              HEARING OFFICER:  Do you ever take your own

9    notes, or do you have notes on this particular student

10   for this 8-15 meeting?

11             THE WITNESS:  I may have.  I do --

12             HEARING OFFICER:  But, I mean, it's

13   something that's -- it's not in the record.  You did

14   take notes of this meeting?

15             THE WITNESS:  I'd have to check back.

16             HEARING OFFICER:  Okay.  Because in addition

17   to the note regarding Anne Beers in the first couple of

18   lines in the notes it says that the progress notes were

19   given to you and the parents prior to the meeting.

20             THE WITNESS:  Prior to this meeting, but not

21   the meeting where I requested them for the June 11th

22   meeting.  I requested them ahead of that meeting.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 71

1                   HEARING OFFICER:  Okay.  So you did have

2    them prior to the August meeting?

3                   THE WITNESS:  They were.

4                   HEARING OFFICER:  Okay.  And then --

5                   THE WITNESS:  They were not changed.  I did

6    request at that meeting that we have more data because

7    the ones they did give us at the 11th meeting was not

8    adequate.

9                   HEARING OFFICER:  Okay.

10                  THE WITNESS:  And I had requested the

11   teachers also be present.

12                  HEARING OFFICER:  And then just make me

13   understand with DCPS 12 and 13 on why these are

14   inadequate progress notes.

15                  THE WITNESS:  Sure.  The first one is what I

16   would call a report card.  Every student in D.C. public

17   that's of this grade --

18                  MR. BOGIN:  You need to refer to --

19                  THE WITNESS:  D.C. 13, I'm sorry.

20                  HEARING OFFICER:  Oh, you're on 13.  Okay.

21                  THE WITNESS:  Yes.

22                  HEARING OFFICER:  So this is a report card?

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 72

1            THE WITNESS:  Right.

2            HEARING OFFICER:  But it does the -- I guess

3    the initials they're using, P for progressing and N for

4    needs support?

5            THE WITNESS:  Uh-huh.

6            HEARING OFFICER:  Despite the fact that it's

7    titled a progress report or that it's fashioned as a

8    report card to me it indicates status of progress.

9            THE WITNESS:  Right, but not based on

10   J███████ specific needs in his IEP and his

11   individualized plan.

12           HEARING OFFICER:  So I would need to go

13   through these categories of motor development,

14   cognitive, social emotional and see if these areas of a

15   determination were contemplated in the IEP, and your

16   testimony is that they're not congruent?

17           THE WITNESS:  They're not -- when an IEP is

18   drafted it is -- there's a way to chart evaluation and

19   based on percentages, how much time and how he has

20   mastered that, so this doesn't give me any indication

21   as to whether he's mastered his individualized goals.

22           HEARING OFFICER:  Okay.  In your experience

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 73

1    is there a standard form that's used?

2            THE WITNESS:  There is, and there's also

3    written progress notes that have been -- I do know that

4    the OT and speech therapist write down each session,

5    and when I did review his record at West there was no

6    documentation of those so there was no way of knowing

7    if they were meeting with him regularly either.

8            HEARING OFFICER:  So should there have been

9    tracking forms in that instance?

10           THE WITNESS:  There should have been some

11   sort of documentation of each session.

12           HEARING OFFICER:  And the -- was it your

13   testimony that the team in August reached a consensus

14   that the IEP could not be revised because of the lack

15   of documentation of progress?

16           THE WITNESS:  Yes, we didn't have enough to

17   change it and there was no -- there was nobody at that

18   meeting that worked with J█████, that has worked with

19   J█████ or that knew J█████ in order to make changes to

20   the document.

21           HEARING OFFICER:  But whoever authored the

22   meeting notes felt that there was enough input there to

HEARING IN RE:  J███████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 74

1    determine an appropriate class size and an appropriate

2    placement?

3                THE WITNESS:  I didn't feel they had

4    appropriate knowledge of J████ to do that.

5                HEARING OFFICER:  Okay.  And in your visit

6    with Anne Beers were you able to determine whether or

7    not the related service providers could provide

8    services at Anne Beers, because I know you testified

9    that the student could receive related services at the

10   private placement?  Is that not possible at Anne Beers?

11               THE WITNESS:  No, I asked about that to his

12   teacher and she said that there were part-time -- I did

13   not get to speak with them personally.  They weren't

14   there, but they said there were part-time specialists.

15               HEARING OFFICER:  Thank you.  Anything else

16   for this witness, Counsel?

17               MR. BOGIN:  No.

18               HEARING OFFICER:  Okay.  Ms. George?

19               MS. GEORGE:  No, thank you.

20               HEARING OFFICER:  Okay.  Thank you for your

21   time and testimony.  Call your next witness.

22               MR. BOGIN:  Can we go off?  Are we off the

HEARING IN RE: J███ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 75

1    record?

2            HEARING OFFICER:  We can go off the record

3    for two minutes.

4            (There was a brief pause in the

5    proceedings.)

6            HEARING OFFICER:  Okay.  We're back on

7    record in the matter of J████ A███████ born July 29th

8    of the year 2003.  Counsel, your next witness.

9            MR. BOGIN:  Yeah, we'd call Dr. Doyle

10   (phonetic), please.

11           HEARING OFFICER:  Dr. Doyle, would you raise

12   your right hand for me, please.

13                   GRIFFIN DOYLE, M.D.

14   having first been duly sworn, was examined and

15   testified as follows:

16           HEARING OFFICER:  All right.  Go ahead,

17   Counsel.

18                   DIRECT EXAMINATION

19           BY MR. BOGIN:

20      Q    Could you give us your name, please?

21      A    Griffin Doyle.

22           MR. BOGIN:  And Dr. Doyle's vitae is our

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 76

1    Exhibit JA 29.

2              HEARING OFFICER:  Uh-huh.  Okay.

3              MR. BOGIN:  We're going to proffer him as an

4    expert in psychology.

5              HEARING OFFICER:  Okay.  Ms. George.

6                   VOIR DIRE EXAMINATION

7              BY MS. GEORGE:

8         Q    I just wanted to clarify next to your name

9    it says Ph.D.?

10        A    Yes.

11        Q    Then down to the bottom I don't see -- is it

12   Washington Psychoanalytic Foundation, graduate of a

13   four year -- is that where you obtained your --

14        A    Catholic University.

15        Q    Oh, that's where it is.

16        A    It's postgraduate.

17             MS. GEORGE:  Thank you.  Thank you.  Sorry.

18             HEARING OFFICER:  Okay.  Dr. Doyle will be

19   qualified as an expert in the areas of --

20             MR. BOGIN:  Psychology.

21             HEARING OFFICER:  Thank you.

22             MS. GEORGE:  Okay.

HEARING IN RE: J█████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 77

1               DIRECT EXAMINATION (CONTINUED)

2               BY MR. BOGIN:

3        Q      Okay.  Dr. Doyle, are you familiar with

4   J█████ A████████?

5        A      Yes, I am.

6        Q      And could you give us your understanding of

7   his psychological makeup?

8        A      His psychological makeup begins with I think

9   his constitutional makeup that is what he came into

10  this world with that I think has been documented with

11  many, many of the evaluations he's had, general

12  developmental evaluations, occupational evaluations and

13  speech and language evaluations that I think point out

14  that, first of all, he's a guy who in terms of his

15  overall development, which certainly includes his

16  psychological development, is very delayed, I think

17  primarily due to these constitutional problems.

18              They have really in some areas crippled his

19  ability to develop very simple but critical early

20  functions that would lead to his being able to keep

21  moving up the developmental ladder.  For instance, I

22  think because of a lot of his sensory motor

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 78

1    dysfunction, his modulation problems, his overall motor

2    difficulties, particularly his inability to integrate

3    his sensory systems with his motor systems to get him

4    to organize what he's experiencing and then respond

5    back to the world, that that is really very, very

6    crippled.

7              So that one of the chief problems that I

8    think brought his parents to want to get some help was

9    that he really wasn't engaged -- he really wasn't being

10   a part of what was going on around him very, very

11   often.  There was also certainly the concern about his

12   lack of language development, which I think was maybe

13   initially the leading edge to seeking help and

14   clarification about why wasn't he not only developing

15   words but really using them in a practical social way,

16   why was he not even doing what comes before language,

17   is looking at somebody that he's with, at being

18   engaged, at smiling, at sharing something of curiosity,

19   sharing something scary, sharing something joyful, sort

20   of the whole range you would expect of a toddler and

21   now a preschooler.

22             The difficulty then also arises in that he's

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 79

1    -- it's been extremely difficult for him to become a

2    guy who is consistently -- what I would say is

3    intentional, that is that he has an idea or he gets a

4    spark somehow from his environment that gives him some

5    kind of motivation to take a step, to take some action,

6    that for him to be able to do that consistently either

7    when he's on his own, or better yet when he's in a

8    sharing social situation, really is if you think about

9    it such a basic, basic way to enter into the, you know,

10   the world so that people can really read and respond to

11   you, that they can see exactly what he's intending to

12   do because he signals it and he's executing something

13   that matters to him.

14              And that may be just returning a smile or it

15   may be his trying to figure out how to get a window

16   open, and if you try to help him he might push your

17   hand away because he wants to do it.  Those are very,

18   very clear kinds of intentions.  We can think of

19   thousands.  Because of that also that is really, that

20   is really the world in which children learn.  They

21   learn in a way by initiating, by having a desire and

22   following it, and they learn from what happens next and

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 80

1    that allows them to organize more and more and more in

2    more and more complex ways what their world is about

3    that we do until the day we die.

4              For him that has I think in part happened,

5    but I think it's very, very fragmented for him so that,

6    for instance, as the testing showed the one thing that

7    he is really almost age appropriate at is collecting

8    information.  He can do a lot of the age appropriate

9    things about colors, shapes, those kinds of facts that

10   certainly are -- is one area we like to see kids be

11   able to develop because what they're doing there is

12   they're categorizing things as having to do with each

13   other.

14             That's one very, very early cognitive way of

15   organizing your world.  But for him to take it into

16   much more complex thinking than that, to be able to

17   link those categories, to be able to see subtleties

18   between categories on an age appropriate level is

19   something that's really entirely a different kind of

20   thinking.

21             I also want to say that just in the last

22   couple of weeks he has shown signs with me when I meet

Page 81

1    with him and with his teachers that he is beginning to

2    see these links.  He hasn't actually taken the

3    initiative to clearly show everybody that he's finding

4    out the links, that he's actually making the

5    discoveries, but when something is put in front of him

6    as a link it's clear to see that he can see the

7    commonality of a happy face in a book and then being

8    able to sit down and now make shapes and faces and make

9    a face that's a happy face and to then make a face

10   that's not a happy face, so that he's crossing that

11   idea from receptively seeing it visually in a book to

12   actually producing it himself, that it's something he's

13   kind of comprehending anew.

14           I think he also psychologically right now is

15   a guy who is very, very difficult, and I was just

16   speaking with some of the other professionals involved,

17   to really get a sense of his patterns, to be able to

18   get more kind of clear information for yourself about

19   how to be with him and how to help him develop.  And I

20   think one of the hallmarks of what I've just described

21   is that he's a guy who sometimes is actually

22   functioning better than people expect and then suddenly

HEARING IN RE: J██████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 82

1    is not functioning that way at all.

2              And this can happen in a period of a minute

3    or two quick exchanges, so that being able to stay

4    engaged with him to help him develop is an enormous

5    challenge because of his inconsistent functioning, that

6    sometimes he can actually take initiative about

7    something that seems quite mature, age appropriate, and

8    then other times seems absolutely baffled,

9    self-absorbed by the simplest of action, the simplest

10   of what do I do next that he's kind of frozen in his

11   feet.

12             And I think that has made his development

13   and people being able to help his development that much

14   more complicated because he hasn't really been able to

15   organize enough about his world to start really

16   operating more consistently.  I think for the moment

17   the last thing I'd like to say is -- two things, I'm

18   sorry, but I think this inconsistency is really

19   documented in the testing, and I checked this with the

20   expert, the occupational therapists who are working

21   with him, that in the sensory world there's two kinds

22   of things that we're looking for, and that is how kids

HEARING IN RE: J████ A████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 83

1  are discriminating what they're experiencing, that they

2  can see the differences and they can get all their

3  senses to sort of weave together into making those

4  recognitions.

5         The other thing that we're looking for is

6  how their senses work separately in terms of how they

7  register sensation literally, like how much touch does

8  it take on someone's hand to actually have that nervous

9  system activated and tell you instantaneously that

10 somebody just touched the top of your hand.  With J████

11 his sensory system is neither regular nor is it too

12 sensitive nor not sensitive enough.  It is actually a

13 mixed sensory system.

14        Now, what that means is that what he's

15 hypersensitive to, that's very clear, sound and light

16 and to some extent on certain parts of his body tactile

17 sensation, particularly his mouth -- I mean, he's

18 particularly undersensitive with his mouth and his face

19 and his hands, but the rest of his body is

20 hypersensitive to touch.  He's also very undersensitive

21 to sensation in his muscles and his skeleton, which

22 they call the propria scepter (phonetic) system, so on

Page 84

1    the other hand instead of being overwhelmed by that

2    system being activated it's underwhelmed so that he's

3    sensing and seeking that kind of stimulation all the

4    time.

5              He's the kind of guy who could well become

6    kind of a thrillseeker because he wants to fall and he

7    wants to crash and he actually doesn't have a system

8    that tells him, you know, you really shouldn't jump

9    from the third step because that hurts too much. The

10   first step, okay.  So if you fall from there, you know,

11   it might hurt but it's tolerable and it's funny.  So

12   there is a very, very good example on such a

13   fundamental level why he's so inconsistent in his

14   behavior and his intention, because simultaneously he's

15   trying to calm his entire nervous system down and at

16   the same moment he is contradictorily trying to get it

17   going, and this is -- this is like someone who is

18   trying to, you know, rub their stomach and pat their

19   head at the same time.

20              I think the final thing I want to say right

21   now is so what does this mean in terms of him

22   psychologically, and that is that because of what I

HEARING IN RE: J██████ A███████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 85

1    just described he is a guy who has a strategy about his

2    world and that is that he stands back, he observes when

3    he's functioning as best as possible, when he can stand

4    still and watch and look and take something in, and

5    that eventually in some ways, particularly lately with

6    his peers at his school, then he ventures in and he

7    stands there.

8           He's not a guy who can say I want to do that

9    or boy that looks cool, but he stands there and if

10   someone kind of looks at him like does this look like

11   fun then he wants to do what the other kids are doing,

12   but this is a very complicated process for him because

13   at the same moment that he's turned on, that is his

14   nervous system is charged, he's simultaneously being

15   very, very vigilant that he's not going to become

16   overwhelmed and overstimulated and terrified.

17          So he really has to be in a position where

18   he's not going to do something where somebody tells him

19   to or respond to J█████, what's your name, that you're

20   out to get nothing from him that way, or things like

21   that.  But if kids are talking and people are saying

22   well, that's my grandma and that's so and so and so and

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 86

1   so and then his daddy walks in he's saying that's my

2   daddy and I'm J█████.  It has to start with him and that

3   is because then I think he intuitively knows he can --

4   he's got a much better chance that he's going to be

5   able to be involved and not become disregulated

6   constitutionally, his whole nervous system will start

7   to jangle and then he's got to go into a much more

8   primitive way of getting himself back together.

9            So in a way it's kind of genius when I think

10  about how he's operating that he's trying to walk a

11  fence all the time.  He's trying to do what he can to

12  develop.  He clearly is interested in people and he's

13  terribly, terribly constrained to be with people that

14  he's -- as a consequence oftentimes indecipherable and

15  he's left alone and he often wants to be alone.  And I

16  think it's misunderstood what's behind that, but he is

17  a guy who's got pervasive developmental problems that

18  is really crippling his overall human development.  I

19  hope what I've said so far answers your question.

20       Q    Okay.  And do you work with J█████ on a

21  regular basis?

22       A    Yes, I work with him on Tuesdays and

Page 87

1    Thursdays at 12 noon for an hour.

2         Q    And where is that?

3         A    That's at the Jenny Walter Center right

4    when they've concluded their morning, they finish their

5    day.

6         Q    And what are you doing with him?

7         A    Well, I think I can answer that better now

8    after what I said before.

9         Q    Okay.

10        A    And that is certainly part of what I'm doing

11   is I think an ongoing and an endless assessment that

12   has to keep being refined, and that is -- what I'm

13   looking for is how can we get engaged.  But in order to

14   do that what can I do to help him be able to get

15   engaged, and first and foremost what that means is can

16   I help him get relatively calm and alert.

17             And anybody who has been with J████ long

18   enough can clearly see -- you don't have to have any

19   extra degrees to see when he's calm and alert and

20   available, and that's the first thing that I'm shooting

21   for and so is he intuitively, to be able to take in his

22   world and have it register, have it be something he can

HEARING IN RE:  J▇▇▇▇▇ A▇▇▇▇▇
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 88

1    organize, have it be a tolerable amount of stimulation.

2              So first what I'm trying to do is

3    functionally help him be able to attend more to what

4    he's drawn to and to what he's experiencing in his

5    environment.  Once I see that he's actually there or if

6    I'm successful in helping him then I try to work off of

7    what matters to him.  I'll give you an example.  He

8    spends a lot of time looking at things and he doesn't

9    give much signal most of the time that he wants

10   somebody to look at it with him, or what exactly is he

11   looking at.  He doesn't point much and he doesn't name

12   much of the time.

13             So, for instance, he has a little -- they

14   have a lot of little swivel windows in his room where I

15   see him and he loves to go to the window.  People have

16   a lot of theories why other than what's naturally out

17   there.  It's -- I think it's at least sometimes clear

18   that what he's looking out the window for is his father

19   in his white car who is supposed to be coming within

20   the hour so that there's more clearly some purpose to

21   it.

22             At other times developmentally I think it's

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 89

1    much more the case that he's simply trying to take in

2    his world through the modality that I think he feels

3    most competent in, and that is his visual system.  When

4    he's at that window it's awful hard to try to be with

5    him.  He doesn't give you any cues.  He doesn't invite

6    you.  He doesn't do anything like that.  So when this

7    started happening with me what I thought was I've got

8    to find a way to make this window something that we're

9    sharing somehow, some way, and he doesn't have the

10   organization or the sequencing ability to do that

11   himself.

12          What I did then was I unlocked the window

13   and I started fiddling with the crank, and totally

14   trial and error, and what I learned was -- that day and

15   thereafter was that he's naturally interested in

16   figuring out how do things work.  This is one of the

17   ways all kids organize their work, but that they become

18   fascinated in how many blocks can I stack or how high

19   can I make it.  I can't count yet, but how high can I

20   make it before it's going to fall.

21          And his learning how to do something like

22   that is, one, very organizing, and it's two, exciting

HEARING IN RE: J███████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 90

1    for him to sense that he can make something like that

2    happen, that he doesn't just have to watch it or get

3    somebody to do it for him.  That's one of the ways that

4    I've found more reliably than others I can keep engaged

5    with him and he can keep calm and alert and look at me

6    and smile a little and let me do it and tell me how to

7    do it at my urging, and we are actually playing

8    together.

9             That is the task for me all the time.  That

10   is the task for the teachers and the occupational

11   therapists, but most of all it's the task of his mom

12   and his dad.  That is the -- in my words that is the

13   entry into getting into J███████ world and helping him

14   develop some of these fundamental skills where he's got

15   so many -- he doesn't have his equipment, if you will

16   -- pardon the phrase or word, but he doesn't have all

17   of his equipment that should be operating reliably for

18   him.  It doesn't work very well.

19             So how do we get him to keep developing

20   anyway?  That's what I do with him every day.  I'm

21   focusing mostly on that kind of early, early

22   functioning, and I'm also focusing on trying to help

HEARING IN RE: J▮▮▮▮▮ A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 91

1   him activate and get motivated and intentional through

2   what matters to him, through what naturally turns him

3   on, like making something happen with his hands and his

4   eyes and so forth.

5        Q    Okay.  Now, you said you see him at Jenny

6   Walter Hall.  Do you have an opinion as to whether the

7   work you do and similar kinds of services needs to be

8   provided as part of his educational program?

9        A    Yes, I do, very much.  I said that in my

10  statement I wrote.  I think that it's critical that he

11  needs to have a really multidimensional approach to him

12  because he has pervasive multiple delays in many

13  different systems of his body and less tangibly his

14  mind that the OTs have to learn some of what I do and I

15  have to learn what they do, and so do the teachers and

16  mom and dad, that we have to be thinking about as much

17  as we can all of him all of the time.

18       So that's why I say I have to start with is

19  his system, is his nervous system relatively operating

20  now so we can try to get engaged, so we can go back and

21  forth, so he can learn, so he can explore.  That is the

22  approach they're taking at Jenny Walter.  I know Jenny

Page 92

1   Walter from previous years, and I've been thrilled to

2   see how they've been approaching him and how he's

3   responded, especially how astoundingly he's responded

4   to being with peers that are very alluring to him and

5   really are pulling him developmentally as I described

6   earlier.

7           He sees something they're doing and once he

8   feels he understands it enough and it's safe enough he

9   wants to be with them, he wants to share it, he wants

10  to do it also.  So it's a really -- a very, very

11  comprehensive approach that he needs as well as these

12  separate therapies that he's engaged in now.

13      Q       Okay.  And is there a name to the work that

14  you're doing with him?

15      A       Well, I think the work that I'm doing is

16  most broadly called relationship-based developmental

17  psychotherapy.  It's also called DIR and is considered

18  to be probably one of -- probably the most

19  comprehensive relationship-based approach to children

20  with pervasive developmental delays.  Excuse me.

21      Q       Okay.  And what's DIR stand for?

22      A       It stands for developmental individual

HEARING IN RE: J████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 93

1  difference relationship-based therapy, individual

2  difference meaning sensory motor, constitutional, early

3  neurological differences that every child is born with.

4  Some of them call it temperament.  We need to break it

5  down much, much more than that.

6        Q    Okay.  And you said that from earlier times

7  you were familiar with Jenny Walter Hall Center?

8        A    Yes.

9        Q    And as a psychologist are you able to form

10 an opinion about the appropriateness of that as an

11 educational placement for J█████?

12       A    Yes.  As a psychologist I don't want to

13 repeat myself, but I just said that I think it's more

14 than just a preschool where you're trying to educate

15 and work with kids who are, you know, within a range

16 typically developing children.  That requires an

17 enormous expertise in and of itself and we all know it,

18 but at Jenny Walter what they're doing and what their

19 mission is is to work with kids who are atypically

20 developing, who have to be understood as incredibly

21 unique, that they can't be given the same approach as a

22 more typically developing child because they don't

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1    possess and they're very, very crippled in developing

2    higher order functioning that they need to keep

3    learning to work their way right up the scale to be

4    able to think abstractly, to be able to deal with

5    playground politics, to work, to be able to negotiate

6    their social world, to deal with frustration, a lot of

7    the things we think of for preschool children, how to

8    get them ready for what's going to be a much more

9    demanding and a much -- it's going to require a great,

10   great deal of regulation and understanding when they

11   enter a regular primary school.

12           So Jenny Walter is really very, very special

13   that way because they founded themselves on having a

14   psychological, but I think a much more thoroughly

15   psychological view of the child that it's not just

16   about their psyche but it's about the entire child,

17   that one of the parts of the child becomes yes, their

18   psyche and their mind and how do they function and how

19   do they function with adversity, how do they relate to

20   another person, how do they find gratification, but all

21   of that has to be founded on much, much earlier

22   functions that these children in a regular preschool

1    who are typically developing are able to master with

2    much, much less heartache, with much more a sense of --

3    in a reasonable amount of time of mastery and then they

4    can move on to something else.

5            These kids have a different path.  They have

6    a very, very different path, and if people don't

7    approach them understanding just how complicated and

8    unique they are they're much more liable to stagnate

9    than develop.

10       Q    Okay.  And just so the record is clear, how

11   often and for how long do you see J█████ at Jenny Walter

12   Hall?

13       A    How long do I foresee --

14            MS. GEORGE:  Asked and answered -- oh, I'm

15   sorry.  Go ahead.

16            BY MR. BOGIN:

17       Q    How long -- how many times a week do you see

18   him?

19            MS. GEORGE:  That was asked and answered.

20            THE WITNESS:  Twice a week.

21            MS. GEORGE:  He said --

22            HEARING OFFICER:  I'll allow it.

Page 96

1          MS. GEORGE:  -- Tuesday and Thursday for one

2    hour a day.

3          HEARING OFFICER:  Okay.  I'll allow it in.

4          BY MR. BOGIN:

5    Q     Right.  And for an hour a day?

6    A     For an hour a day.

7    Q     And do you think -- in your opinion is that

8    an appropriate amount of service for you to provide?

9    A     I think that's an appropriate amount of

10   service for me to provide directly to him.  I think

11   there's other services I need to provide as well about

12   him.

13   Q     Such as?

14   A     Such as first and foremost working with his

15   mom and dad on how do we see them as really the most

16   instrumental people in J█████ world, how do they help

17   him developmentally all day long.  They can't get down

18   on the floor with him.  They can't knock off two hours

19   a day to do what I do like is often recommended, you

20   know, in the books, but how can they adapt the

21   principles I've been talking about to J█████ and their

22   real world, their family.

HEARING IN RE: J████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 97

1          So that's I think a critical thing for me to

2    collaborate with them about, as well as collaborating

3    particularly with the teachers who have the most

4    opportunities every single day to help him with his

5    development, that we need to be cross -- what I call

6    sort of cross-pollinating, exchanging information,

7    educating each other with our expertise, and that

8    certainly includes working with the rest of the

9    professional team, the speech and the occupational

10   therapists on how to keep thinking about him as a whole

11   child and how to use what we're all finding better --

12   that works better and better and better with him so

13   that his development is something that we not only can

14   speed up but we can do it more and more efficiently.

15          MR. BOGIN:  I don't have any further

16   questions.

17          HEARING OFFICER:  Ms. George.

18               CROSS-EXAMINATION

19          BY MS. GEORGE:

20     Q    Dr. Doyle, I just have a couple of

21   questions.

22     A    Sure.

HEARING IN RE: J████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 98

1      Q     Did you first meet J████ when he enrolled at

2   Jenny Walter?

3      A     No, I first met him in October once he had

4   already been there --

5      Q     Okay.

6      A     -- for I think six weeks, I guess, something

7   like that.

8      Q     Okay.  So it may be oversimplified a little

9   bit -- a lot.  You provide him with psychological

10  counseling; is that right?

11     A     Well, I wouldn't really call it

12  psychological counseling.

13     Q     If you were going to call it something at an

14  IEP -- do you know what an IEP is?

15     A     Sure.

16     Q     If you were going to call it something at an

17  IEP what would it be called?

18     A     I would call it developmental psychotherapy.

19  I'm trying to help him develop psychological tools to

20  -- that are pillars for the rest of his development.

21     Q     Okay.  Are you providing your services

22  pursuant to an IEP at Jenny Walter?

HEARING IN RE: J████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 99

1        A      I don't think I've seen it on an IEP.  It

2   may be -- I may be on an IEP, but --

3        Q      You've never seen one?

4        A      To my best recollection I don't know that,

5   no.

6        Q      Okay.  Do you think that it's true that

7   J████ needs to be in an out of general education

8   setting?

9        A      Yes.

10       Q      Yes.  Is it true he needs a small class size

11  and a low student to teacher ratio?

12       A      Yes.

13              MS. GEORGE:  Okay.  That's all.  Thanks.

14              HEARING OFFICER:  Redirect?

15              MR. BOGIN:  I have no questions.

16              HEARING OFFICER:  Doctor, there was -- we

17  took some earlier testimony in regards to the student's

18  progress, and we received on record some testimony that

19  attempted to describe the difference between regression

20  and signs of no progress.

21              THE WITNESS:  Uh-huh.

22              HEARING OFFICER:  Some of your testimony --

Page 100

1    let's see.  You talked about the student having -- let

2    me get to it -- constitutional problems?

3                    THE WITNESS:  Yes.

4                    HEARING OFFICER:  That cripple his ability

5    to develop?

6                    THE WITNESS:  Yes.

7                    HEARING OFFICER:  Would you -- okay.  Just

8    trying to maybe synchronize the terms of art that we've

9    had.  When you say crippling the ability to develop,

10   would you say that that is a sign of -- that it would

11   manifest itself into a sign of regression or a sign of

12   no progress?

13                   THE WITNESS:  I would say it would be closer

14   to say that the debilitating effects of his

15   constitutional problems would cause periodic

16   regressions from time to time.  I think more

17   characteristically how it would manifest would be that

18   his progress would be more gradual, might even take a

19   pattern of two steps forward and one step back like a

20   little bit of a regression.

21                   HEARING OFFICER:  And just so we're talking

22   the same language, the information that I received is

HEARING IN RE: J███████ A██████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 101

1    that regression or signs of regression would manifest

2    itself when a student one day could display a certain

3    skill and then another day would not be able to display

4    that skill.  That's the regression, and no progress is

5    just if you set a goal for a particular student and

6    over the course of that year he does not achieve or

7    accomplish that goal.

8            THE WITNESS:  Well, I think of regression

9    and I think of progress maybe a little differently,

10   especially with these -- all of these kinds of kids

11   that have pervasive delays.

12           HEARING OFFICER:  Right.  So just based on

13   the information that I have with my understanding of

14   regression and no progress what would you -- which side

15   would the crippling the ability to develop, which side

16   would you put that on?

17           THE WITNESS:  I would put that on that

18   periodic regression, that his variable functioning

19   would be typical of kids like this and that their

20   progress would be shown by having fewer and fewer

21   regressions and that their -- the steps forward they

22   take are becoming more and more consistent and more and

HEARING IN RE: J_____ A_____
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 102

1    more solid.

2                HEARING OFFICER:  Okay.  And that

3    developmental delay, would that be effectively -- in

4    your experience would that be effectively addressed

5    through a classroom setting or through related

6    services?

7                THE WITNESS:  I think it would be addressed

8    through both of those services plus the occupational

9    therapy and the speech therapy which are really

10   addressing in many ways the constitutional problems,

11   the nervous systems themselves that are, as I put it,

12   the equipment that he was born with that isn't very --

13   excuse me -- very reliable for him, which also explains

14   why some days he's functioning like he's progressed and

15   then inexplicably another time he may not be, that

16   that's one of the terrible, terrible headaches for kids

17   who have atypical nervous systems, is that they don't

18   -- they're not consistent themselves, and it's --

19   that's one of the great challenges I think for kids

20   like this.

21               HEARING OFFICER:  Okay.  Thank you, sir.

22   Anything else for this witness?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789  (301) 762-8282  (703) 288-0026   (410) 539-3664

HEARING IN RE: J_____ A_____
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 103

1          MR. BOGIN:  Yes.

2                    REDIRECT EXAMINATION

3          BY MR. BOGIN:

4     Q     Following up on what you were just asked, in

5  your opinion would it then be important to chart

6  J_____ progress over a long period of time and

7  contemporaneously?

8     A     Yes.  It would be -- it's critical to both

9  see what was happening with him from moment to moment

10  or day to day, but it's very, very important to be able

11  to see the big picture about him, which I think is

12  exactly what we're talking about now in terms of the

13  patterns with which he behaves.

14          And one of the patterns being what I

15  described earlier and the other professionals that I

16  just spoke with were all saying here's a guy who most

17  typically some days seems to be very -- quite

18  regulated.  His language knocks people out because they

19  don't expect it because it seems so much more mature,

20  and then the following week he won't respond to any

21  kind of direction, he's self-absorbed, he's

22  nonresponsive, he's rather inactive so that one could

HEARING IN RE: J██████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 104

1   get very misled and alarmed that uh-oh, this is a

2   really serious regression.

3          That's why I think being able to see the

4   pattern hopefully taking an upward trend knowing that

5   along the way that there are going to be -- there's

6   going to be a bumpy road is absolutely critical so that

7   you don't get caught up in what's happening from day to

8   day but you certainly notice it, observe it and work

9   with it.

10          MR. BOGIN:  I don't have anything further.

11          HEARING OFFICER:  Have you had an occasion

12   to work with an IEP team or participate in an MDT

13   meeting on behalf of a student?

14          THE WITNESS:  Yes, I haven't in quite a

15   while in the district, but many, many, many times in

16   Montgomery County.

17          HEARING OFFICER:  Okay.  Could you take a

18   look at -- Counsel, could you refer him to DCPS 12 and

19   13?

20          THE WITNESS:  Do you want to just show me

21   it?

22          MR. BOGIN:  Yeah.  That's 12.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 105

1          HEARING OFFICER:  Just look at 12 first.

2          THE WITNESS:  Sure.

3          HEARING OFFICER:  Just read it over and then

4    let me know when you've had a chance to --

5          THE WITNESS:  Okay.

6          (There was a brief pause in the

7    proceedings.)

8          THE WITNESS:  Okay.

9          HEARING OFFICER:  Without going into the

10   specifics of that document in general what does that

11   document suggest to you, what does that document

12   provide you with?

13         THE WITNESS:  Well, I would say overall what

14   it provides me with is the special educator here, this

15   list of cognitive and speech and language goals are all

16   over the developmental map.  In other words,

17   understanding concepts, for instance, is a much, much

18   higher function than lack of eye contact.

19         HEARING OFFICER:  Okay.  I guess what I'm

20   trying to determine is if you were to try to put

21   yourself in the place of the author of this document

22   what does this document purport to -- what type of

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 106

1    information does this document purport to give to a

2    reader, to a member of an IEP team?

3              THE WITNESS:  Well, frankly what it would

4    mean to me, if someone said help us with our IEP here

5    what I would say is that this conveys to me that the

6    team doesn't understand J████ developmentally.

7              HEARING OFFICER:  And going over to 13, just

8    let me know when you've had a chance to read that.

9              (There was a brief pause in the

10   proceedings.)

11             THE WITNESS:  Okay.

12             HEARING OFFICER:  Okay.  Based on that

13   document and the prior document that you just looked

14   at, on those two documents, are you able to determine

15   whether or not this particular student is making any

16   progress?

17             THE WITNESS:  Well, it's hard for me to say

18   because I don't know what the baseline was, for

19   instance, in semester one, whether -- for instance,

20   under motor development it's got a P that he can jump.

21   I don't know if the first semester that was considered

22   to be a, you know, a target or a goal.

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 107

1              HEARING OFFICER:  Okay.  I see what you're

2    saying.  They seem to try to give you a scoring key so

3    you know what the initials stand for, but you're saying

4    that you don't have the baseline?

5              THE WITNESS:  I don't see the baseline, sir.

6    I mean, I see the days of instruction and so forth.

7    That's all.

8              HEARING OFFICER:  Okay.  Anything else for

9    this witness?

10             MR. BOGIN:  No.

11             HEARING OFFICER:  Okay.

12             MS. GEORGE:  No.

13             HEARING OFFICER:  Thank you for your time

14   and testimony.

15             THE WITNESS:  Okay.  Thank you.

16             MR. BOGIN:  Let me see who's --

17             MS. GEORGE:  Wait.  I have to point out that

18   now I have a problem with my witness because when I

19   called her she said -- I told her I'd call her before

20   12:30 and she said oh, that's good because I'm sick and

21   I was thinking about going home early, so as long as I

22   could -- if I could call her out of order.

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 108

1              MR. BOGIN:  Or we're not -- I don't think

2    we're going to get done by 2:00.  How many people --

3    are we off?

4              HEARING OFFICER:  No, we're still on the

5    record.

6              MR. BOGIN:  I'd like to know how many people

7    DCPS is planning on calling so we can figure out

8    whether --

9              MS. GEORGE:  Two.

10             MR. BOGIN:  And I've got four more.

11             HEARING OFFICER:  I think with the next

12   witnesses -- I'm not sure if DCPS is willing to

13   stipulate, but I think that I have enough information

14   in regards to the private placement.  I would like to

15   have more information in regards to whether or not

16   there was a determination of progress or whether or not

17   there was a division of information that would have

18   given the IEP team information on progress, and whether

19   or not there was a notice of placement for Anne Beers.

20   So if you want to limit your line of questioning to the

21   questions that I have as well as the issues that are

22   laid out in your complaint then we may be able to

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 109

1    expedite the testimony.

2              MR. BOGIN:  I'm just trying to process that

3    for a second.

4              HEARING OFFICER:  Okay.

5              MR. BOGIN:  So just so I'm clear --

6              HEARING OFFICER:  Meaning that, of course, I

7    would hear the challenge from you, but I don't know if

8    I need anymore information in regards to the private

9    school placement --

10             MS. GEORGE:  I'll -- okay.

11             HEARING OFFICER:  -- and whether or not it's

12   appropriate.

13             MS. GEORGE:  You've heard enough to

14   determine whether it can provide educational benefit,

15   in other words?

16             HEARING OFFICER:  Well, I -- do you have

17   challenges for that?  I'm still on the front end.

18             MS. GEORGE:  I actually don't, so --

19             HEARING OFFICER:  Okay.  So if that helps

20   you out.

21             MR. BOGIN:  Well, yes.  I mean --

22             HEARING OFFICER:  Okay.

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 110

1          MR. BOGIN:  And so here's who I have left,

2     the director of Jenny Walter Hall to talk about why

3     it's appropriate.  I presume we don't need that.

4          HEARING OFFICER:  (Inaudible).

5          MR. BOGIN:  The speech and language person

6     who is providing services.  From your discussion it

7     sounds like we don't need that, and -- as well as the

8     occupational therapist.

9          HEARING OFFICER:  Well, I would like to try

10    to make clear whether or not the related services could

11    be provided at DCPS's placement, and if not why not.

12         MR. BOGIN:  Well, we're not going to --

13    okay.  That's not -- that's a different --

14         HEARING OFFICER:  Right.  So DCPS, are you

15    guys willing to concede -- Ms. George, are you willing

16    to concede that the speech and language services are

17    appropriate?

18         MS. GEORGE:  That what speech and language

19    services are appropriate?

20         MR. BOGIN:  That we're providing, or I can

21    just bring them in.

22         MS. GEORGE:  Oh.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 111

1           MR. BOGIN:  I can bring them in briefly.

2           HEARING OFFICER:  I know that we kind of

3    pointed out -- Ms. George kind of pointed out that the

4    services that the previous witnesses is providing was

5    not contemplated by the IEP, so I'm not sure if there's

6    going to be a similar challenge to the speech and

7    language therapies.

8           MS. GEORGE:  The current IEP calls for OT

9    services and speech and language services.

10          MR. BOGIN:  Right.

11          HEARING OFFICER:  Okay.

12          MR. BOGIN:  No, we're providing -- of course

13   we don't agree that --

14          HEARING OFFICER:  Okay.

15          MR. BOGIN:  I mean, that sort of hamstrings

16   us.  I mean --

17          HEARING OFFICER:  Okay.  Let's proceed.  I

18   just -- I wanted to --

19          MR. BOGIN:  I understand that and I

20   appreciate that.

21          HEARING OFFICER:  Okay.

22          MR. BOGIN:  I'll just bring them in, say

Page 112

1    what they're doing so it's on the record, and if DCPS

2    objects -- I mean challenges it that's fine.  If not

3    we'll just -- you know, it'll be quick.

4              HEARING OFFICER:  Okay.

5              MR. BOGIN:  I'll just say, you know, give us

6    -- their background is in the record.  You work with

7    J█████, how often and what are you doing, and that's --

8              HEARING OFFICER:  Fantastic.

9              MR. BOGIN:  Okay.  Can we go off the record?

10             HEARING OFFICER:  Go off the record for two

11   minutes.

12             MR. BOGIN:  See who's there.

13             (There was a brief recess in the

14   proceedings.)

15             HEARING OFFICER:  We're back on the record

16   in the matter of J█████ A█████████ born ███████████ of the

17   year 2003.  Counsel.

18             MR. BOGIN:  Yeah, we'd call Carmel Higgins

19   -- oh, I'm sorry, I'm sorry.  Unless -- give us -- I

20   looked at the wrong resume.  I'm sorry.  Give us your

21   name, please.

22             THE WITNESS:  Leslie Humes (phonetic).

HEARING IN RE: J█████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 113

1          HEARING OFFICER:  Who are we calling?

2          MR. BOGIN:  Ms. Humes.

3          HEARING OFFICER:  Okay.  Ms. Humes, do you

4     want to raise your right hand for me, please?

5                    LESLIE HUMES,

6     having first been duly sworn, was examined and

7     testified as follows:

8          HEARING OFFICER:  Okay.  Counsel, you may

9     proceed.

10          MR. BOGIN:  And -- well, sign in for us,

11     please.

12          THE WITNESS:  Okay.

13          MR. BOGIN:  And Ms. Humes' resume for the

14     record is our Exhibit JA 30F -- 30.

15          HEARING OFFICER:  Thank you.

16                 DIRECT EXAMINATION

17          BY MR. BOGIN:

18     Q     Okay.  And what's your profession?

19     A     I'm a speech language pathologist.

20     Q     And do you see J████ A███████?

21     A     He's seen by Stacy Rayna (phonetic).  She is

22     a therapist at my practice.

HEARING IN RE: J████ A██████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 114

1      Q      Okay.  And how often does Ms. Rayna see him?

2      A      Two hours a week.

3      Q      And where?

4      A      She sees him at his day care.

5      Q      Which is called?

6      A      Capitol Cities --

7             FEMALE SPEAKER:  Model Cities.

8             THE WITNESS:  Model Cities.  I'm sorry.

9      Model Cities.  I was there last week to visit and to

10     observe.

11            BY MR. BOGIN:

12     Q      Okay.  And what is she working on?

13     A      She is working on his speech language goals

14     that were recommended by DCPS.

15            MR. BOGIN:  Okay.  I don't have any further

16     questions.

17            HEARING OFFICER:  Ms. George.

18                   CROSS-EXAMINATION

19            BY MS. GEORGE:

20     Q      When you say speech language goals that were

21     recommended by DCPS --

22     A      Uh-huh.

HEARING IN RE: J̶̶̶̶̶̶̶̶ A̶̶̶̶̶̶̶̶

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 115

1      Q      -- where were they recommended, do you --

2      A      It's -- what we did was we used the IEP from

3   12-12-06.

4      Q      Okay.

5      A      And we've been working towards those goals

6   and also implementing some more auditory processing

7   goals that weren't in there, but the basis of the

8   therapy was to work towards progress for these goals.

9             MS. GEORGE:  Okay.  Thanks, Ms. Humes.  I

10  don't have any other questions.

11            THE WITNESS:  Okay.

12            HEARING OFFICER:  Are you done with this

13  witness?

14            MR. BOGIN:  Yeah.  Ms. Stevenson will be our

15  next witness.  I'll go get her.

16            HEARING OFFICER:  Could you sign Mr. -- Dr.

17  Doyle's name as well?

18            MR. BOGIN:  Okay.  Ready?

19            THE WITNESS:  Yes.

20            MR. BOGIN:  Give us your name, please.

21            THE WITNESS:  Erin Stevenson.

22            HEARING OFFICER:  Ms. Stevenson, raise your

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 116

1    right hand, please.

2                    ERIN STEVENSON,

3    having first been duly sworn, was examined and

4    testified as follows:

5                    HEARING OFFICER:  Okay, Counsel.

6                    DIRECT EXAMINATION

7                    BY MR. BOGIN:

8        Q    And what's your profession?

9        A    Occupational therapist.

10       Q    And do you know J▓▓▓ A▓▓▓▓▓▓?

11       A    Yes, I do.  I work with him.

12       Q    How often?

13       A    Two days a week.

14       Q    For how long?

15       A    Sixty minutes each session.

16       Q    Okay.  And what are you working on with him?

17       A    I am also working on the goals that were

18   presented from his IEP, working on fine motor, visual

19   motor activities as well as sensory integration,

20   postural control, things like that.

21                    MR. BOGIN:  Okay.  I don't have any further

22   questions.

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 117

1          HEARING OFFICER:  Ms. George.

2                CROSS-EXAMINATION

3          BY MS. GEORGE:

4     Q     When did you start working with him?

5     A     Well, he started at our summer camp in June

6     and then I started working with him at the day care in

7     August.

8          MS. GEORGE:  Okay.  Thank you.

9          HEARING OFFICER:  Any redirect?

10         MR. BOGIN:  None.

11         HEARING OFFICER:  Okay.  Thank you for your

12    time and testimony.

13         MR. BOGIN:  Thank you.

14         HEARING OFFICER:  Call your next witness.

15         MR. BOGIN:  Do you want to call your --

16         MS. GEORGE:  That would be great.

17         MR. BOGIN:  Because Ms. Steele is going to

18    be a while I think, so --

19         MS. GEORGE:  Oh, okay.  Ms. Steele is the

20    mother?

21         MR. BOGIN:  The mother.

22         MS. GEORGE:  Okay.

HEARING IN RE: J███████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 118

1           (There was a brief pause in the

2    proceedings.)

3           MS. GEORGE:  Good morning, Ms. Matthews.

4    This is Laura George.  I'm in the hearing now.

5           THE WITNESS:  Okay.  Can I put you on hold

6    for one moment?

7           MS. GEORGE:  Sure, sure.

8           HEARING OFFICER:  Is there a volume there?

9           MS. GEORGE:  I put it up as far as I could.

10          HEARING OFFICER:  Do you want to grab that

11   mic.

12          (There was a brief pause in the

13   proceedings.)

14          THE WITNESS:  Hello?

15          MS. GEORGE:  Ms. Matthews, yes.

16          THE WITNESS:  Yes, I'm going to go to

17   another office because they're having a meeting in

18   here.

19          MS. GEORGE:  Do you want me to call you at

20   another office?

21          THE WITNESS:  Yes.  The number is --

22          MS. GEORGE:  Okay.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 119

1           THE WITNESS:  -- 645-3250.

2           MS. GEORGE:  Okay.  Thank you.

3           THE WITNESS:  Give me two minutes to get

4     down there.

5           MS. GEORGE:  Okay.

6           MR. BOGIN:  Can we go off the record for a

7     second?

8           HEARING OFFICER:  Off the record for two

9     minutes.

10          (There was a brief recess in the

11    proceedings.)

12          HEARING OFFICER:  Back on the record in the

13    matter of J████ A████████, born ████ ████, 2003.

14          THE WITNESS:  Good morning.  Anne Beers.

15    This is Mrs. Matthews speaking.

16          MS. GEORGE:  Mrs. Matthews, this is Laura

17    George again.  Are you all set there?

18          THE WITNESS:  Yes, I am.

19          MS. GEORGE:  Okay.  The hearing officer will

20    swear you in first.

21          HEARING OFFICER:  Okay.  Ms. Matthews, this

22    is Will Purcell, the hearing officer.  Can you hear us

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 120

1  okay?

2                THE WITNESS:  Yes.

3                HEARING OFFICER:  Okay.  Would you raise

4  your right hand, please?

5                THE WITNESS:  Okay

6                        MS. MATTHEWS,

7  having first been duly sworn, was examined and

8  testified telephonically as follows:

9                HEARING OFFICER:  Okay.

10                    DIRECT EXAMINATION

11              BY MS. GEORGE:

12      Q    Ms. Matthews, could you begin by stating

13  your position and where you work?

14      A    Okay.  I'm the special education coordinator

15  at both Anne Beers and Benning Elementary School.

16      Q    Okay.  How long have you been the special

17  education coordinator at Anne Beers?

18      A    This will be my second school year.

19      Q    Okay.  Now, have you ever met J█████

20  A██████████?

21      A    No.

22      Q    Okay.  But are you familiar with him?

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 121

```
 1        A      Yes.

 2        Q      All right.  Have you reviewed an IEP for

 3   J█████ A█████████ that was developed in December of '06?

 4        A      Yes.

 5        Q      Okay.  Do you have anything in front of you

 6   now?

 7        A      Yes, I do.

 8        Q      Do you have the documents I gave you?

 9        A      Yes.

10        Q      The documents I gave her are my disclosures.

11              MR. BOGIN:  Just so I'm clear, but not ours?

12              MS. GEORGE:  No.

13              BY MS. GEORGE:

14        Q      All right.  Can you tell us, Ms. Matthews,

15   if -- can you describe the program that would have been

16   provided for J█████ A█████████, a 4 year old, if he had

17   attended Anne Beers in the 07/08 school year?

18        A      Okay.  What we have is a noncategorical

19   early childhood program.

20        Q      Okay.

21        A      It's a full-time program that provides

22   intensive special education instruction to children
```

HEARING IN RE: J█████ A█████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 122

1  ages three and four.  The program has ten students, one

2  teacher and one paraprofessional.  We also have related

3  service providers, speech therapists, occupational

4  therapists, physical therapists (inaudible) P.E.

5  teacher to provide services that are on a student's

6  IEP.

7      Q    Okay.  We had a witness here who testified

8  that she had visited Anne Beers.  I don't know if you

9  were aware of her visit earlier this year.  Stephanie

10  Owens, do you recall her visit?

11      A    No, I don't.

12      Q    Okay.  Well, she made some statements about

13  what she witnessed there and I'm going to ask you if it

14  reflects what you know to be true about Anne Beers.

15      A    Okay.

16      Q    In the classroom that J████ would have been

17  in is it extremely noisy?

18          MR. BOGIN:  Objection.  Lack of foundation.

19          MS. GEORGE:  Foundation?

20          MR. BOGIN:  All we know is she's the

21  coordinator.  She's not the teacher, so we don't know

22  when or if she's in the classroom.

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 123

1          HEARING OFFICER:  The class that the student

2    would have been in, is there only one class for this

3    particular student, they identified the class based on

4    the IEP?

5          MS. GEORGE:  I can -- I'll ask some more

6    questions.

7          HEARING OFFICER:  Thank you.

8          BY MS. GEORGE:

9      Q    So Ms. Matthews, are you familiar with the

10   class -- is there only one classroom that the student

11   would have been in in the 07/08 school year?

12     A    Yes.

13     Q    It's the one with ten students and one

14   teacher?

15     A    Right.

16     Q    And have you visited that classroom this

17   year?

18     A    Yes, several times.

19     Q    Several times?

20     A    Uh-huh.

21     Q    Okay.  Would you describe it as being

22   extremely noisy?

HEARING IN RE: J███████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 124

1      A      No, I wouldn't describe it as being

2   extremely noisy.

3      Q      What would you describe the noise level as?

4      A      About average.  I mean, these are three and

5   four year olds, and there are times when they're going

6   to be playing and giggling and having a good time or

7   they're singing, and that could appear to be extremely

8   noisy.

9      Q      Okay.  Do you think that -- are picture

10  schedules used in the classroom?

11     A      Yes.

12     Q      Okay.  Are transitional routines utilized in

13  the classroom?

14     A      Yes.

15     Q      Would you describe the students in the

16  classroom for the 07/08 school year as low functioning

17  academically and behaviorally?

18     A      There's a range.  There are some students

19  that are higher functioning than others.

20     Q      What is academic functioning when you're

21  talking about a four year old?

22     A      Right, that is the question, because at this

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 125

1    age group you're really focusing on socializing,

2    socialization of skills, daily living skills.  The

3    academic piece is basic colors, letters, alphabet, but

4    most of it is the socialization and the daily living

5    skills.

6        Q    Okay.  And you said there's a range in that

7    level of functioning in the classroom?

8        A    Yes.

9        Q    Would you describe the classroom as being

10   structured?

11       A    Yes.

12       Q    Does the teacher provide transitional cues?

13       A    Yes, she does.

14       Q    Are integrated therapy services provided?

15       A    You mean therapy inside of the classroom?

16       Q    Not necessarily.

17            MR. BOGIN:  Objection.

18            HEARING OFFICER:  Basis?

19            MR. BOGIN:  The witness doesn't -- the

20   witness needs to answer questions, not ask, and counsel

21   needs to ask questions, not answer.

22            HEARING OFFICER:  Sustained.

HEARING IN RE: J▮▮▮▮▮ A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 126

1          MS. GEORGE:  I'll move on.

2          BY MS. GEORGE:

3     Q    Do you think there's a high level of

4 behavior needs in the classroom?

5     A    No.

6     Q    Are all the students functioning on a low

7 level with respect to language?

8     A    Yes, most of them are, yes.

9     Q    Most of them are?

10    A    Uh-huh.

11    Q    So you say that there's one student -- I

12 mean one teacher and one paraprofessional?

13    A    Yes.

14    Q    So the student to teacher ratio is one to

15 five, correct?

16    A    Yes.

17         MR. BOGIN:  Objection.

18         HEARING OFFICER:  Basis?

19         MR. BOGIN:  That's incorrect.  It's not --

20         HEARING OFFICER:  You can handle it on

21 cross.

22         MR. BOGIN:  It's not a correct statement of

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 127

1    the testimony.

2            HEARING OFFICER:  Oh, okay.  You used prior

3    testimony in your question?

4            MR. BOGIN:  She said there were ten students

5    and one teacher, and then she said that the

6    student/teacher ratio --

7            MS. GEORGE:  Oh.

8            MR. BOGIN:  -- is five to one.

9            HEARING OFFICER:  Oh, okay.  That's fine.

10   You can clear that up on cross.

11           MS. GEORGE:  Thank you.

12           BY MS. GEORGE:

13      Q    In the classroom are there models for

14   pragmatic language use?

15      A    Yes, there are.

16      Q    Okay.  Are there pictorial cues used?

17      A    Yes, there are.

18      Q    Are there transitional cues?

19      A    Yes.

20           MR. BOGIN:  Objection.  Asked and answered.

21           HEARING OFFICER:  Sustained.

22           BY MS. GEORGE:

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 128

1    Q    Okay.  If they're a student who had sensory

2  needs do you think that the classroom would be

3  appropriate for him?

4    A    Yes, I do.

5    Q    Okay.  Now, have you reviewed all the --

6          MR. BOGIN:  Objection.  She asked an opinion

7  question without qualifying her.

8          HEARING OFFICER:  Sustained.  Are you asking

9  it be stricken from --

10          MR. BOGIN:  Yes.

11          HEARING OFFICER:  Lay a foundation.

12          MS. GEORGE:  I'll move on.

13          BY MS. GEORGE:

14    Q    Did you review some evaluations -- did you

15  review the evaluations I provided you with --

16    A    Yes, I did.

17    Q    -- for J████ A█████?

18    A    Uh-huh.

19    Q    And did you note that he has some sensory

20  difficulties or needs?

21    A    Yes.

22    Q    Do you recall that?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 129

1       A       Yes.

2       Q       Okay.  Do you think that the program at Anne

3   Beers could assist him with those needs?

4               MR. BOGIN:  Objection.  Asks for an opinion

5   without qualification.

6               HEARING OFFICER:  Sustained.  You've got to

7   find out what is she basing her opinion on and lay a

8   foundation for that for the record.

9               BY MS. GEORGE:

10      Q       Well, you're familiar with the program at

11  Anne Beers, right?

12      A       Yes, I am.

13      Q       And you're familiar with what it can provide

14  with regard to -- strike that.  Never mind.  Are you

15  familiar -- you testified earlier that you're familiar

16  with the IEP I provided you --

17      A       Yes.

18      Q       -- for the 12th?  And there were several

19  IEPs but they were all the same but there were three

20  separate dates on them.  Can you implement that IEP at

21  Anne Beers or could you have in the 07/08 year?

22      A       Yes, we could.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 130

1        Q        And could you have provided the related

2    services on there, the OT services and the speech and

3    language services?

4        A        Yes, we could.

5                 MS. GEORGE:  Okay.  I don't have any other

6    questions.

7                 HEARING OFFICER:  Cross-examination.

8                        CROSS-EXAMINATION

9                 BY MR. BOGIN:

10       Q        Ms. Matthews, can you hear me?

11       A        Yes.

12       Q        Okay.  I believe you said you were the

13   special education coordinator at Anne Beers and at

14   Benning Elementary School?

15       A        Yes.

16       Q        How frequently are you at Anne Beers?

17       A        I'm here four days a week.

18       Q        Okay.  And what's the name of the teacher in

19   that classroom that's proposed for J████?

20       A        Ms. Griffin.

21       Q        Okay.  And how often have you been in Ms.

22   Griffin's classroom?

HEARING IN RE: J████ A█████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 131

1      A      About 50 times.

2      Q      Fifty times this school year?

3      A      Yes.

4      Q      Uh-huh.  So that's about three times a week?

5      A      Yeah, I guess.

6      Q      Well, you guess or you know?

7      A      I'm not sure.  It may not be three times

8  every week.  It depends.

9      Q      Uh-huh.  Why do you go in there?

10     A      Just to go in and see how the kids are

11 doing.

12     Q      So how long are you in there when you go

13 visit?

14     A      Maybe up to about 15 minutes.

15     Q      Fifteen minutes, was that your testimony?

16     A      Yes.

17     Q      Okay.  And what's Ms. Griffin's background?

18     A      Her background is in early childhood.  She's

19 a third year teacher.

20     Q      Uh-huh.  Early childhood education?

21     A      Yes.

22     Q      Does she have any special education

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 132

1    certification?

2        A    Yes, she does.

3        Q    What is that?

4        A    She's certified as a special education

5    teacher, a certified special education teacher.

6        Q    Well, is her background in early childhood

7    or is it a background in special education?

8        A    Both.

9        Q    So she's certified both as early childhood

10   and as special education?

11       A    Yes, that's my understanding.

12       Q    Uh-huh.  And special education for what

13   grades?

14       A    For pre-K, kindergarten.

15       Q    So there's a special education certification

16   for a kindergarten and pre-K?

17       A    Yes.

18       Q    Is that separate from any other special

19   education certification?

20       A    There are other teachers that are certified

21   on the high school level, so --

22       Q    No, ma'am.  Let me ask that question again

HEARING IN RE: J█████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 133

1    for you.  Okay.  Is special education, pre-K and K, a

2    separate special education certification than, say,

3    special education one through eight or nine through

4    twelve?

5         A       It is my understanding that it is, yes.

6         Q       Uh-huh.  And how did you form that

7    understanding?

8         A       Just based on my experience here with D.C.

9    Public Schools.

10        Q       And you deal with certification issues?

11        A       In terms of talking to teachers and asking

12   them what their certification is.

13        Q       Uh-huh.  Okay.  Now, when the school year

14   started how many students were in that classroom?

15        A       When the school year started there were nine

16   students in the classroom.

17        Q       And how many adults?

18        A       At that time there was three adults to one

19   student and we had a dedicated aide.

20        Q       Okay.  And from your testimony is it fair to

21   assume that the student with the dedicated aide is no

22   longer in the classroom?

HEARING IN RE: J███████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 134

1     A     Yes.

2     Q     Okay.  So he or she left and two new

3   students came; isn't that right?

4     A     Well, actually there's nine students in

5   there now.  The class can hold up to 10.

6     Q     Well, wasn't it your testimony that there

7   were 10 students?

8     A     Meaning that the program can have 10

9   students.

10     Q     Ma'am, was it your testimony that there were

11   10 students in the classroom?

12     A     My testimony was that the program can hold

13   10 students.

14     Q     Uh-huh.  You weren't asked how many students

15   the program could hold, were you?

16     A     My testimony was that the program holds 10

17   students.

18     Q     So there are only nine students there?

19     A     Yes.

20     Q     So when you answered that the

21   teacher/student ratio was five to one that wasn't

22   correct either, is it?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 135

1       A       With 10 students in a class it would be 5 to

2       1.

3       Q       Ma'am, you weren't asked what if there was

4       another student.  You were asked what the

5       student/teacher ratio was today, weren't you?

6       A       Again, based on what the program could hold,

7       10 students, it would be 5 to 1.

8       Q       Well, there's only one teacher so it would

9       be ten to one, wouldn't it?

10      A       No, there's a paraprofessional in there.

11      Q       Well, and you --

12      A       Two adults and ten children that can be in

13      the program.

14      Q       Correct, but there's only one teacher,

15      right?

16      A       Yes, there is one teacher.

17      Q       So the student/teacher ratio can go to 10 to

18      1; isn't that right?

19      A       No, again, my position is it's five to one.

20      Q       Well, isn't the other person a

21      paraprofessional?

22      A       Yes, but there's another adult in the

HEARING IN RE: J█████ A█████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 136

1    classroom.

2        Q    Did I ask you about the adult ratio or did I

3    ask you about the teacher ratio?

4        A    Again, this is another person that provides

5    support in the classroom.

6        Q    Okay.  When did you get the documents that

7    you've been looking at?

8        A    I received them last week.

9        Q    Okay.  When -- did Anne Beers Elementary

10   School ever receive an IEP for J████ before December of

11   2007?

12       A    No.

13       Q    Before December of 2007 were you contacted

14   about a placement for J████ A████████ at Anne Beers?

15       A    No, I was not.

16       Q    Did you ever participate in an --

17       A    I'm sorry.  Could you repeat that?

18       Q    Well, is the phone going to ring again or

19   not?

20       A    No, it won't ring.

21       Q    Okay.  Before December of 2007 did you

22   participate in an MDT meeting for J████, A████████ --

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 137

1        A      No.

2        Q      -- or an IEP meeting for J█████ A████████?

3        A      No.

4        Q      Are you familiar with IEPs?

5        A      Yes.

6        Q      Okay.  And tell me what's -- what is

7    required to be in an IEP.

8               MS. GEORGE:  I'm objecting.  This is beyond

9    the scope of my direct.

10              MR. BOGIN:  She talked about how she could

11   implement the IEP.

12              HEARING OFFICER:  Overruled.

13              BY MR. BOGIN:

14       Q      Tell us what's required to be in an IEP.

15       A      Well, of course what the services are, what

16   the goals are for the particular service.  We need

17   performance levels to be in the IEP.  We also need

18   placement consideration and justification for that.

19       Q      Uh-huh.

20       A      We need any modifications or accommodations

21   that the student would need.

22       Q      Uh-huh.  I don't mean to interrupt you.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 138

1    Anything about how progress is determined?

2         A    Yes, that should be in the IEP as well --

3         Q    And that should be --

4         A    -- evaluation schedule.

5         Q    Uh-huh.  And the -- I'm sorry.  I didn't

6    mean to cut you off.  Go ahead.

7         A    And evaluation procedures.

8         Q    Uh-huh.

9         A    That's supposed to be a part of the IEP.

10        Q    And measurement criteria, right?

11        A    Yes.

12        Q    And that's supposed to be all measurable by

13   objective measures, right?

14        A    Yes.

15        Q    Now, you have in front of you DCPS 11,

16   right, which is the DCPS IEP?  Do you have that?

17        A    Yes.

18        Q    Okay.  And when was that --

19        A    It's dated 12-12-06?

20        Q    Yes, ma'am.

21        A    Yes.

22        Q    That was my question.  What's it dated?

HEARING IN RE: J██████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 139

1      A      12-12-2006.

2      Q      Okay.  And what's today?

3      A      Oh, what is it, December 20th, 2007.

4      Q      Okay.  And is -- have you seen an IEP dated

5  more recently than 12-12-06?

6      A      No, I have not.

7      Q      Oh, by the way, what's your background in

8  early childhood education?

9      A      Actually, my background is in social work.

10     Q      Okay.

11     A      I'm a licensed clinical social worker.

12     Q      Are you licensed -- do you have a

13  certification as a special education teacher?

14     A      No, I do not.

15     Q      So it was your testimony that Beers could

16  implement DCPS 11, the IEP for 07/08, right?

17     A      Yes.

18     Q      You weren't testifying as an educator, were

19  you?  You were testifying as a social worker; is that

20  right?

21     A      I was testifying as a special education

22  coordinator.

HEARING IN RE: J████ A█████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 140

1      Q     Well, I understand that, but you don't have

2  a degree or certification in special education, do you?

3      A     Right.  No, I do not.

4      Q     So you were testifying as a social worker,

5  right?

6      A     Yes, my background is in social worker, as a

7  social worker, yes.

8           MR. BOGIN:  Okay.  I don't think I have

9  anything further.

10          HEARING OFFICER:  Redirect?

11          MS. GEORGE:  I just have one question.

12                REDIRECT EXAMINATION

13          BY MS. GEORGE:

14     Q     Ms. Matthews?

15     A     Yes.

16     Q     I just have one more question.  This is

17 Laura George.  At Anne Beers do you keep regular and

18 contemporaneous progress notes for the students?

19     A     Yes, the teacher keeps progress notes.

20          MS. GEORGE:  Okay.  Thank you.

21          THE WITNESS:  Okay.

22          HEARING OFFICER:  Ms. Matthews?

HEARING IN RE: J██████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 141

1          THE WITNESS:  Yes.

2          HEARING OFFICER:  This is Will Purcell, the

3   hearing officer.

4          THE WITNESS:  Uh-huh.

5          HEARING OFFICER:  I need you to take a look

6   at DCPS 12 and DCPS 13 and let me know when you've had

7   a chance to look them over.

8          THE WITNESS:  Okay.  What exactly is that?

9          HEARING OFFICER:  I'm sorry.  DCPS 12 -- can

10  you grab it?

11         MR. BOGIN:  Yeah.

12         HEARING OFFICER:  Thank you, sir.  Let's

13  see.  DCPS 12 at the top of the page, it says to

14  Zaundra Johnson from Ms. Meshak.  It's dated June 11th,

15  2007.

16         THE WITNESS:  Yes.

17         HEARING OFFICER:  And DCPS 13 is titled a

18  progress report, 3 year old, school year 2006/2007.

19         THE WITNESS:  Okay.

20         HEARING OFFICER:  Have you reviewed those

21  documents?

22         THE WITNESS:  Yes.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 142

1            HEARING OFFICER:  Okay.  What are these

2    documents and what are they intended to show?

3            THE WITNESS:  It looks like the one that

4    says District of Columbia Public Schools, Office of

5    Academic Services, is a progress report for the

6    student, and it shows the student's progress in the

7    classroom.

8            The second one appears to be a memo that was

9    written by the teacher, Zaundra Johnson, that addressed

10   specifically the goals that are in the student's IEP

11   and as to whether the student has mastered the goals or

12   not.

13           HEARING OFFICER:  In your review of the

14   document did you review that in conjunction with the

15   December 12th, 2006 IEP?

16           THE WITNESS:  Yes.

17           HEARING OFFICER:  Were you able to assess

18   progress based on those documents?

19           THE WITNESS:  Yes.

20           HEARING OFFICER:  What is your assessment?

21           THE WITNESS:  That the student was not

22   making significant progress.

Page 143

1              HEARING OFFICER:  Okay.  Anything else for

2    this witness?

3              MR. BOGIN:  No.

4              HEARING OFFICER:  Ms. George?

5              MS. GEORGE:  No.

6              HEARING OFFICER:  Thank you for your time

7    and testimony, ma'am.

8              THE WITNESS:  Okay.

9              HEARING OFFICER:  All right.

10             MS. GEORGE:  Bye-bye.

11             THE WITNESS:  Bye.

12             MR. BOGIN:  Do you want to call your other

13   witness or do you want to --

14             MS. GEORGE:  You have left the parents; is

15   that right?

16             MR. BOGIN:  Yeah.

17             MS. GEORGE:  I can call her now if it

18   doesn't matter to you.

19             MR. BOGIN:  It doesn't matter to me.

20             MS. GEORGE:  Okay.

21             MR. BOGIN:  And then we'll see in terms of

22   time.

HEARING IN RE: J██████ A████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 144

1           MS. GEORGE:  Okay.  I'll call up Zaundra

2    Johnson.

3           (There was a brief pause in the

4    proceedings.)

5           FEMALE SPEAKER:  Good morning -- good

6    afternoon, I'm sorry.  Care center.

7           MS. GEORGE:  Good afternoon.  This is Laura

8    George from Office of General Counsel, and I'm looking

9    for Zaundra Johnson.

10          FEMALE SPEAKER:  Laura, I'm going to have to

11   take your number and give her the message.  She's down

12   on the lower level right now.

13          MS. GEORGE:  Okay.  We're at a hearing right

14   now and she's anticipating testifying.

15          FEMALE SPEAKER:  Do you want me to go get

16   her?

17          MS. GEORGE:  The student is J████ A███████.

18   Right.  Okay.  They're going to get her.

19          HEARING OFFICER:  Do you guys want to go off

20   record?

21          MR. BOGIN:  Yeah.

22          HEARING OFFICER:  How much time do you need?

Page 145

1          MS. GEORGE:  I have no idea.  Probably three

2     minutes.

3          (There was a brief recess in the

4     proceedings.)

5          HEARING OFFICER:  Okay.  We're back on

6     record in the matter of J████ A████████, born ██████████,

7     2003.  Ms. George, do you have a witness on the phone?

8          MS. GEORGE:  Yes, I do.

9          HEARING OFFICER:  Who do we have?

10         MS. GEORGE:  Zaundra Johnson.

11         HEARING OFFICER:  Okay.  Ms. Johnson, this

12    is Will Purcell, the hearing officer.  Can you hear me

13    okay?

14         THE WITNESS:  Yes, sir.

15         HEARING OFFICER:  Would you raise your right

16    hand, please?

17         THE WITNESS:  Yes

18              ZAUNDRA JOHNSON,

19    having first been duly sworn, was examined and

20    testified telephonically as follows:

21         HEARING OFFICER:  Okay.  Ms. George.

22              DIRECT EXAMINATION

HEARING IN RE: J█████ A███████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 146

1          BY MS. GEORGE:

2      Q    Ms. Johnson, could you state your occupation

3  and where you work, please?

4      A    I am the supervisor for early childhood

5  special education with the District of Columbia Public

6  Schools, and I am located at the care center

7  (inaudible) school.

8      Q    Okay.  Can you tell us what licenses and

9  degrees you hold?

10      A    Let me see.  I hold a license as a clinical

11  -- as a school psychologist.  My master's is in

12  clinical psychology.  My bachelor's is in psychology.

13  My EDS is in special education, and I am a third year

14  doctoral student for administration.  I also hold a

15  special education teaching -- teacher's certificate in

16  the state of Maryland.

17          HEARING OFFICER:  I'd ask her to keep her

18  voice up.

19          MR. BOGIN:  Yeah.  I didn't hear that.

20          MS. GEORGE:  Can you keep your voice up and

21  repeat the last thing you said?  They weren't able to

22  hear you.

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 147

1           THE WITNESS:  Yeah.  The last thing I said?

2           MS. GEORGE:  Yes.

3           THE WITNESS:  In regards to being a -- meet

4    the criteria for a special ed. -- certified special ed.

5    teacher in the state of Maryland.

6           BY MS. GEORGE:

7       Q    Okay.  And were you -- have you been

8    qualified as an expert in a due process hearing in the

9    past?

10      A    Yes, I have.

11      Q    An expert in what respect?

12      A    For placement.

13      Q    Oh, for placement?

14      A    Yes.

15          MS. GEORGE:  Okay.  I'd like to ask the

16   witness to be qualified as an expert in placement at

17   this time.

18          MR. BOGIN:  Your Honor, may I?  May I

19   inquire?

20          HEARING OFFICER:  Yes, sir.

21              VOIR DIRE EXAMINATION

22          BY MR. BOGIN:

HEARING IN RE: J████ A████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 148

1      Q      Ms. Johnson, you said you met the criteria

2   for being a certified special education teacher in

3   Maryland.  Are you a certified special education

4   teacher in Maryland?

5      A      No.  My license has expired, but if I were

6   to return there and receive endorsements I have all the

7   qualifications.

8      Q      But you're not a certified special education

9   teacher in the District of Columbia, correct?

10     A      No, I'm a certified school psychologist in

11  the District of Columbia.

12     Q      I appreciate that.  And you're not a

13  certified special education teacher currently in

14  Maryland, correct?

15     A      That is correct, sir.

16     Q      Are you a certified special education

17  teacher anywhere?

18     A      Not -- I do not currently hold a

19  certification in special education.

20     Q      Okay.  And how long have you been at the

21  care center?

22     A      Since August of 2004.

HEARING IN RE: J████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 149

1      Q      And has that always been in the position of

2  supervisor for early childhood special education?

3      A      Yes.

4      Q      And before that were you employed by DCPS?

5      A      No.

6      Q      Who were you employed by?

7      A      Prince George's County Public School.

8      Q      In what position?

9      A      I was the program manager for the

10  (inaudible) Family Learning Center for three years, and

11  then prior to the other fifteen years I was a school

12  psychologist for early childhood special education

13  (inaudible).

14          MR. BOGIN:  Uh-huh.  And -- okay.  I don't

15  have any further questions.  I'm not quite sure what an

16  expert in placement is, so --

17          HEARING OFFICER:  Ms. Johnson, where do you

18  derive -- you said you testified as an expert in

19  placement.  Where -- in your experience where do you

20  derive that experience or level of expertise?

21          THE WITNESS:  Let me clarify it more.  I was

22  designated as an expert in the placement of children in

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 150

1    early childhood programs.

2               HEARING OFFICER:  And what in your

3    experience that we have on record, what gives you that

4    level of expertise?

5               THE WITNESS:  Because I've sat in on

6    numerous IEP meetings, assisted the team in determining

7    an appropriate placement for more than 3,000 children.

8               HEARING OFFICER:  Okay.  And in the IEP

9    meetings you served as the clinical psychologist?

10              THE WITNESS:  As the school psychologist,

11   yes.

12              HEARING OFFICER:  Okay.  And in how many --

13   approximately how many due process hearings have you

14   served as an expert?

15              THE WITNESS:  Only one.

16              HEARING OFFICER:  Mr. Bogin.

17              MR. BOGIN:  Can I follow up?

18              HEARING OFFICER:  Sure.

19              BY MR. BOGIN:

20       Q      I'm trying to understand what being an

21   expert in placement means, so maybe you could help us

22   with that.

HEARING IN RE: J̶̶̶̶ A̶̶̶̶̶̶̶̶
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 151

1    A    I can only tell you from my perspective what

2  it meant for that particular hearing.

3    Q    Okay.  Well, tell us.

4    A    There was a question of whether or not we

5  made the appropriate placement for the child that the

6  hearing was in reference to, and the opposing counsel

7  deemed that we did not make an appropriate one.

8    Q    See, what I'm struggling with is that

9  placement decisions are not -- are supposed to be a

10 team decision, right?

11   A    You're absolutely correct.

12   Q    Okay.  So I understand that being a member

13 of the team is important, but don't you agree with me

14 that when you're being proffered as an expert in

15 placement it's -- implies that you're the individual

16 who makes the placements rather than the team?

17   A    Sir, I can only tell you what the hearing

18 officer allowed.

19       MR. BOGIN:  Well, okay.  I'm going to

20 object.  I don't think it's a recognized field and I

21 think it has to be a team decision.

22       HEARING OFFICER:  Yeah, I think that's if,

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 152

1   in fact, even if she served in the capacity of a

2   placement specialist or something, but it sounded as

3   though she had intimate detail and knowledge for the

4   prior hearing because she participated in the IEP

5   determination of placement, and we may have that

6   similar fact pattern here but I'm not sure if it's

7   necessary or if she qualifies as an expert in that

8   arena.

9           Do you have more to proffer or would you be

10  willing to proceed having heard her testimony, it would

11  be heavily weighted because -- or if, in fact, she

12  participated as a matter of the IEP team?  I'm just not

13  convinced she's an expert.

14          MS. GEORGE:  I'll proceed with my questions.

15          HEARING OFFICER:  Okay.  Thank you.

16           DIRECT EXAMINATION (CONTINUED)

17          BY MS. GEORGE:

18  Q    Ms. Johnson?

19  A    Yes.

20  Q    Are you familiar with J████ A███████?

21  A    Yes, I am.

22  Q    Have you met him?

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 153

1        A       Yes, I have.

2        Q       Okay.  When did you first become familiar

3    with him?

4        A       The first time I was familiar with J█████ was

5    when he came through the care center for assessment,

6    then after we placed him at West I visited the program

7    in supervising our teacher and I observed J█████ in the

8    classroom at West.

9        Q       All right.  At issue in this hearing is his

10   placement at Anne Beers.

11       A       Okay.  I was chair at the meeting for that

12   placement.

13       Q       Okay.  Let me go back to a June 12th, '07

14   MDT meeting.

15       A       Yes.

16       Q       At this meeting -- well, first it says that

17   you were present at this meeting, JoAnn Lowry, Alicen

18   Steele, Carl Anderson and Stephanie Owens, the parents.

19   Who -- aside from the parents --

20             MR. BOGIN:  Could we just have the counsel

21   make sure the record is clear by referring to a record?

22   I'm sorry.

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 154

1          MS. GEORGE:  I'm looking at JA 14, the last

2     page.

3          BY MS. GEORGE:

4     Q     Who are JoAnn Lowry and -- well, who is

5     JoAnn Lowry?

6     A     JoAnn Lowry is the special education teacher

7     here at the care center.

8     Q     At the care center?

9     A     Uh-huh.

10    Q     And was she familiar with J██████ A█████████?

11    A     No, she was not.

12    Q     Okay.  But you had met him?

13    A     Yes.

14    Q     And what was the purpose of this meeting?

15    A     The purpose of the meeting was to update the

16    IEP.

17    Q     Okay.  Why was that taking place in June

18    '07?

19    A     Well, it had taken place in April with the

20    classroom teacher.  However, the parents were not

21    satisfied with the teacher's update of the IEP and the

22    team at the school.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 155

1    Q    In April of '07?

2    A    Yes.

3    Q    Was the IEP changed in April of '07?

4    A    Well, it -- for all practical purpose, no,

5    it was not.

6    Q    It was not?

7    A    The initial IEP was in December of '06, so 4

8    months later or 5 months later in April they had

9    another IEP meeting.

10    Q    Okay.  At this point in June of '07 the

11    parents had raised a concern that the child's progress

12    was not documented by the teacher at West and there are

13    some notes about this in the MDT.  Can you tell us

14    about that?

15    A    Yes.  The parents were concerned that the --

16    when they came to the IEP meeting with the teacher in

17    April that there was -- she did not indicate on the IEP

18    that there was any progress or did not address progress

19    or lack thereof.

20    Q    And did the parents also express at this

21    point that they didn't think West was appropriate for

22    their child?

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 156

1    A    Yes.

2    Q    And were you in agreement, was the team in

3    agreement at that point about West?

4    A    Yes.

5    Q    Okay.  And what was the consensus regarding

6    the lack of progress notes?

7    A    We informed the parents that the -- that we

8    agreed that the teacher should have conducted progress

9    reports, that she did not have to do an annual IEP

10   considering that the IEP had just -- had been -- the

11   initial IEP was conducted on 12-06 and this was April

12   '07, but she should have provided the parents with

13   progress notes.

14   Q    The note says that the MDT agrees that the

15   team should reconvene to discuss J▓▓▓▓▓ progress?

16   A    Uh-huh.

17   Q    Why was it necessary to reconvene?

18   A    Well, once we set up a meeting, an IEP

19   meeting with the parent, we had the teacher to provide

20   us with written documentation for the IEP in regards to

21   J▓▓▓▓ progress, and if I am remembering correctly I

22   think we also had the information from the speech

Case 1:08-cv-00580-RJL    Document 8-4    Filed 07/03/2008    Page 21 of 46
HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 157

1    pathologist, but the parents were concerned that that

2    would not suffice and wanted to reconvene.

3        Q    All right.  So prior to the reconvening were

4    some progress reports developed?

5        A    No, they were not.

6        Q    Okay.  I'm looking at what -- well, what for

7    the record is DCPS 12 and 13.

8        A    Uh-huh.

9        Q    I have a note that says to Zaundra Johnson

10   from Ms. Meshak.

11       A    Right.

12       Q    And it says a goal page update.

13       A    Yes, she did do that.

14       Q    And what was the purpose of this?

15       A    This was to update -- to document J████████

16   progress towards the goals, and she included all of the

17   goals on the IEP and indicated if they had been

18   mastered or not.

19       Q    Okay.  And DCPS 13, I'm looking at a

20   progress report for the school year 06/07, and this is

21   like a form and it has Ps and Ns on it --

22       A    Uh-huh.

HEARING IN RE: J▓▓▓▓▓ A▓▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 158

1        Q      -- also from Ms. Meshak.  Are you familiar

2    with this document for J▓▓▓▓?

3        A      Yes.

4        Q      And what's the purpose of this?

5        A      This also provided progress for -- this is

6    the official progress report for three year olds.  This

7    is also given to our general ed. children.

8        Q      Okay.  Were these provided to the parents or

9    advocate?

10       A      Yes, at the meeting.

11       Q      At the 8-15-07 meeting?

12       A      I believe so.  I cannot say for sure, but I

13   know at least by the June 11th.

14              MR. BOGIN:  Objection.

15              HEARING OFFICER:  Basis?

16              MR. BOGIN:  Well, the answer wasn't

17   responsive to the question.

18              HEARING OFFICER:  Did you get the answer,

19   Ms. George?

20              MS. GEORGE:  Yes, she said it was provided

21   prior to June 11th.

22              HEARING OFFICER:  What are you looking for?

HEARING IN RE: J█████ A█████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 159

1              BY MS. GEORGE:

2        Q      So the team reconvened on 8-15-07; is that

3    correct?

4        A      Yes.

5        Q      Okay.  I'm looking at what is DCPS 3.  Do

6    you have the MDT notes from 8-15-07 in front of them?

7        A      Let me get them.  I have J█████ folder and

8    let me get to it.  Yes, the 8-15-07.

9        Q      Okay.

10       A      Yes, I have that in front of me.

11       Q      The first sentence of the note says the

12   purpose of the meeting is to review J█████ progress

13   and determine if any changes are needed on the IEP.

14   Did the MDT team determine any changes needed to be

15   made to the IEP?

16       A      We -- yes, the placement.  We determined

17   that -- and agreed with the parent that progress had

18   not been made and that J████ would benefit from a

19   smaller classroom setting with a lower teacher/student

20   ratio.

21       Q      Okay.  So you determined that placement

22   needed to be changed?

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 160

1      A      Yes.

2      Q      Okay.  Were there any changes made to the

3  IEP as far as the type of services, the disability code

4  or the hours of services?

5      A      I'm going to refer back to the notes as

6  opposed to my memory.  No.

7      Q      Okay.  So at this meeting was a different

8  placement discussed?

9      A      Yes.

10     Q      With -- among the whole team?

11     A      Yes.

12     Q      Was Anne Beers proposed?

13     A      Yes.

14     Q      Did the parents have questions about Anne

15  Beers?

16     A      They did.

17     Q      Could you describe the discussion concerning

18  Anne Beers?

19     A      They wanted to know about the service

20  delivery model at Anne Beers, how many kids were in the

21  classroom, the qualifications of the teacher and, you

22  know, paraprofessional, and it's a service delivery

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 161

1    model mostly.

2         Q      Okay.  Did you provide answers to those

3    questions?

4         A      Yes, I did.

5              HEARING OFFICER:  She needs to keep her

6    voice up, please.

7              MS. GEORGE:  Oh, the hearing officer asked

8    that you keep your voice up.

9              THE WITNESS:  Okay.  Sorry.

10             MS. GEORGE:  It's hard to hear.

11             THE WITNESS:  I apologize.

12             MS. GEORGE:  You're fine.  Thanks.

13             BY MS. GEORGE:

14        Q      So was the notice of placement provided at

15   this time to Anne Beers?

16        A      Yes, I believe so.

17        Q      Was a written notice of placement provided

18   on this date to Anne Beers?

19        A      Yes, it was.

20        Q      Okay.  Now, are you familiar with the

21   program at Anne Beers?

22        A      Yes, I am.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 162

1    Q      Why do you think it's appropriate?

2           MR. BOGIN:  Objection.

3           MS. GEORGE:  Withdrawn.

4           BY MS. GEORGE:

5    Q      Do you think it's appropriate for J████

6    A███████?

7    A      Yes, I do.

8           MR. BOGIN:  Objection.

9           HEARING OFFICER:  Basis?

10          MR. BOGIN:  This is still an opinion

11   question that she's not qualified.

12          HEARING OFFICER:  Sustained.

13          MS. GEORGE:  She's a member of --

14          HEARING OFFICER:  Yeah, but that doesn't

15   give her -- we don't have the information as it relates

16   to how she knows about the program at Anne Beers.

17          MS. GEORGE:  Okay.  Thanks.

18          BY MS. GEORGE:

19   Q      Are you familiar with the program at Anne

20   Beers?

21   A      Yes, I am.

22   Q      Okay.  How are you familiar with that

HEARING IN RE: J█████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 163

1    program?

2         A     I designed the program at Anne Beers in

3    response to the superintendent's initiative to develop

4    model programs.  Anne Beers was a program that I

5    designed, presented to the LSRT team, the principal,

6    and it was approved.  Part of the design of the program

7    was that I would come on a weekly basis to support the

8    teams.

9              We have at Anne Beers a inclusion program.

10   We have a preschool inclusion program, a preschool

11   self-contained program and a preschool autism program,

12   and that's the first in the city.

13        Q     The first program of its kind in the city?

14        A     Yes.

15        Q     Is it the only program of its kind in the

16   city?

17        A     Yes, it is for preschools.

18        Q     Okay.  And do you think based on your

19   knowledge of the program at Anne Beers that it was

20   appropriate for J█████?

21        A     Yes, I do.

22        Q     Can you be more specific about why it was

HEARING IN RE: J█████ A██████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 164

1    appropriate for J███?

2         A    It's superfluous for J████ because we do

3    know that J████ has some good skills, and we felt that

4    in a program where there was a continuum of service

5    which would allow him to -- as he progressed to be

6    mainstreamed into our inclusion program which has --

7              MR. BOGIN:  Objection.

8              THE WITNESS:  -- a special ed. --

9              HEARING OFFICER:  Just one second.  Give us

10   one second, ma'am.

11             MR. BOGIN:  It's not in the notice, any of

12   that information about inclusion or anything else.  All

13   we know is that the IEP calls for him out of general

14   education.

15             HEARING OFFICER:  Well, this is -- she's --

16             MS. GEORGE:  The inclusion program is for

17   three year olds.  It's not for four year olds.

18             HEARING OFFICER:  Give us a second.  She

19   began by laying the foundation as to what she knows of

20   the program.  She says that she designed the program

21   and now she's -- I think she's relating her information

22   that she has from the student and the IEP to the

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 165

1   information that she has about the program.

2              MR. BOGIN:  I understand that, but what

3   she's talking about is not what's proposed for J█████.

4   What's proposed for J█████ is the full-time special

5   education, so the fact that there's inclusion and all

6   the rest of that is not relevant because that's not

7   what the proposal is.

8              HEARING OFFICER:  Well, no, I think that she

9   mentioned -- I think she was talking about the program

10  in sum, that it has a self-contained classroom, it has

11  an inclusion setting.  She was giving all the different

12  facets of the program.

13             MR. BOGIN:  I don't --

14             HEARING OFFICER:  Okay.

15             MR. BOGIN:  That's not my -- I understand

16  that and that's okay in describing the program.

17             HEARING OFFICER:  Okay.

18             MR. BOGIN:  But that's not okay in saying

19  why it's appropriate because that's not what's

20  proposed.  She can only talk about what's on the

21  placement notice.  We're back to the issue that I

22  raised before, which is of course there's no response,

HEARING IN RE: J████ A███████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

1  and they said they were going to rely on their

2  placement notice, and their placement is out of general

3  education so the other material is not relevant.

4            HEARING OFFICER:  But Anne Beers is on that

5  placement notice, right?

6            MR. BOGIN:  Yeah, and the IEP says out of

7  general education.

8            HEARING OFFICER:  Okay.  But I think she's

9  talking about Anne Beers and it appears that she has

10  intimate knowledge and detail about Anne Beers because

11  she designed the program, so I'm going to allow it.

12  If, in fact, the placement notice said Anne Beers and

13  we just happened upon a witness who designed the

14  program I think the record should give that incident

15  detail.

16            MR. BOGIN:  But that's not the issue.  I

17  mean, I understand that she designed the program and

18  she can talk about the program for the rest of the day.

19  That's not it.  She can't talk about things in the

20  program that make it appropriate if they're not

21  proposed for J█████.  That's the issue.

22            HEARING OFFICER:  The objection is

HEARING IN RE: J██████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 167

1    overruled.

2              MR. BOGIN:  Okay.

3              BY MS. GEORGE:

4         Q    Let me back up.  I'm looking at the prior

5    notice, Ms. Johnson.

6         A    Yes.

7         Q    And it says that a combination general ed.

8    special ed. was rejected because of J█████ needs?

9         A    Correct.

10        Q    It says it was accepted, an out of general

11   education program and a smaller class size?

12        A    Yes.

13        Q    Okay.

14        A    We were placing J█████ in our noncategorical

15   self-contained program which is out of general ed.

16        Q    Okay.

17        A    And it has a -- it has -- no more than 10

18   children are placed in that program and there is a

19   special ed. -- certified special ed. teacher and who --

20   who is a male and he also has years of experience with

21   servicing emotionally disturbed children, and he has a

22   -- his bachelor's -- I mean, his certification is in

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 168

1    early childhood special education and there's also a

2    paraprofessional in the classroom, so we felt that that

3    was appropriate.

4        Q    Okay.  Are you familiar with what has been

5    termed sensory needs that J████ A█████ has, that it

6    was discussed here -- you weren't here -- but that he

7    has a tendency to have sensory overload.  It was --

8            HEARING OFFICER:  Well, ask questions to lay

9    the foundation if she knows.

10           BY MS. GEORGE:

11       Q    Are you familiar with this in regards to

12   J████ A████████?

13       A    I would have to review his records.  Not

14   specifically.

15       Q    Okay.

16       A    Uh-huh.

17       Q    Now, given that there was this problem with

18   -- an admitted problem with a lack of documentation

19   about his progress in the past at West, when you

20   convened on 8-15-07 and made a placement decision was

21   there enough data available to make that decision?

22       A    Yes, we believe so because the notes that

Case 1:08-cv-00580-RJL    Document 8-4    Filed 07/03/2008    Page 33 of 46
HEARING IN RE: J▮▮▮▮▮, A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 169

1    the teacher did provide on 6-17, I believe, she

2    indicated that he had not made progress, and also the

3    advocate, the parent advocate indicated that the child

4    had regressed and the parents indicated that the child

5    had regressed.

6         Q    Okay.  So given the information that was

7    provided to you by the advocate and the parent then,

8    and in addition to the information from Ms. Meshak that

9    was provided in June, the team believed they had

10   sufficient data to make a placement decision, correct?

11        A    Yes, we felt that J▮▮▮▮ would need a more

12   restrictive program with a smaller teacher/student

13   ratio.

14        Q    All right.  Have you visited -- did you

15   visit Anne Beers in the 07/08 school year?

16        A    Yes.

17        Q    How often did you stop by?

18        A    I visited -- I am at Anne Beers every week.

19        Q    Every week?

20        A    Uh-huh.

21        Q    And did you visit the classroom that ▮▮▮▮

22   would have been in?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 170

```
 1       A     Yes.

 2       Q     Okay.  Is it your observation that it was a

 3   particularly noisy classroom?

 4       A     No.

 5       Q     Okay.  Do you know if picture schedules are

 6   used in the classroom?

 7       A     Yes.

 8       Q     Are transitional routines used in the

 9   classroom?

10       A     Yes.

11       Q     How many adults are in the classroom and --

12   just how many adults are in the classroom?

13       A     Two adults.

14       Q     And what are those adults?

15       A     A special education teacher and a

16   paraprofessional.

17       Q     Okay.  Is the classroom very structured?

18       A     Yes, it is.

19       Q     Do the teacher and paraprofessional provide

20   transitional cues?

21       A     Yes, they do.

22       Q     So do you have some familiarity with the
```

HEARING IN RE: J████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 171

1    students that would have been in the classroom if Jesse

2    had attended in the fall of '07?

3        A      Yes, I see them every week.

4        Q      Okay.  Would you characterize them as having

5    a high level of behavior needs?

6        A      No.

7        Q      Is their language functioning low across the

8    board?

9        A      No.

10       Q      Can you describe their behavior needs and

11   their language -- well, let's start with behavior

12   needs.

13       A      They just require a structured routine.

14       Q      Uh-huh.

15       A      There are no -- none of our children are

16   identified as emotionally disturbed.

17       Q      Uh-huh.

18       A      They're all identified as developmentally

19   delayed.  They all have language.  In fact, I conduct a

20   language activity with them because I -- within this

21   model program intensive ongoing staff development is

22   one of the components and modeling the behavior, so I

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 172

1    have conducted speech activities with the children, so

2    --

3         Q    Okay.  Are there varying levels --

4         A    Yes.

5         Q    -- with respect to language?

6         A    Yes, but none of the little ones are

7    severely impaired.

8         Q    Okay.  Is the student to teacher ratio low,

9    do you think?

10        A    Currently we have eight children in the

11   classroom and two adults.

12        Q    What was the case at the beginning of '07?

13        A    At the beginning of the school year?

14        Q    Uh-huh.

15        A    We had four children in the classroom.

16        Q    Okay.  Do you know if that classroom

17   provides models for pragmatic language?

18        A    Yes, they do.  Our speech pathologist

19   conducts class therapy within the classroom providing

20   models and the teacher and the speech pathologist meets

21   on a weekly basis to discuss follow-through the teacher

22   does in the classroom.

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 173

1       Q       Okay.  So with respect to structure are

2   pictorial cues used?

3       A       Yes.

4       Q       And are there previews for upcoming events?

5       A       Yes.

6       Q       Yes?

7       A       Uh-huh.

8       Q       Would you describe the classroom as

9   particularly disorganized?

10      A       No.

11      Q       How would you describe it as far as

12  organization?

13      A       Well, considering that another part of my

14  duties and responsibility, because this is a model

15  program I have my team come out and we structured the

16  classroom, we provided the best practice in regards to

17  the setup of the classroom, so it is organized.

18      Q       Okay.  One more question.  Going back to the

19  MDT notes from 8-15-07 along with you, the parent and

20  the advocate there are two other individuals listed.

21  Marion McDowell?

22      A       Yes, she's a special education, certified

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 174

1    early childhood special education teacher.

2         Q        And Monica Harris?

3         A        Is our speech pathologist.

4         Q        And have they met J█████?

5         A        I don't think that Marion -- I know that

6    Marion had not met J█████, and I would have to look to

7    see if Monica assessed J█████.

8         Q        Why were they part of the team?

9         A        Because it was the summer and they were the

10   available speech and language pathologists and special

11   education teacher on staff.

12        Q        Are they familiarized with the student --

13   were they familiarized with the student before the

14   meeting?

15        A        Yes, I did discuss J█████ with them.

16        Q        Were they provided with some records?

17        A        Yes, they were.

18             MS. GEORGE:  Okay.  I don't have any other

19   questions.  Thank you.

20             HEARING OFFICER:  Okay.  Counsel.

21                      CROSS-EXAMINATION

22             BY MR. BOGIN:

Page 175

1        Q        Thank you.  Ms. Johnson, do you have any

2    documents with you?

3        A        I have J███████ file in front of me, sir.

4        Q        Okay.  But you don't have documents from the

5    hearing, right?

6        A        No, sir, I do not.

7        Q        Okay.  And did you -- you said that you had

8    been to West in the spring of 2007 to J████████

9    classroom; isn't that right?

10       A        Yes, sir.

11       Q        And how many children were in that program?

12       A        The -- at the time, and I am relying on my

13   memory --

14       Q        Uh-huh.

15       A        At the time that -- I believe there was six

16   children with IEPs, six or seven children with IEPs and

17   twelve children, not disabled, typically developing

18   children --

19       Q        Uh-huh.

20       A        -- on my memory.

21       Q        Okay.  And did you talk to the teacher?

22       A        Yes, I did.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 176

1    Q    Did you ask her about how J████ was doing?

2    A    No, that is not the purpose of going there.

3    Q    What was the purpose?

4    A    As supervisor I visit my program.

5    Q    Okay.

6         MS. GEORGE:  I'm going to object to the

7    questions about West since placement at West was not an

8    issue.

9         MR. BOGIN:  She testified that she had been

10   there.  I was just following up on it.  Now --

11        HEARING OFFICER:  Are you done with that

12   line of questioning?

13        MR. BOGIN:  Yeah.

14        BY MR. BOGIN:

15   Q    Are you familiar with the IEP that was

16   developed for J████?

17   A    I am familiar in that yes, I reviewed it.

18   Q    Okay.  And isn't it correct that it contains

19   goals and objectives?

20   A    Which one, the 12-06 one?

21   Q    Yes.

22   A    That it contains goals and objectives?

HEARING IN RE: J████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 177

1      Q      Yes.

2      A      Yes.

3      Q      And how frequently is progress to be

4   measured in that IEP?

5      A      IDEA requires that we do it quarterly.

6      Q      I didn't ask you what IDEA required.  I

7   asked you what the IEP specified.

8      A      I think the IEP says monthly, sir.

9      Q      Okay.  So that's how frequently progress was

10  to be measured; isn't that right?

11     A      You're absolutely correct.

12     Q      Okay.  And was progress measured monthly in

13  the 06/07 school year?

14     A      It was not.

15     Q      Okay.  And you talked about -- well, strike

16  that.  Did you -- you talked about some documents which

17  we know as DCPS 12 and 13.  No. 12 is a memorandum from

18  you to -- I'm sorry, to you from Ms. Meshak.  Are you

19  familiar with that document?

20     A      Just a second.  Let me get to it.  This is

21  the one that says to Dr. Johnson, supervisor, from Ms.

22  Meshak, special education teacher, June 11th, 2007?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 178

1      Q      Yes, ma'am.

2      A      Yes, I have that in front of me.

3      Q      Okay.  Now, the -- the first part says J█████

4  has not mastered the following goals.  Do you see that?

5      A      Yes, I do.

6      Q      And it says cognitive.  And one is he has

7  not mastered identifying his name, correct, and the

8  short-term objective was J█████ will be able to identify

9  his first name in print four out of five opportunities;

10  isn't that right?  That was the first objective on the

11  IEP?

12      A      Let me go back to the IEP.

13      Q      Okay.

14      A      Yes, it is.

15      Q      Okay.  And we can't tell from Ms. Meshak's

16  memorandum whether he can't identify his name in print

17  at all, one out of five times, two out of five times or

18  three out of five times, can we?

19      A      You're absolutely correct.

20      Q      Okay.  So there's no measurable -- and it's

21  the same with everything else in the memorandum; isn't

22  that right?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 179

1      A      That's correct.

2      Q      So there's nothing measurable in that

3   memorandum, is there?

4      A      No, there's not.

5      Q      Okay.  And if you turn over to the progress

6   report, DCPS 13, all we have is progressing and needs

7   supports, right?

8      A      You are correct.

9      Q      And we don't know what the difference

10  between progressing and needs support is, do we?

11     A      You're absolutely correct.

12     Q      And we don't know whether, in fact -- in

13  fact, it seems like progressing and needs support can

14  be synonymous; isn't that right?

15     A      I wouldn't go that far.

16     Q      Well, you could be progressing and still

17  need support; isn't that right?

18     A      Well, we would need to have the criterion

19  which Ms. Meshak was --

20     Q      Correct.  And we don't have those criteria,

21  do we?

22     A      I could not speculate as to what she -- what

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 180

1    criteria she was using for (inaudible).

2         Q    Okay.  Correct.  And we don't know what the

3    difference is between progressing and needs support is,

4    do we?

5         A    You're absolutely correct.

6         Q    Okay.  Now, on 8-15 were you in charge of

7    the MDT meeting?

8         A    I chaired it.

9         Q    You chaired it.  And had -- do you know

10   whether Ms. McDowell and Ms. Harris had been to Anne

11   Beers?

12        A    No, they had not.

13        Q    Okay.  So you were the only person there who

14   had any knowledge of Anne Beers program, correct?

15        A    The program had not been open yet.

16        Q    Okay.  So the program was to open in

17   September of '07 just so we're clear?

18        A    (Inaudible).

19        Q    Okay.  The start of the 07/08 school year?

20        A    Correct.

21        Q    Okay.  And it's your -- it was your

22   testimony that the parents asked -- I'm sorry, the

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 181

1   father and Ms. Owens asked some questions about Anne

2   Beers and there was some description of Anne Beers

3   given.  Wasn't that your testimony?

4        A     Correct.

5        Q     Okay.  Can you tell us where in what we have

6   as DCPS 3 there's any reflection of the questions that

7   were asked or the answers that were given?

8        A     It's not in the notes.

9        Q     Okay.  So who took the notes?

10       A     One of my staff persons.  I believe it was

11  (inaudible).

12       Q     Uh-huh.  Okay.  And if you'd -- do you have

13  the prior notice which is in our record as DCPS 4?

14       A     I'll have to look through the --

15       Q     Uh-huh.

16       A     -- through the folder, and if you could just

17  bear with me.

18       Q     I will.

19             (There was a brief pause in the

20  proceedings.)

21             THE WITNESS:  Yes, I have the prior notice.

22             BY MR. BOGIN:

HEARING IN RE: J▮▮▮▮▮ A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 182

1        Q        Okay.  And is there any description of the

2    Anne Beers program other than that it has a smaller

3    class size?

4        A        Out of general ed.  This will meet his

5    needs, small class size, uh-huh.

6        Q        Right.  So that's the whole description of

7    Anne Beers, right?

8        A        On prior notice.

9        Q        Yes, ma'am.

10        A        Prior notice.

11        Q        And you already admitted to me that there

12    was no description in the notes; isn't that right?

13        A        You're correct.

14        Q        Uh-huh.  Okay.  Now, I'm sorry.  One of the

15    times when your voice dropped you were telling us about

16    the staff at Anne Beers.  Who did you say the teacher

17    was?

18        A        The teacher at that time?

19        Q        Yeah.

20        A        I didn't say who she was.

21        Q        I thought you said that the teacher was

22    certified or something.  I thought you were describing

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 183

```
1   the teacher for us.

2        A     Yes.

3        Q     And what did you say?

4        A     Pardon me?

5        Q     How did you describe the teacher?  We didn't

6   hear it.

7        A     Certified in early childhood special

8   education.

9        Q     Okay.  And who is the teacher?

10       A     The teacher now is Mr. Williams.

11       Q     Uh-huh.

12       A     At the time the first -- when Anne Beers was

13  initially opened it was Mrs. -- what was her name, it's

14  escaping me.  Just a second.  Ms. Griffin.

15       Q     Okay.  And when did --

16       A     She's also early childhood --

17       Q     When --

18       A     -- a certified master's degree from GW in

19  early childhood special education.

20       Q     When did Ms. Griffin leave?

21       A     She's still there.

22       Q     Well, she's not in the --
```

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 184

1      A      We're expanding the program so she's going

2    to have other duties.

3      Q      When did Mr. Williams become the teacher?

4      A      Mr. Williams became the teacher just two

5    weeks ago.

6      Q      Okay.  Uh-huh.  And when the program started

7    there were four children in the classroom?

8      A      That's not my memory in regards to the day

9    that it started.  I can go get my book --

10     Q      No, ma'am.

11     A      -- and find out for sure.

12     Q      No, ma'am.  Please don't go get your book.

13     A      It was not at capacity.

14     Q      Uh-huh.  And did it grow?

15     A      Yes, we place children year round.

16     Q      So what's the size now?

17     A      There's eight children in the classroom.

18     Q      And when -- was there ever a child there --

19    strike that.  Did -- in addition to placing children in

20    the program were children moved out of the program?

21     A      What do you mean moved out?

22     Q      Placed in another program.

HEARING IN RE: J█████ A█████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 185

1       A       (Inaudible) and were placed in another

2   program.

3       Q       Well, did somebody -- did one or more of the

4   children who were in the program go to a different

5   program?

6       A       One child two weeks ago went to another

7   program.

8       Q       Uh-huh.

9       A       Uh-huh.

10      Q       And the staffing in that classroom was

11  always two adults and the children?

12      A       There were three adults and the children.

13  The child that transitioned out of the program had a

14  dedicated aide.

15      Q       Uh-huh.  Okay.

16      A       Uh-huh.

17      Q       Now, you said you had J███████ IEP in front

18  of you or available to you?

19      A       I have it available.  Would you like me to

20  refer to it?

21      Q       Yes, ma'am.

22      A       Okay.  Hold on a second.

HEARING IN RE:  J▬▬▬▬ A▬▬▬▬▬
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 186

1                 (There was a brief pause in the

2    proceedings.)

3                 THE WITNESS:  Yes, I have it now.

4                 BY MR. BOGIN:

5        Q     Okay.  And when was the IEP developed?

6        A     The initial IEP was developed on 12-12-06.

7        Q     Okay.  Was there a subsequent IEP?

8        A     We have an IEP in August.

9        Q     Uh-huh.  And the only change I believe you

10   told us on direct to the IEP was the placement; isn't

11   that right?

12       A     Correct.  That's what I said.

13       Q     So have there been -- you agree with me that

14   today is December 20th, right?

15       A     Correct.

16       Q     And that's more than a year after December

17   12th; isn't that right?

18       A     That is correct.

19       Q     And have there been new goals and objectives

20   developed?

21       A     No, because J▬▬▬ did not enroll in August.

22       Q     And the only way a child gets a new IEP is

HEARING IN RE: J██████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 187

1   if he enrolls in the DCPS program.  Is that your

2   testimony?

3        A      In early childhood special education, yes,

4   sir.

5        Q      Okay.  So if a child is eligible for

6   services but isn't in a DCPS program he or she doesn't

7   get an IEP; is that right?

8        A      No, that's not what I said.

9        Q      Okay.  Well, what did you say?

10       A      In the case of J████ the only way we could

11  have updated his IEP is if he had been enrolled in a

12  DCPS school in our program or another DCPS school.  He

13  was not.

14       Q      I was going to say what has prevented you

15  from updating his IEP?

16       A      J████ is not in any of our programs.

17       Q      Well, how does that prevent you from

18  updating his IEP?

19       A      Because he's not enrolled in a District of

20  Columbia public school.

21       Q      I see.  But aren't there -- there are

22  children --

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 188

1    A    We don't have access to him.

2    Q    Oh, really?  Did you ask?

3    A    Well, no, we don't ask -- we don't go in the

4  community and ask people who are not enrolled in DCPS

5  if you have an IEP and you want it to be updated.

6    Q    I see.  So for children who are placed by

7  DCPS in nonpublic special education programs in early

8  childhood they don't get IEPs?

9    A    The nonpublic (inaudible) takes care of

10  them, not early childhood at the care center.

11    Q    I see.  So it's a bureaucratic issue as to

12  who's responsible, not who is entitled; is that right?

13    A    That's your opinion, sir.  It is not a fact.

14    Q    Okay.  Did you try and update J██████ IEP

15  since August of 2007?

16    A    J█████ was not enrolled in DCPS.  No, we do

17  not update children --

18    Q    What does enrolled mean?

19    A    -- who are not enrolled in DCPS.

20    MS. GEORGE:  I'm going to object because --

21  and I should have objected a little while ago.  There's

22  no allegation that the IEP is currently in need of

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 189

1    being updated.

2            HEARING OFFICER:  So the basis for your

3    objection?

4            MS. GEORGE:  The allegation is it's not

5    encompassed in the complaint.  The complaint is solely

6    that placement was inappropriate.  The complaint was

7    filed before the IEP is supposedly in need of update.

8            MR. BOGIN:  Exactly.

9            MS. GEORGE:  It can't encompass this.

10           HEARING OFFICER:  Your basis is relevance?

11           MS. GEORGE:  Yes, thank you.

12           MR. BOGIN:  Exactly, but they haven't done

13   anything and now it's expired.  I mean, we can't

14   anticipate their failure.  We can only talk about what

15   happened, but now we know that the IEP is out of date.

16           HEARING OFFICER:  Well, how many more

17   questions do you have in regards to this in light of

18   the fact that this is not going to the issue?

19           MR. BOGIN:  I think we've made the point.

20           HEARING OFFICER:  Okay.  Go ahead.

21           BY MR. BOGIN:

22      Q    Are any of the children at Beers receiving

HEARING IN RE: J███████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 190

1    psychological services in the --

2        A    Is that something we can divulge to you?

3        Q    Yes, ma'am.

4            HEARING OFFICER:  Before we move on I just

5    need clarification.  Did DCPS place -- make a private

6    placement here?

7            MR. BOGIN:  No.

8            HEARING OFFICER:  Okay.  I was just going to

9    your earlier question.

10           MR. BOGIN:  I was just trying to explore

11   with her who --

12           HEARING OFFICER:  I appreciate it.

13           BY MR. BOGIN:

14       Q    Okay.  Did you hear my question, ma'am?

15       A    Please repeat it.

16       Q    Okay.  Do any of the eight children in the

17   classroom we're talking about receive psychological

18   services?

19       A    No.

20       Q    How many of them get occupational therapy?

21       A    I couldn't tell you offhand, but they do

22   receive services from occupational therapists.

HEARING IN RE: J█████ A████████

CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 191

1      Q      How many of them get speech and language

2   therapy?

3      A      Oh, I'm more than sure that 99 percent of

4   them do, and there's a full-time occupational therapist

5   there.

6      Q      There is?

7      A      Yes.

8      Q      Would you like to know that Ms. Matthews

9   says that there was a part-time special education --

10   I'm sorry, occupational therapist.  Was she incorrect?

11      A      Well, she may be.  It may have just changed.

12      Q      I see.  When would it had have changed?

13      A      I don't know.

14      Q      Okay.

15      A      But it's my understanding from the last time

16   I was there.

17      Q      When was the last time you were there?

18      A      Last week.

19      Q      And you know Ms. Matthews testified today,

20   right?

21      A      (Inaudible) I stand corrected.

22      Q      I'm just asking.

Page 192

1              MS. GEORGE:  Objection.  She wasn't here.

2    How would she know?

3              BY MR. BOGIN:

4        Q    So 99 percent of the children get speech and

5    language therapy.  Is that your testimony?

6        A    Without looking at everyone's IEP I would

7    say yes.

8        Q    Well, were you involved in placing all of

9    the children at -- all of the eight children at Beers?

10       A    No, I was not, but my data that I review on

11   a monthly basis on all of our children so that we can

12   accurately program for them and get an indication of

13   what are needed services for our program, 90 percent of

14   our children have speech and language.

15       Q    Is that 90 percent or 99 percent?

16       A    Well, I said that without having the IEP in

17   front of me --

18       Q    Uh-huh.

19       A    -- so please don't hold me to that.

20       Q    Well --

21       A    I can tell you exactly if you would like to

22   hold on.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 193

1    Q    No, ma'am.

2         HEARING OFFICER:  No.

3         THE WITNESS:  Okay.

4         BY MR. BOGIN:

5    Q    The answer might be you don't know.  Is that

6    a possible answer?

7    A    I think I've said that in the beginning.

8    Q    Okay.

9    A    I qualified my answer.

10        MR. BOGIN:  I don't have anything further.

11        HEARING OFFICER:  Redirect?

12        MS. GEORGE:  Yes.

13              REDIRECT EXAMINATION

14        BY MS. GEORGE:

15   Q    Ms. Johnson?

16   A    Yes.

17   Q    I just have one follow-up question.

18   A    Uh-huh.

19   Q    You described for opposing counsel that the

20   notes -- the MDT notes for 8-15-07 didn't fully reflect

21   the questions and answers that went on between you and

22   the parents regarding the placement issue; is that

HEARING IN RE: J█████ A█████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 194

1    correct?

2        A    Correct.

3        Q    Okay.  I'm looking at the MDT notes for that

4    day.  Do you have them in front of you?

5        A    Let me go back to it.  Yes.

6        Q    Okay.  Well, it states here that the father

7    raised concerns about the class size of the inclusion

8    class at West.  The father was given the option to

9    place J████ in a smaller class but it would not be an

10   inclusion class, but an out of general education class

11   with fewer children?

12       A    Yes.

13       Q    Further down it says DCPS answered parents'

14   questions about service delivery models offered by DCPS

15   and options for J████?

16       A    Yes.

17       Q    Does this -- is this accurate at least in

18   respect to part of the questions and answers that were

19   provided?

20       A    Yes, it was.  I believe our meeting was like

21   three hours, so the notes do not reflect everything

22   that was said in the meeting.

HEARING IN RE: J███████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 195

1          MS. GEORGE:  Okay.  Thank you.  That's the

2   only question I have.

3          HEARING OFFICER:  Ms. Johnson?

4          THE WITNESS:  Yes, sir.

5          HEARING OFFICER:  This is the hearing

6   officer.

7          THE WITNESS:  Yes, sir.

8          HEARING OFFICER:  In your experience what

9   constitutes a low student/teacher ratio?

10          THE WITNESS:  For early childhood programs

11   when we say low teacher/student ratio we do not place

12   more than 10 children in the classroom with 2 adults.

13          HEARING OFFICER:  Okay.  So it's a student

14   to adult ratio and not a student to teacher ratio?  I'm

15   just trying to be clear.

16          THE WITNESS:  Yes.  Well, also the teacher

17   ratio too.

18          HEARING OFFICER:  Okay.

19          THE WITNESS:  I'm sorry.  Yes, it is when I

20   -- when we speak in that manner it is adults because it

21   allows the paraprofessional -- allows for her to work

22   in a small group with children too, but the teacher of

HEARING IN RE: J███████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 196

1    course delivers the instruction.

2                    HEARING OFFICER:  Okay.  So in your

3    experience relevant to this particular student a low

4    student to adult ratio -- or a low student to teacher

5    ratio would be 10 students to 2 children -- 10 students

6    to 2 teachers -- 2 adults?

7                    THE WITNESS:  Yes, sir.

8                    HEARING OFFICER:  Okay.  Do you recall

9    reviewing any evaluations with the IEP team?

10                    THE WITNESS:  Pardon me?

11                    HEARING OFFICER:  Do you recall reviewing

12    any student evaluations with the IEP team for this

13    student?

14                    THE WITNESS:  For the 8-15 meeting, sir?

15                    HEARING OFFICER:  Is that the only meeting

16    that you attended?

17                    THE WITNESS:  I attended the 8-15 and the

18    6-17.

19                    HEARING OFFICER:  Right.  For both of those

20    meetings did you review any student evaluations?

21                    THE WITNESS:  No, we did not review a

22    student evaluation.  I did have my staff review the

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 197

1   child's records but not in the meeting officially

2   review the record.

3            HEARING OFFICER:  Okay.  For this particular

4   student what's the significance of tracking month

5   monthly progress towards goals?

6            THE WITNESS:  You track monthly progress in

7   order to let data drive instruction.  If the child, if

8   you note that the child is not achieving the goal then

9   you make adjustments in the classroom, i.e. you may

10  provide opportunities for the child to work on that

11  goal.

12            You may consult with a speech pathologist or

13  another service -- related service provider or another

14  teacher in regards to what am I doing wrong here or how

15  can we change, make changes so that he will benefit so

16  that he will, you know, improve in this area, or you

17  may see that it may be developmentally too high for the

18  child and may need to change it, so you want to keep

19  track of the child's progress as frequently as possible

20  so that you can make those needed adjustments.

21            HEARING OFFICER:  Okay.  But is it your

22  testimony that at the August meeting and the earlier

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 198

1    meeting you did not have access to that information?

2           THE WITNESS:  The information, I did not

3    have access to it from the teacher, no, but we did

4    accept the testimony -- not the testimony but the

5    parents' position and the advocate's position and the

6    overall position of the teacher that progress was not

7    made.

8           HEARING OFFICER:  So the team's

9    determination to change the student's placement was not

10   based on a finding of monthly progress or lack thereof.

11   It was simply based off of the recommendations and

12   concerns raised by the educational advocate and the

13   parent?

14          THE WITNESS:  And the teacher.  Although she

15   did not document it in a formal manner on the IEP she

16   did agree and state that the child had not made

17   progress in a lot of the areas.

18          HEARING OFFICER:  Okay.  You also testified

19   that all of the students in the Beers classroom where

20   this particular student would be placed, they all have

21   developmental delays?

22          THE WITNESS:  Yes, sir.

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 199

1          HEARING OFFICER:  Okay.  And none of those

2   students are receiving psychological counseling?

3          THE WITNESS:  No, they are not, sir.

4          HEARING OFFICER:  In your experience is that

5   related service required for that disability

6   classification?

7          THE WITNESS:  For developmentally delayed?

8          HEARING OFFICER:  Right.

9          THE WITNESS:  No, no.  The -- in my 25 plus

10  years of experience we -- let's see.  I'll just speak

11  for the District of Columbia.  I think we have had in

12  three years, and we service four hundred plus children

13  a year, assess that many children a year, I think we

14  have maybe two who we provided with psychological

15  services --

16          HEARING OFFICER:  And you're a clinical

17  psychologist?

18          THE WITNESS:  -- who were developmentally

19  delayed.

20          HEARING OFFICER:  Okay.  And you're a

21  clinical psychologist, correct?

22          THE WITNESS:  My master's was in clinical

HEARING IN RE: J██████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 200

1  psychologist and I'm a certified school psychologist.

2          HEARING OFFICER:  Anything else for this

3  witness?

4          MR. BOGIN:  No.

5          MS. GEORGE:  No.

6          HEARING OFFICER:  Thank you for your time

7  and testimony, ma'am.

8          THE WITNESS:  Thank you, sir.

9          HEARING OFFICER:  Anyone else you want to

10  call before --

11          MS. GEORGE:  I have no other witnesses.

12  Thank you.

13          HEARING OFFICER:  We're back to you.

14          MR. BOGIN:  Okay.  I'm going to call both

15  parents.

16          HEARING OFFICER:  Okay.

17          MR. BOGIN:  Let's start with Mr. Anderson

18  because I think that'll be quicker, and then we'll see

19  where we are.

20          HEARING OFFICER:  Okay.  Do you want to slap

21  the mic. down.  We actually have some extra ones so we

22  can slap that one down and add this one here.

HEARING IN RE: J██████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 201

1                     CARL ANDERSON,

2      having first been duly sworn, was examined and

3      testified as follows:

4                HEARING EXAMINER:  Okay.  Mr. Bogin.

5                     DIRECT EXAMINATION

6                BY MR. BOGIN:

7           Q     Give us your name.

8           A     Carl Anderson.

9           Q     And just so we're clear, what's your

10     relationship to J█████ A████████?

11          A     I'm his father.

12          Q     Okay.  And on August 15th did you attend a

13     meeting at the care center?

14          A     Yes.

15          Q     And do you recall that meeting?

16          A     Yes.

17          Q     In your recollection there was some

18     testimony that the meeting took three hours.  Is that

19     your recollection?

20          A     No.

21          Q     How long did it take?

22          A     Maybe half an hour to 45 minutes.

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 202

1        Q      Now, we all know that at the end of the

2    meeting that you got a placement notice that said that

3    J████ was to be placed at Anne Beers.  Was there any

4    discussion about Anne Beers during the meeting?

5        A      Honestly I don't remember very well.  It may

6    have been discussed near the end, but if it was -- as

7    best I can recall it would have been presented as we

8    have a new program.  And, I mean, the best I can

9    remember is maybe we have a new program and we'll do

10   better with this program than we did with the last one.

11   That's as best I can remember, but I don't remember if

12   even that was said.

13       Q      And when you say we'll do better with this

14   program than the last program was that referring to

15   West?

16       A      Yes.

17       Q      And who would have said that?

18       A      Zaundra Johnson.

19       Q      And did you ask any questions about Beers?

20       A      No, I don't remember.

21       Q      Did Stephanie Owens ask any questions about

22   it?

HEARING IN RE: J███████ A███████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 203

1       A       I don't believe so, no.

2       Q       Why not?

3       A       I just don't have a good memory of it being

4    presented at all honestly.  I cannot remember that part

5    of the meeting.  I remember talking a lot about West.

6    I remember talking about my concerns about West and

7    what was going to happen with J█████, but -- and then I

8    remember, you know, at the end of the meeting saying

9    that we were going to pursue a private school option

10   for J██████.

11          But as far as being offered this Beers

12   option I don't remember that too well and I was at the

13   prior meeting of June, I forget the exact date but the

14   date in June, and at that time she wouldn't, you know,

15   give us any placement at all because her position was

16   until this IEP is updated we can't possibly make any

17   placement recommendation.

18      Q       When you say she who do you mean?

19      A       Zaundra Johnson.

20      Q       Okay.  And so you attended the June 12

21   meeting?

22      A       Yeah.

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 204

1      Q      Tell us about that meeting.

2      A      Let's see.  That one is harder.  I kind of

3   have to look back at the record of that one.  Is it

4   okay if I look back at the meeting notes?  This is a

5   while ago.

6      Q      Well, before you do that you started telling

7   us about requesting a placement at the June meeting.

8      A      Right.

9      Q      Tell us about that.

10     A      Okay.  Let's see.  Let's see.  As best I

11  remember we wanted a placement.  They wouldn't give us

12  any placement.  Our educational consultant, Stephanie

13  Owens, said that, you know, where's the data to try to

14  make a new IEP, and I believe it was at that meeting,

15  June 12th, that they gave us the two items which are --

16     Q      12 and 13?

17     A      -- 12 and 13.

18     Q      Uh-huh.

19     A      Yeah, and at that time we looked at them and

20  thought that that was completely inadequate, that they

21  were supposed to be documenting his progress at least

22  monthly and, you know, asked them if they had that, if

HEARING IN RE: J_____ A_____
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 205

1    they had done that in any way, and Zaundra Johnson said

2    no, I'm afraid we have not done that.  She admitted it.

3    It's actually on the meeting notes that they did not do

4    that.

5        Q    Yeah, let me show you what's in the record

6    as JA 14 and ask if that's what you're referring to.

7        A    Yes, that's right, yes.  Zaundra Johnson

8    stated that the teacher was in error in not documenting

9    the child's progress with evaluation procedures stated

10   on the IEP, and so the meeting basically broke up at

11   that time because I guess Stephanie at that time at

12   that meeting wanted them to at least bring Jesse's

13   teachers to the next meeting so that maybe we'd have

14   more of an input from them, maybe we could come up with

15   some kind of IEP.

16       Q    Okay.  And then did you -- at the June 12th

17   meeting did you ask for where J_____ would go to school?

18       A    I did.

19       Q    And what were you told?

20       A    I was told until we have an IEP we're not

21   going to give you any placement.

22       Q    Okay.  And then how did -- if you recall how

HEARING IN RE: J▮▮▮▮▮ A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 206

1    did the August meeting come about?

2        A    Come about?

3        Q    Who scheduled it?

4        A    I guess it was kind of a follow-up to the

5    June meeting where the hope was that maybe we'd have

6    some more data, you know, because we didn't have

7    sufficient data at the June meeting, so it was hoped

8    that maybe by August they'd come up with something

9    else.

10            You know, at that time they didn't have any

11   new data.  Zaundra Johnson told us so.  At that time we

12   also discussed -- I discussed other issues that I was

13   really upset about with the prior placement at West.

14   One of those was that J▮▮▮▮▮ special education teacher

15   at West I found out through a No Child Left Behind

16   request had no degree, had no training, no

17   certification, no nothing.

18            And I asked her about that.  I asked what

19   are you going to do about that.  She said she's a

20   unionized -- part of the teacher's union.  She was

21   hired under --

22            MS. GEORGE:  Objection.  I move to strike.

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 207

1    This is not relevant to anything regarding this

2    complaint.

3              MR. BOGIN:  We'll move on.

4              THE WITNESS:  Okay.

5              BY MR. BOGIN:

6         Q    So you discussed what other concerns besides

7    the teacher?

8         A    At the West school I discussed how initially

9    J████ was placed at the West school, and I believe

10   there were five to six special ed. kids and nine

11   mainstream kids, and we -- it was presented to us that

12   that was the way it was going to stay and you had one

13   special education teacher, one normal teacher and two

14   aides.

15             MS. GEORGE:  Objection to this line, too.

16   West isn't at issue.

17             MR. BOGIN:  Well, no, but the whole -- the

18   whole purpose that DCPS changed the placement was for

19   smaller class size, so we get to compare what the class

20   size was with what the class size they're proposing is.

21             HEARING OFFICER:  I will allow it.

22             MR. BOGIN:  Okay.

HEARING IN RE: J▆▆▆▆ A▆▆▆▆▆▆▆
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 208

1          THE WITNESS:  Okay.  And so by the end of

2   the year the class size had ballooned to I believe it

3   was nine, nine mainstream, nine special ed. students

4   and I -- we felt, Alicen and I felt that that was part

5   of the problem why J▆▆▆ had difficulty functioning at

6   the school, too many kids, too many kids with real

7   issues and problems making too much noise, that kind of

8   thing.

9          BY MR. BOGIN:

10      Q    All right.  And how many adults?  It was 18

11   children and how many adults?

12      A    I mean, they claimed that it was four, but

13   in reality I rarely saw the fourth person so, you know,

14   to my mind it was three.

15      Q    Okay.  So what's that -- what's the student

16   to adult ratio with 18 students and 4 adults?

17      A    Well, if it was 18 that would be 4 and a

18   half I guess, 4 and a half to 1.

19      Q    And did you hear what the ratio would be at

20   Beers?

21      A    I guess they're claiming it's five to one.

22      Q    Right.  So in your understanding is that a

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 209

1    change?

2        A    A change for the worse perhaps.

3        Q    Okay.  Now, on the August 15th meeting was

4    there a vote about the placement?

5        A    No.

6        Q    Was there consensus about the placement?

7        A    No.

8        Q    How did the placement get made?

9        A    Zaundra Johnson just brought it up out of

10   nowhere, I mean, if she did.  I can't even remember her

11   actually telling us about that, but the record seems to

12   reflect that she did so I can't --

13       Q    Okay.

14       A    But we certainly did not vote on it.  We did

15   not discuss it.  You know, we didn't have input on

16   that.

17            MR. BOGIN:  Okay.  I don't have any further

18   questions.

19            HEARING OFFICER:  Ms. George.

20            MS. GEORGE:  Just a couple of questions.

21                    CROSS-EXAMINATION

22            BY MS. GEORGE:

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 210

1        Q        After the meeting, after you received the

2    prior notice to Anne Beers did you go to visit?

3        A        Alicen did.

4        Q        Okay.

5        A        And Stephanie Owens did.

6        Q        Okay.  But I won't ask you anymore questions

7    about that.  The prior notice states that the -- Anne

8    Beers has a smaller class size.  You'd agree, right,

9    that the class size is smaller than it was at West?

10       A        Smaller than at West.  That's --

11       Q        Ten is smaller than eighteen, right?

12       A        I don't know.  I never went there so I don't

13   know, but 10 is smaller than 18 certainly.

14               MS. GEORGE:  Okay.  That's all.  Thank you.

15               HEARING OFFICER:  Redirect?

16               MR. BOGIN:  None.

17               HEARING OFFICER:  Okay.  Thank you for your

18   testimony, sir.

19               MR. BOGIN:  I have 1:25.  I need to leave at

20   2:00.

21               MS. GEORGE:  Okay.

22               MR. BOGIN:  How would you like to -- I don't

HEARING IN RE: J▮▮▮▮ A▮▮▮▮▮▮▮
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 211

1    want to leave -- I'm not sure that we can finish Ms.

2    Steele by 2 o'clock.

3                 HEARING OFFICER:  We can try.

4            MR. BOGIN:  Okay.  I mean, I just don't want

5    to leave half the testimony and we won't be able to do

6    closing.

7                 HEARING OFFICER:  Yeah, we can brief

8    closing.  I'll leave the record open for close of

9    business tomorrow for closing comments.

10             MR. BOGIN:  Okay.  All right.  We'll call

11   Ms. Steele.

12             HEARING OFFICER:  Ms. Steele, raise your

13   right hand, please.

14                      ALICEN STEELE,

15   having first been duly sworn, was examined and

16   testified as follows:

17                  DIRECT EXAMINATION

18           BY MR. BOGIN:

19       Q     And what's your name?

20       A     Alicen Steele.

21       Q     And just so the record is clear, what's your

22   relationship to J▮▮▮▮ A▮▮▮▮▮▮?

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 212

1   A   I'm J██████ mom.

2   Q   Okay.  Did you have the opportunity to visit

3   the Anne Beers program that was proposed for J█████?

4   A   Yes, I did.

5   Q   And when did you go?

6   A   I went in October.

7   Q   Of what year?

8   A   2007.

9   Q   And with whom?

10  A   With Stephanie Owens.

11  Q   Okay.  And what did you see when you were

12  there?

13  A   Well, first we went and met with the teacher

14  and she had to get ready for a little while because she

15  had not been aware that we were coming, but she was

16  really nice and she met with us and we talked with her

17  for a while about her background and her philosophy,

18  and then we -- the kids came back in the classroom and

19  we got to observe the class.

20  Q   Okay.  And what did you observe?

21  A   As far as the class it was chaos, sheer

22  chaos, kids running around.  They had come in from

HEARING IN RE: J████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 213

1    recess and they're running around.  One kid was shoving

2    another kid into the door.  There was a good 10, 15

3    minutes of really loud chaos.

4                I can't describe it any other way upon their

5    coming in, and it was a room that was all cinderblock

6    or CMU walls, hard floors, no carpeting whatsoever,

7    nothing acoustically dampening in any way so that the

8    noise just bounced from wall to wall, to floor to

9    ceiling to wall, and it was amazing.

10                Then they finally got the kids settled down

11    at a little circle area.  There's a mat in the center

12    of the room and they tried to do these sing song

13    activities and one of the children had a dedicated

14    aide, and basically the entire time I was there the

15    dedicated aide had the child in a bear hug because the

16    child was trying to get away and lunging and

17    disruptive.

18                Two of the other children were rolling

19    around on the mat for the majority of the sing song

20    activity, hitting other kids and not taking part in the

21    activity.  The other kids were trying to pay attention

22    and trying to mimic the songs that the teacher was

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 214

1    singing.  Aside from -- I mean, that actually took

2    quite a while and they were doing that.

3            And then they brought a mechanical parakeet

4    over and tried to say good morning to the different --

5    the different children tried to say good morning to the

6    parakeet and some of them could and some of them could

7    not, and I had the distinct impression that many of the

8    children were preverbal or very, very limited in verbal

9    and, in fact, when I had talked with Ms. Griffin before

10   the children came in she said -- and these were her

11   exact words, I know something is getting in there but I

12   don't -- they can't tell me about it, which tells me

13   they are preverbal.

14           Those were her very words, and she didn't

15   have a sense of the different children's individual

16   issues as individuals.  She just -- you know, I really

17   -- she was really nice and she has such a load on her

18   so I, you know, kind of don't blame her individually,

19   but she didn't have a sense of their individual issues

20   and they're all over the place, and it's just -- it

21   seemed like just a hard situation for her.

22       Q      Okay.  And did you see any other activities?

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 215

1       A       Any other activities besides kind of the

2   shoving and the rolling in the floor and --

3       Q       Well, yeah, or organized activities.

4       A       Yeah.  That was pretty much it, yeah.

5       Q       Okay.  What -- when the children came in

6   from recess and you said it was chaos --

7       A       Uh-huh.

8       Q       -- what was the staff doing?

9       A       Well, the dedicated aide was holding the

10  child and then they were kind of following the children

11  who were the most rambunctious and trying to get them

12  collected and saying calm down, you know, come over

13  here, kind of calling out trying to regain order.

14      Q       And how successful were they?

15      A       Well, eventually they got everyone to sit

16  down on the mat in the center, but it just took a long

17  time, and knowing my son, I mean, this is the thing.  I

18  know my son and he can function at a very good level,

19  almost normal I would almost venture to say but I'm his

20  mother, when things are controlled and the environment

21  is quiet and he has a reassuring presence near him, but

22  in that kind of environment he will go nuts.

HEARING IN RE: J█████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 216

1              He will freak out.  He will become a little

2     animal because he can't deal with it, and that's what

3     we deal with him -- we know him so well.  Day to day he

4     can be doing fine, and then a loud noise or something

5     can just freeze him and make him terrified and make him

6     so he cannot function at a two year old level, much

7     less a four year old level, but then if you can get him

8     retracked and calmed down and focused then all of a

9     sudden he's back up to maybe a three year old level,

10    he's doing better and he's able to learn and able to

11    function, so it was just -- actually, it was a very

12    disturbing visit.

13          Q      Because?

14          A      Because I know that if my son were there he

15    would not be able to cope at all and he would regress.

16          Q      And when you say regress what do you mean?

17          A      I mean very substantial social and emotional

18    backsliding to the point where he starts to lose

19    contact with other people and cannot learn and cannot

20    do things that he could do previously and not just, you

21    know, little tiny adjustments of his behavior but huge,

22    you know, backsliding because that's what happened at

Page 217

1    West.

2        Q    Well, tell -- how did you see that?

3        A    Over the six months or the five months that

4    he was at West -- before he was at West he was at a

5    normal day care, ten kids, two teachers, and we knew

6    that he had trouble socializing and verbalizing, but we

7    -- you know, the teachers are like family and they

8    really were doing their best, no special training but

9    they were doing their best.

10        And they could get him to talk to them

11    occasionally, you know, like on a day-to-day basis,

12    good morning, Ms. Colter (phonetic).  They could get

13    him to tell them the shapes and recite The Little

14    Caterpillar, you know, things -- if the time was right

15    they could get him to -- even Ms. Anthony would say --

16    come up to him and take his juice and say is this my

17    juice, and J█████ would say no, it's mine.  It's J███████

18    is what he would say, and so they were able to get him

19    to interact.

20        Over the time at West we discovered on April

21    18th at that meeting that the teachers at West never

22    got him to talk to them at all.  They were never able

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 218

1    to interact with him on a verbal level at all, and at

2    home it was evidenced by -- and he was not able to

3    interact with his peers, I mean, just -- and you can

4    read Stephanie's report about all the misbehavior and

5    whatnot that were coming out of that frustration.

6           But even at home we were seeing behavioral

7    issues where on Monday morning he would be kind of okay

8    and as the week would progress he would become more and

9    more out of line, harder to control, less able to give

10   me eye contact, where I've never had trouble with him

11   with eye contact as his mother.  We've always been very

12   close, and by Friday he would be like this little

13   animal and then over the weekend we'd start to pull him

14   back and not make it quite back to where we started the

15   previous week, and week after week till the end of the

16   semester he was a wreck.

17          He was -- I could tell he was depressed and

18   he was very, very -- he's always been a very compliant

19   little boy and compliance was completely out the

20   window, and it was terrifying, and just to kind of end

21   it on a happy note we enrolled him in a private summer

22   program, and by the second week they had him

Page 219

1    interacting with them verbally and starting to make eye

2    contact because that was a, you know, a controlled

3    small therapy program.

4              It's just -- it just -- he is so dependent

5    on his environment and it's not just the number of

6    students.  It's how the environment around him can help

7    him function in a constructive way so he can get the

8    foundation to move beyond special education, and of

9    course that's our goal.

10             MR. BOGIN:  I don't have anything further.

11             HEARING OFFICER:  Ms. George.

12                    CROSS-EXAMINATION

13             BY MS. GEORGE:

14        Q    Ms. Steele, you visited Anne Beers in

15    October of '07?

16        A    Uh-huh.

17        Q    Was that after you had placed him at Jenny

18    Walter?

19        A    Uh-huh, yeah.

20        Q    What was the purpose of the visit at that

21    time?

22        A    To see if we could make the Anne Beers

HEARING IN RE: J█████ A██████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 220

1    program work.

2         Q    Could you tell me why you waited until

3    October to visit Anne Beers?

4         A    Well, it was an interesting logistic thing.

5    So we had the meeting in June and they didn't have any

6    reasonable data.

7         Q    Uh-huh.

8         A    And they said well, the next meeting we're

9    going to have the teachers there and we'll be able to

10   talk this out a little bit better and we can't give you

11   a placement now, so we couldn't visit Beers over the

12   summer.  It didn't exist actually.  It didn't exist I

13   guess.

14        Q    Well, it's been established that they did

15   offer placement on 8-15-07, right?

16        A    Well, we haven't got there yet.

17        Q    Well, let's get there because it's really --

18   my question is about if --

19        A    Yeah, but 8-15.  Am I going to wait to find

20   a school for my child until August 15th and just if

21   there's nothing there not send him to school?  I have

22   to -- I mean, over the summer I have to find somewhere

HEARING IN RE: J█████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 221

1  for my child to be recovering from that regression.  I

2  can't let him regress further.

3      Q    So is -- what you're saying is you

4  researched private schools before 8-15-07?

5      A    Yeah, because I didn't have any placement.

6      Q    But even so after the notice of placement

7  was given at Anne Beers you waited until October 5th to

8  go and visit?

9      A    Yeah.

10     Q    Okay.

11         MS. GEORGE:  Okay.  That's all.  Thanks.

12         HEARING OFFICER:  Redirect?

13              REDIRECT EXAMINATION

14         BY MR. BOGIN:

15     Q    Why did you wait until October 5th?

16     A    It's just -- you know, it was such a hard

17  time.  We were trying to -- we were dealing with my son

18  recovering from that spring and the search for a school

19  was not easy.  Finding a place that was appropriate for

20  J████ was not easy because they are few and far

21  between, and if they exist they were full by that time

22  because we didn't know that we didn't have a placement

HEARING IN RE: J▓▓▓▓ A▓▓▓▓▓▓▓
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 222

1   until June.

2           And finally, you know, we found this place

3   and it seemed so appropriate and, you know, what parent

4   isn't going to do what's right for their child

5   immediately if there's something else that can happen,

6   you know, that okay, I could go find out about this

7   other thing but I have to act right now, so that's why

8   we placed him at the Jenny Walter.

9       Q    Okay.  But my question is why did you wait

10  until October 5th to go to Beers?

11      A    Well, it took a while to just get organized.

12  I mean, everything -- it took a while to organize and,

13  you know, between September and October it's one month

14  which is not really that long.

15          MR. BOGIN:  Okay.  We don't have anything

16  further.

17          HEARING OFFICER:  Do you have any other

18  witnesses?

19          MR. BOGIN:  No.

20          HEARING OFFICER:  Okay.  Do you want to get

21  to your next case or do you want to do your closing?

22          MR. BOGIN:  I'd like to -- I need to get to

HEARING IN RE: J█████ A█████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 223

1   F Street.

2           HEARING OFFICER:  All right.  We'll leave

3   the record open for closing briefs.  You can fax it in

4   to the Student Hearing Office.  I can give you my

5   E-mail address and you can E-mail it to me.

6           MS. GEORGE:  E-mail would be fine with me.

7           HEARING OFFICER:  W Purcell, which is

8   P-U-R-C-E-L-L.

9           MR. BOGIN:  P-U-R-C-E-L-L.

10          HEARING OFFICER:  At Verizon dot net.

11          MR. BOGIN:  Okay.

12          HEARING OFFICER:  And I'll have an HOD out

13  10 days from today.

14          MS. GEORGE:  It's W Purcell at --

15          HEARING OFFICER:  Yes, ma'am.

16          MS. GEORGE:  And simultaneously send to

17  opposing counsel?

18          MR. BOGIN:  Yeah, right.

19          MS. GEORGE:  Oh, I don't have your E-mail I

20  don't think.  Do I?  Hold on.

21          MR. BOGIN:  You can send it to Ike's.

22          MS. GEORGE:  I don't have his either.

HEARING IN RE: J███████ A███████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 224

1          MR. BOGIN:  It's on there.

2          MS. GEORGE:  His E-mail?

3          MR. BOGIN:  I'll give it to you.  We don't

4    have to do it on the record.

5          MS. GEORGE:  Oh, you're right.  I'm sorry.

6    Thank you.

7          HEARING OFFICER:  We're adjourned.

8          MS. GEORGE:  Okay.

9          (The hearing was concluded at 1:38 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

HEARING IN RE: J████ A████████
CONDUCTED ON THURSDAY, DECEMBER 20, 1997

Page 225

1                    CERTIFICATE OF TRANSCRIBER

2              I, Bonnie K. Panek, do hereby certify that

3      the foregoing transcript is a true and correct record

4      of the proceedings; that said proceedings were taken by

5      me stenographically and thereafter reduced to

6      typewriting under my supervision; and that I am neither

7      counsel for, related to, nor employed by any of the

8      parties to this case and have no interest, financial or

9      otherwise, in its outcome.

10

11

12

13     BONNIE K. PANEK

14

15

16

17

18

19

20

21

22