IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.A., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | C.A. No. 08-CV-0580 (RJL) |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby file this opposition and reply to defendants' motion for summary judgment and opposition to plaintiffs' motion for summary judgment (hereafter "opposition"). Throughout its opposition, District of Columbia Public Schools ("DCPS") consistently and pervasively mischaracterizes both law and fact, while inflating the substantive value of the hearing officer's determination ("HOD").[1] In his decision, the hearing officer fails to offer a minutia of analysis as to how he reached his conclusion that the parents failed to meet their burden of proof to establish that the proposed Individualized Education Program ("IEP") and placement at Anne Beers Elementary School were inappropriate. The HOD is completely lacking in substance and analysis, is inherently flawed and is not deserving of deference. It should therefore be reversed.

---

[1] Impartial hearing officer Will Purcell, Esq. decided the administrative case in *J.A. v. District of Columbia Public Schools* (January 3, 2008). Citations to this determination will hereafter be to the administrative record which contains the decision at pages 3-8.

**I.    THE DEFENDANTS ERR IN ASSERTING THAT THE HOD IS SUFFICIENTLY DETAILED TO PERMIT THIS COURT TO UNDERSTAND THE HEARING OFFICER'S BASIS FOR RULING.**

**A.    The Hearing officer's Determination is Not Entitled to Deference.**

Defendants desperately try to defend the hearing officer's determination in this case. In their attempt, they seek to rely on *J.P. v. County Sch. Bd. of Hanover County*, 516 F.3d 254 (4th Cir. 2008), in which the Court rejected the argument that a hearing officer is required to include a high level of detail in his decision. However, had defendants taken a cursory look at the actual administrative decision on review before the Fourth Circuit, they would have realized that it differed greatly from the one before this Court. In *J.P.*, the Fourth Circuit ultimately found that the hearing officer's decision was sufficiently detailed to meet its standard. The decision in *J.P.*, was a 25-page opinion that, "included summaries of the witnesses' testimony, an outline of the relevant legal standards, and the hearing officer's findings of fact and legal conclusions. " *Id.* at 262. Moreover, while each summary of testimony was described by the Fourth Circuit as "relatively short (typically a page or two)," each was nearly as long as the *entire decision* in this case. Most importantly, the Court emphasized that, "the summaries by and large captured the essence of the witnesses' testimony on the central issues of the case." There can be no question that the decision here does not come close to meeting the standard set forth by the Fourth Circuit.[2]

---

[2]    Interestingly, the Fourth Circuit noted that the decision could have been more detailed, "We recognize, however, that the hearing officer's opinion could have been more thorough. As the district court noted, only two of the factual findings made by the hearing officer addressed issues about which the parties disagreed, and those findings are about as bare-boned as they could be." *Id*. at 262.

As to witness credibility, the Court in *J.P.* found that, "our case law does not require an IDEA hearing officer to offer a detailed explanation of his credibility assessments." *Id*. at 261. However, this standard does require *some* explanation of credibility. Here, the hearing officer provided *no explanation as to credibility at all,* never mind a detailed one. In his Findings of Fact and Conclusions of Law, the hearing officer only mentions the testimony of two individuals – the two DCPS witnesses (one of whom he does not mention by name), and certainly does not include any sort of credibility assessment. This is shocking considering that a total of *eight* witnesses testified,[3] this certainly does not satisfy the minimum requirement set forth in *J.P.*

Finally, defendants argue that because we have not offered any examples of an "improper process" by which the hearing officer reached his decision, that this Court must give the decision deference. DCPS Opposition at 21. We cannot offer any examples based on the bare-boned decision. We have no idea what sort of process the hearing officer engaged in when reaching his decision. That is precisely the problem and the reason that this Court should not give the decision any deference. Moreover, the defendants further attempt to support the hearing officer and his "process" by pointing out that he questioned many of the witnesses during the due process hearing and asked significant questions. However, he did not include any of this

---

[3] Defendants claim that we are incorrect in our assertion that the hearing officer does not even mention the testimony of Stephanie Owens. DCPS Opposition at 21-22. The hearing officer does briefly mention Ms. Owens in the HOD, but that reference is not to her testimony. Admin. Rec. at 3-4. Instead, he includes a brief statement that Ms. Owens conducted two observations of J.A., and a one-sentence overview of her recommendations for him. This information was taken from Ms. Owen's written report and not her testimony. In fact, the hearing officer cites to her report, which was part of disclosure, in the decision. He does not, however, mention her testimony, which dealt with much more than her recommendations – Ms. Owens was present at *both* of the IEP meetings and testified at length about what occurred at them. None of this information, including the weight that the hearing officer gave to the testimony in reaching his decision, is included in the HOD.

information in the HOD; specifically, he did not indicate how he used the testimony he elicited in reaching his decision. Under the standards set forth by the Fourth Circuit and this Court in *Brahnam v. District of Columbia*, 427 F.3d 7, 11 (D.C. Cir. 2005), *Petway, J.P. v. District of Columbia*, 2005 WL 3276349 (D.D.C. 2005), and *Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (stressing that, "While the Court must give "due weight" to the Hearing officer's decision, a decision without reasoned and specific conclusions deserves little deference."), all of which are discussed in our motion for summary judgment, this decision is not entitled to deference and should be reversed.

    **B.**    **The IEP and Proposed Placement Were Not Appropriate and Denied J.A. a FAPE.**

The IEP here, both in its creation and resulting substance, makes a mockery of the IDEA. We have already set forth the multiple reasons why the unrevised, unmodified, incomplete IEP was inappropriate to meet J.A.'s needs, particularly in light of the fact that he failed to make progress on his goals and objectives and regressed during his time at West.[4] Moreover, the testimony at the hearing, as discussed at length in our motion for summary judgment, details all the reasons why the proposed program at Anne Beers was also not appropriate for J.A. In their opposition, defendants try and discredit Ms. Owen's opinion about the Anne Beers program and

---

[4] Defendants attempt to twist the testimony of Dr. Doyle to show that regression is inherent in J.A.'s disability. DCPS Opposition at 10. This is wrong. Dr. Doyle testified that because of J.A.'s disability, his progress would be gradual and might at times appear as if he is regressing. However, his overall message was that given the right learning environment and program, J.A. could make significant progress. He testified that, "These kids have a different path. They have a very, very different path, and if people don't approach them understanding just how complicated and unique they are they're much more liable to stagnate than develop." Tr at 95. Dr. Doyle was in no way suggesting that J.A.'s lack of progress during his time at West and his failure to meet the goals and objectives in his IEP were acceptable.

why it is not appropriate for J.A. by stating that she observed only once, and the children had just returned from recess, so it was noisier than usual. DCPS opposition at 12. However, defendants fail to address the plethora of other things that Ms. Owens testified about which led her to conclude that Anne Beers was inappropriate for J.A. These included inappropriate models and students at his cognitive and behavioral level (Tr. at 40-41, 43), failure to appropriately chart progress (Tr. at 42), lack of structure (Tr. at 43), lack of transitional cues (Tr. at 43), lack of integrated services (Tr. at 43), and the low level of language in the classroom (Tr. at 43). Ms. Steele, J.A.'s mother, confirmed these concerns in her testimony. Tr. at 211-222.

II. **THE DEFENDANTS' ERR IN ARGUING THAT THE PROCEDURAL VIOLATIONS DID NOT RESULT IN THE DENIAL OF FAPE.**

    A.    **The Defendants Err In Their Assertion that DCPS Convened a Proper IEP Team.**

DCPS makes the ridiculous argument that the IEP team on August 15, 2007 was within the requirements of the IDEA because that team made no modifications to the IEP, but only proposed placement.[5] This assertion is wrong for two obvious reasons. First, the August 15,

---

[5] The Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400. *et seq*., sets forth explicit requirements for the makeup of an IEP team.
    The term "individualized education program team" or "IEP Team" means a group of individuals composed of –
        (I)    the parents of a child with a disability;
        (ii)    not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);
        (iii)    not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child;
        (iv)    a representative of the local educational agency who –
            (I)    is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;
            (II)    is knowledgeable about the general education curriculum; and

2007 IEP team did not *just* determine placement – the school system's own notes from the meeting reflect that team met to *review* J.A.'s progress and determine if changes were needed on the IEP. Admin. Rec. at 127. In fact, Ms. Owens indicated in her testimony that, "we spent the majority of the time on on [sic] that meeting was [the] inability to draft a new IEP." Tr. at 68. Then, over the objection of the parents, and without a complete team, DCPS made the decision that J.A.'s IEP was appropriate and that it did not requires modifications to the goals and objectives. The review of J.A.'s progress, along with the decision, *not to modify his IEP*, required the presence of a full IEP team, and particularly the presence J.A.'s teacher. The IDEA specifies, "A regular education teacher *of the child*, as a member of the IEP Team, must, consistent with paragraph (a)(3) participate in the *review and revision of the IEP of the child*." 30 C.F.R. 300.324 (b)(i)(2) (emphasis added); 5 D.C.M.R 3008. Had DCPS complied with the law and had one of J.A.'s teachers at the meeting,[6] as the parents had requested, it is possible that

---

|      |       |                                                                                                                                                                                                           |
|------|-------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|      | (III) | is knowledgeable about the availability of resources of the local educational agency;                                                                                                                     |
|      | (v)   | an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);                                             |
|      | (vi)  | at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and                    |
|      | (vii) | whenever appropriate, the child with a disability.                                                                                                                                                        |

20 U.S.C. § 1414(d)(1)(B).

[6]    In its opposition, DCPS implies that it satisfied the IDEA requirement to have J.A.'s teacher present because the parents met with J.A.'s teacher in April, 2007 to discuss his progress and because his teacher prepared a one-page goal summary for the team to review. This *clearly* does not satisfy the IDEA requirement that she be present at the meeting to give feedback, address the parents' question and concerns, and provide insightful information to the team about J.A.

the team would have made necessary revisions to the IEP and proposed an appropriate program and placement for J.A.

Second, the DCPS argument that, "The only change that [was] made [to the IEP] was that of *placement*" is simply incorrect.[7] In making the decision to change J.A.'s placement from West ES to Anne Beers ES, the team made a fundamental decision to remove J.A. from an inclusion setting, and place him in a self-contained special education classroom for *his entire school day*. This sort of decision encompasses more than placement, including the type of services provided, the delivery method, and location of those services within the school setting. Moreover, by removing J.A. from the regular education classroom and placing him in a self-contained classroom, the team made the decision to significantly minimize his exposure to his non-disabled peers – something the IDEA takes very seriously.[8] 34 C.F.R. § 300.116; 5 D.C.M.R. § 3011. Given this significant change in the delivery of J.A.'s services, as well as the change in location from an inclusion model, to self-contained classroom, one would have expected a comprehensive discussion of the accommodations and modifications that would need to be adjusted in the new environment. All of these decision must be made by a complete IEP team. Here, they were not.

Finally, defendants fail to address the lack of an Occupational Therapist ("OT") on the IEP team. On the "goal page update" submitted prior to the second IEP meeting, the OT reports that, "J.A. has made some progress in meeting his goals." Admin. Rec. at 114. However, there is

---

[7]   A change *solely* in placement would mean that a student would attend a different Elementary School, but the rest of the services, and how and where they would be delivered would remain exactly the same. This was not he case with J.A.

[8]   The IDEA requires that placement decision be made, "in conformity with the [Least Restrictive Environment] LRE provisions of this subpart . . . ." 34 C.F.R. § 300.116(a)(2).

no information about which goals or objectives he progressed on, what sort of progress he made, how close he is to meeting that goal, what he needs to do in order to move forward, and whether new goals are necessary. Because the OT was similarly lacking from the IEP team meeting, it was impossible to obtain this information or revise the OT goals on the IEP.

### B. J.A.'s Progress Reports Failed to Provide Any Information.

The school system's failure to have a complete IEP team present is particularly egregious in light of the lack of information the team had regarding J.A.'s progress, or lack of progress, during his year at West. In our previous filing we acknowledge that DCPS provided the parents with some sort of "progress report," which was presented to the parents after the first IEP meeting.[9] However, the existence of this "progress report" certainly does not eliminate the fact that DCPS failed to document J.A.'s progress during the time that he was at West on a monthly basis, as required by the IEP. Tr. at 177. The progress report, or goal page update, as it is titled, was dated June 11, 2007 and has no indication that it tracked J.A.'s progress throughout his time at West. Moreover, it merely tells the reader that J.A. did not master the goal and does not provide information as to how close he has come to meeting the goal.[10] As Ms. Owens testified at the hearing, "There is no measurable data here. It's stating if he does nor does not do it. There's no data backing up how often he does it, how - - in what situations he does it, which is

---

[9] The additional "progress reports" that DCPS cites to in its opposition are merely the standard report card and progress report given to other preschool students in DCPS. They are not specific to J.A., and do not report on his progress under his IEP. There was also an "IEP Report Card" which only has information on two goal; that information is incredibly limited. JA-15.

[10] Take for example, J.A.'s motor health goals. His IEP had four pages of motor health goals, with a total of 19 short term objectives, yet the only information provided is, "J.A. has made no progress."

the whole basis of an IEP, having measurable data." Tr. at 64. This failure to adequately report progress is just one more violation in what can only be found as a clear denial of FAPE.

    C.    **The Defendants Fail to Recognize that the Significant and Multiple Procedural Violations Denied J.A. a FAPE.**

The evidence clearly shows, that DCPS committed multiple procedural violations that denied J.A. a FAPE. These were major violations which, when viewed together, denied this family its right to participate in the decision-making process, and ultimately affected J.A.'s right to an appropriate education.

The Supreme Court and this Court have consistently held that compliance with the procedures of the IDEA are of critical importance. In *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176 (1982) the Supreme Court stressed that "the procedural due process protections included by Congress in the IDEA are of critical importance to effectuating the goals of the statute." *Blackman v. District of Columbia*, 277 F.Supp.2d 71, 78 (D.D.C. 2003) citing, *Rowley* 458 U.S, at 205-06. The Supreme Court continued,

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases *79 assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley* at 205-06. More recently, this Court considered the harm that results when a school

system fails to adhere to the procedures required in the administrative process. *Massey v. District of Columbia*, 400 F. Supp.2d 66 (D.D.C. 2005). There, the Court relied on *Blackman* and *Rowley* in noting that, "many of the procedural safeguards in the IDEA are extremely technical, spelling out particular deadlines and required content." The Court went on to rhetorically ask, "Does DCPS mean to imply that it is permitted to violate the IDEA as long as the ways in which it does so are minor? This Court has not been directed to any evidence that Congress intended an exemption for 'close enough.'" *Massey* 400 F.Supp.2d at 73.

There simply cannot be any question as to the harm that occurred in this case from the violations of J.A.'s procedural rights. Had DCPS complied with the procedural requirements of the IDEA and had a complete IEP team with knowledge of J.A. and his abilities and weaknesses, along with progress reports with measurable data, the team might have reached a very different result. At the most basic level, the team would have been able to determine whether the goals and objectives needed to be revised – something the team that was present was not legally qualified to do. Moreover, because the team was lacking these important members, the parents were denied the opportunity to ask question and be active members of the IEP team in developing a program and placement for their son.[11] This is a clear denial of the IDEA.

---

[11] As amended in 2004, the IDEA states that a hearing officer may find that a child did not receive a FAPE if a procedural inadequacy "***significantly impeded the parents' opportunity to participate in the decisionmaking process*** regarding the provision of a free appropriate public education to the parents' child; or caused a deprivation of educational benefit." 20 U.S.C. 1415(f)(3)(E)(ii) (emphasis added). The failure of the school system to have a complete IEP team present to address the parent's concerns about their son impeded the parent's opportunity to participate in the decision-making process in this case, and denied J.A., and his family, a FAPE.

**III.    CONCLUSION.**

Based on the foregoing, we respectfully request that this Court grant summary judgment in favor of J.A. and his parents, vacate the decision of the Hearing officer, and order defendants to reimburse plaintiffs for the expenses incurred in enrolling J.A. at Jenny Waelder Hall for the 2007-2008 school year, with all related services, transportation, costs and attorneys' fees.

Respectfully submitted,

/s/
Michael J. Eig        #912733
Matthew B. Bogin      #911552
Paula A. Rosenstock   #494580

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs